**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| NATALIE DAWN BINGHAM, M.D., M.P.H., *et al*. | ) ) ) | CASE NO. _____ |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | **COMPLAINT** |
| ALAN McCRORY WILSON, in his official capacity as Attorney General of South Carolina, *et al*., | ) ) ) ) ) | |
| *Defendants*. | ) | |

**INTRODUCTION**

1.      Plaintiff physicians have long held sincere religious and conscientious beliefs commanding them to respect the inherent worth of every person, help people in critical need, and place others before themselves.

2.      For Plaintiffs, that includes using their medical training to honor a patient's request to end her pregnancy when it threatens to profoundly harm her.

3.      In 2023, South Carolina banned abortion care after approximately nine weeks of pregnancy upon threat of imprisonment and professional discipline for physicians who perform an unlawful abortion.[1] S.C. Code Ann. §§ 44-41-610–690.

---

[1] *See* Complaint, *Planned Parenthood S. Atl. v. South Carolina*, Case No. 2024CP4000762 (S.C. C.P., Feb. 5, 2024). The plaintiffs in *Planned Parenthood* seek to confirm that the Abortion Ban permits abortion care until approximately nine weeks after the first day of the patient's last menstrual period ("LMP") rather than approximately six weeks LMP. South Carolina physicians, including the Plaintiffs in the present case, are currently observing a six-week gestational age limit for fear of incurring criminal penalties and professional discipline if they are wrong.

4.      In addition to allowing abortion care before approximately nine weeks of pregnancy, the Ban permits abortion care for three secular reasons (collectively, "the Exceptions"): 1) when it is necessary to avert some health risks ("Health Exception"), 2) for some fatal fetal anomalies ("Fatal Fetal Anomaly Exception"), and 3) when the pregnancy was caused by rape or incest that will be reported to law enforcement and the patient is less than twelve weeks pregnant ("Rape or Incest Exception"). South Carolina's Abortion Ban does not allow physicians to provide abortion care mandated by their religious beliefs.

5.      The Health and Fatal Fetal Anomaly Exceptions are so unclear that they often chill Plaintiffs from providing abortion care to patients who need it to preserve their health or those seeking to spare a child diagnosed with a fatal anomaly needless suffering. Because these Exceptions are so vague, when Plaintiffs do provide abortion care to such patients, they are frequently consumed with fear of criminal prosecution, incarceration, and the loss of their livelihood.

6.      Likewise, the Rape or Incest Exception is so narrow that it prevents Plaintiffs from providing abortion care to most patients who became pregnant by rape or incest.

7.      Having to deny or delay abortion care for very ill, grieving, or traumatized patients eviscerates Plaintiffs' core religious convictions and causes them severe emotional distress.

8.      While South Carolina bars Plaintiffs from providing abortion care compelled by their religious beliefs, it allows people to terminate potential life for a wide variety of secular purposes: abortions for any reason up to approximately nine weeks of pregnancy, the Exceptions, and in vitro fertilization ("IVF").

9.      U.S. Supreme Court precedent currently allows South Carolina to criminalize some abortion care. But it does not absolve the State of its constitutional obligation to respect religious

freedom. That is, it does not allow South Carolina to permit abortions when they are provided for secular reasons and criminalize them when they are provided for religious ones.

10.     Plaintiffs seek declaratory and injunctive relief from the Abortion Ban's infringement on their right to be free from unduly vague laws under the Due Process Clause of the Fourteenth Amendment, insofar as the Ban fails to provide adequate notice or guidance of when Plaintiffs can provide an abortion for a severe health risk or fatal fetal anomaly.

11.     Plaintiffs also seek declaratory and injunctive relief from the Abortion Ban's infringement on their right to practice their faith under the Free Exercise Clause of the First Amendment, insofar as the Ban prevents them from providing abortions mandated by their deeply held religious beliefs.

## JURISDICTION, VENUE AND RIGHT OF ACTION

12.     Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(3). This is an action to enforce civil and constitutional rights pursuant to 42 U.S.C. § 1983 and the U.S. Constitution.

13.     This Court has authority to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202, and 1343(a)(3), Federal Rules of Civil Procedure 57 and 65, and the general legal and equitable powers of the Court.

14.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and Local Civ. Rule 3.01(A)(1) (D.S.C.) because Defendant Scarlett Wilson, who is a government officer sued in her official capacity, performs her official duties in this district, and all defendants are residents of South Carolina. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) and Local Civ. Rule 3.01(A)(1) (D.S.C.) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

## PARTIES

I.    **Plaintiffs**[2]

15.    Natalie Dawn Bingham, M.D., M.P.H., is a board-certified obstetrician-gynecologist ("OB-GYN") licensed to practice medicine in South Carolina since 2005. Until December 12, 2024, she provided sexual health, contraceptive, prenatal, labor, delivery, and abortion care in Columbia to patients from throughout the state. She plans to resume providing that care in South Carolina in February 2025. Dr. Bingham is also a Clinical Assistant Professor of Obstetrics and Gynecology and teaches OB-GYN residents and medical students. She is the immediate past Chair of the South Carolina Section of the American College of Obstetricians and Gynecologists ("ACOG") and currently serves as the Chair for the ACOG District IV Legislative Committee.

16.    Dr. Bingham is a life-long Christian and has been Presbyterian since her marriage in 1998. Her faith commands her to respect others' ability to direct the course of their lives. This includes not judging others for their values and choices. In keeping with these tenets, the national governing body of the Presbyterian Church issued a resolution recognizing that "humans are empowered by the spirit prayerfully to make significant moral choices, including the choice to

---

[2] Every Plaintiff sues in their individual capacity and not on behalf of any institution with which they are affiliated.

continue or end a pregnancy."[3] The "induced termination of a pregnancy is a matter of careful ethical decision of the patient . . . and therefore should not be restricted by law."[4]

17.    Dr. Bingham's faith also commands her to use her talents and resources to care for her fellow human beings, which includes shielding them from suffering. As an Elder in the First Presbyterian Church of Spartanburg, for example, she offers inspirational scripture readings and communion to other parishioners, served as Chair for Witness Season, co-chaired the Faith Initiative to End Child Poverty,[5] and was the founder of the Peace and Justice Taskforce.[6] In the spirit of Matthew 25:40, the task force works to dismantle racism through prayer, education, and community advocacy regarding reproductive justice, gun violence, and incarceration.[7]

18.    Dr. Bingham's faith informs her medical practice. For instance, she has always strived not to judge any of her patients and led local and international medical missions. Likewise, she has always tried to empower her patients to make healthcare decisions consistent not only with evidence-based medicine, but also their values and wishes, such as safeguarding their well-being and the quality of their children's lives. This includes the decision to end a pregnancy.

---

[3] *Abortion/Reproductive Choice Issues*, The Presbyterian Church (2006), https://web.archive.org/web/20240712173449/https://www.presbyterianmission.org/what-we-believe/social-issues/abortion-issues/ ; *On Affirming Reproductive Justice*, The Presbyterian Church (2022), https://www.pc-biz.org/search/3001108; *see also Reproductive Rights*; The Presbyterian Church (2025), https://pcusa.org/how-we-serve/justice-peace/reproductive-rights [https://ezproxy.library.und.edu/login?url=https://pcusa.org/how-we-serve/justice-peace/reproductive-rights].

[4] *Id.*

[5] *Faith Initiative to End Child Poverty*, First Presbyterian Church of Spartanburg (2023), https://fpcstage.fosterstaging.com/serve/fiecp; Nickelle Smith, *Alarming statistics prompt 'Faith Child Poverty Summit'*, WSPA News 7 (April 11, 2019) https://www.wspa.com/news/alarming-statistics-prompt-faith-child-poverty-summit/.

[6] *Peace and Justice Taskforce*, First Presbyterian Church of Spartanburg (2025), https://fpcstage.fosterstaging.com/serve/peace-and-justice-taskforce.

[7] *Id.*

19.     South Carolina's Abortion Ban burdens Dr. Bingham's deeply held religious beliefs by forcing her to ignore her patients' informed wish that she protect them from severe physical and mental suffering by ending their pregnancy. Dr. Bingham sues on behalf of herself.

20.     Jane Doe, M.D., M.P.H., is a board-certified OB-GYN and Complex Family Planning specialist. She is licensed to practice medicine in South Carolina. Dr. Doe provides sexual health, complex family planning, routine gynecologic, prenatal, labor, delivery, and abortion care at an academic health center in Charleston to patients from throughout the state. Dr. Doe is also a Professor of Obstetrics and Gynecology with tenure. She teaches OB-GYN residents and medical students.

21.     Dr. Doe is a life-long committed Christian. She grew up attending the Church of the Redeemer in Orangeburg, South Carolina, where she was baptized and confirmed. Since 2009, Dr. Doe and her family have been members of the Grace Church Cathedral in Charleston. There, they are involved in stewardship, including service projects; Christian education; a broad spectrum of youth activities; and fundraising for their community. Dr. Doe's daughter was baptized in the church.

22.     Dr. Doe's faith commands her to serve others in a nonjudgmental, honest, and compassionate manner. This includes alleviating human suffering and maximizing justice in the world. Likewise, Dr. Doe's Christian beliefs require her to live her life with humility, placing others' needs before her own.

23.     Dr. Doe's Christian convictions are what called her to obstetrics and gynecology and complex family planning. As a medical student, she saw women struggle even to obtain information about their sexual and reproductive health because of the stigma surrounding it—let alone timely, appropriate, and respectful care. Her decisions to become an OB-GYN and later a

family planning specialist have allowed her to live her deeply held Christian values and serve those who are marginalized, vulnerable, and in need.

24.     South Carolina's Abortion Ban burdens Dr. Doe's deeply held religious beliefs by forcing her to disregard especially vulnerable patients' wishes because of the predilections of lawmakers, deny these patients abortion care upon threat of her imprisonment and loss of her livelihood, and allow the patients to suffer physical and mental harm. Dr. Doe sues on behalf of herself.

25.     Patricia Seal, M.D., is a board-certified OB-GYN and Complex Family Planning specialist. She is licensed to practice medicine in South Carolina. Dr. Seal provides sexual health, complex family planning, prenatal, labor, delivery, and abortion care at an academic health center in Columbia to patients from throughout the state. Dr. Seal is also the Founder and Director of the Ryan Residency Training Program there and the Medical Director of a health center in Columbia. Dr. Seal is the current Chair of the South Carolina Section of ACOG.

26.     Dr. Seal belongs to the Incarnation Lutheran Church, where she is an active member. All three of her children have attended daycare, after-school care, and Sunday School at the church for the past six years. The cornerstones of Dr. Seal's Christian faith are that God has entrusted each person with the ability to direct the course of their lives and extends unconditional acceptance, support, and love to every person. Dr. Seal tries to follow Jesus's example in everything she does.

27.     The opportunity to care for people and their families throughout their lives drew Dr. Seal to obstetrics and gynecology and complex family planning. Accordingly, she has focused on treating vulnerable people, such as refugees and women with HIV. Allowing a patient to endure

pain and suffering when she could use her medical training to avert it, including by performing an abortion, is anathema to her faith.

28.     South Carolina's Abortion Ban burdens Dr. Seal's faith by forcing her to abandon very sick, grieving, or traumatized patients by withholding abortion care from them. Dr. Seal sues on behalf of herself.

29.     Jessica Tarleton, M.D., M.P.H., is a board-certified OB-GYN and Complex Family Planning specialist. She is licensed to practice medicine in South Carolina. Dr. Tarleton provides hospital-based emergency gynecologic, prenatal, labor, and delivery care at a regional medical center in Florence to patients from throughout the state. She treats a disproportionate number of underserved patients, high-risk patients, and patients experiencing emergencies. Dr. Tarleton is also the current Vice-Chair of the South Carolina Section of ACOG.

30.     Dr. Tarleton was raised by parents with Methodist and Catholic backgrounds who taught her strong values of ethical and altruistic living. She is working with her husband, who is Jewish, to raise their children in the Jewish tradition, instilling values of altruism, justice, and compassion in them. Dr. Tarleton herself has a deeply held conscientious belief that she was put on this Earth to directly serve others, particularly marginalized, stigmatized, and underserved people. This conviction is what drove her to practice medicine, obtain a Master's degree in global health, and focus on women's health. For example, Dr. Tarleton has devoted research and services to underserved populations in Bangladesh, Ethiopia, Colombia, and Bolivia, among other countries. She is currently focused on addressing the high rate of maternal mortality in the United States, which rivals that of many low-income countries. Dr. Tarleton believes as a matter of conscience that having the knowledge, ability, and resources to provide abortion care obligates her to do so when it is needed to preserve a woman's health and well-being.

31.     South Carolina's Abortion Ban burdens Dr. Tarleton's deeply held conscientious belief by forcing her to deny or delay abortion care for very sick, grieving, or traumatized patients. Dr. Tarleton sues on behalf of herself.

32.     Katee L. Wyant, M.D., is a board-certified OB-GYN licensed to practice medicine in South Carolina. Dr. Wyant provides sexual health, cancer, contraceptive, infertility, prenatal, labor, delivery, and abortion care at a health center in Manning to patients from throughout the state.

33.     Dr. Wyant believes as a matter of conscience that the measure of a person's virtue is how they treat others. Thus, it is a conscientious imperative for her to provide the best possible medical care to her patients. Dr. Wyant also holds the conscientious belief that women are capable moral agents who should be trusted to make important decisions about their bodies, lives, and families. For this reason, it is morally repugnant to her to impose such choices on her patients. That includes whether to continue a pregnancy that threatens to seriously harm them or their future child.

34.     South Carolina's Abortion Ban compromises Dr. Wyant's deeply held conscientious beliefs by forcing her to disregard her patients' considered decisions to end a pregnancy when they are very sick, seeking to spare a child diagnosed with a fatal fetal anomaly needless suffering, or struggling with a pregnancy caused by rape or incest. Dr. Wyant sues on behalf of herself.

## II.    Defendants

35.     Alan McCrory Wilson is the Attorney General of South Carolina. South Carolina's Abortion Ban authorizes Attorney General Wilson to bring a "cause of action for injunctive relief" against any physician who violates the Abortion Ban. S.C. Code Ann. § 44-41-680(C)(4). Attorney General Wilson is responsible for upholding the laws of South Carolina, including by representing

the State in legal actions and defending all South Carolina laws against constitutional challenges. *Id.* §§ 1-7-10–1110. He also has the "exclusive right, in his discretion, to [] assign" prosecutors in the State to criminal matters outside their circuits "in case of the incapacity of the local [prosecutor] or otherwise." *Id.* § 1-7-350. Attorney General Wilson is sued in his official capacity.

36.     David Pascoe is the Solicitor for South Carolina's First Judicial Circuit. Solicitor Pascoe is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Pascoe is sued in his official capacity.

37.     Bill Weeks is the Solicitor for South Carolina's Second Judicial Circuit. Solicitor Weeks is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Weeks is sued in his official capacity.

38.     Ernest A. Finney, III is the Solicitor for South Carolina's Third Judicial Circuit. Solicitor Finney is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Finney is sued in his official capacity.

39.     William B. Rogers, Jr., is the Solicitor for South Carolina's Fourth Judicial Circuit. Solicitor Rogers is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes

him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Rogers is sued in his official capacity.

40.    Byron E. Gipson is the Solicitor for South Carolina's Fifth Judicial Circuit. Solicitor Gipson is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Gipson is sued in his official capacity.

41.    Randy E. Newman, Jr., is the Solicitor for South Carolina's Sixth Judicial Circuit. Solicitor Newman is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Newman is sued in his official capacity.

42.    Barry Barnette is the Solicitor for South Carolina's Seventh Judicial Circuit. Solicitor Barnette is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Barnette is sued in his official capacity.

43.    David Stumbo is the Solicitor for South Carolina's Eighth Judicial Circuit. Solicitor Stumbo is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Stumbo is sued in his official capacity.

44.     Scarlett A. Wilson is the Solicitor for South Carolina's Ninth Judicial Circuit. Solicitor Wilson is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes her to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Wilson is sued in her official capacity.

45.     David R. Wagner is the Solicitor for South Carolina's Tenth Judicial Circuit. Solicitor Wagner is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Wagner is sued in his official capacity.

46.     Rick Hubbard is the Solicitor for South Carolina's Eleventh Judicial Circuit. Solicitor Hubbard is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Hubbard is sued in his official capacity.

47.     Edgar L. Clements, III, is the Solicitor for South Carolina's Twelfth Judicial Circuit. Solicitor Clements is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Clements is sued in his official capacity.

48.     W. Walter Wilkins is the Solicitor for South Carolina's Thirteenth Judicial Circuit. Solicitor Wilkins is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes

him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Wilkins is sued in his official capacity.

49.     Duffie Stone is the Solicitor for South Carolina's Fourteenth Judicial Circuit. Solicitor Stone is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Stone is sued in his official capacity.

50.     Jimmy Arthur Richardson, II, is the Solicitor for South Carolina's Fifteenth Judicial Circuit. Solicitor Richardson is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Richardson is sued in his official capacity.

51.     Kevin Brackett is the Solicitor for South Carolina's Sixteenth Judicial Circuit. Solicitor Brackett is charged with prosecuting violations of criminal statutes in cooperation with the Attorney General. *Id.* §§ 1-7-350, 320. Additionally, South Carolina's Abortion Ban authorizes him to bring a "cause of action for injunctive relief" against any physician who violates the Ban. *Id.* § 44-41-680(C)(3). Solicitor Brackett is sued in his official capacity.

52.     The Members of the South Carolina Board of Medical Examiners ("Medical Board Members") are Defendants in this action. The Board of Medical Examiners is responsible for licensing and disciplining physicians and physician assistants who practice in South Carolina. *Id.* §§ 40-47-10(I), 40-1-70. "A physician's license . . . immediately shall be revoked by the State Board of Medical Examiners, after due process according to the board's rules and procedures" for violating South Carolina's Abortion Ban. *Id.* § 44-41-690. Likewise, "[a]ny other licensed person's

13

professional license shall be immediately revoked by the appropriate licensing board, after due process according to that board's rules and procedures" for violating the Ban. *Id.* The Abortion Ban also authorizes the South Carolina Board of Medical Examiners to initiate a complaint, assess fines, and pursue "other disciplinary actions as it may deem appropriate" against a physician or physician assistant who violates the Ban. *Id.* The Board of Medical Examiners currently has nine members. Plaintiffs sue each Medical Board Member in their official capacity.

53.     The Members of the South Carolina Board of Nursing ("Nursing Board Members") are also Defendants in this action. The Board of Nursing is responsible for licensing and disciplining nurses who practice in South Carolina. *Id.* §§ 40-33-10(I), 40-33-110, 40-1-70. The Board of Nursing must immediately revoke a nurse's license after due process for violating South Carolina's Abortion Ban. *Id.* § 44-41-690. The Abortion Ban also authorizes the South Carolina Board of Nursing to initiate a complaint, assess fines, and pursue "other disciplinary actions as it may deem appropriate" against a nurse who violates the Ban. *Id.* § 44-41-690. The Board of Nursing currently has ten members. Plaintiffs sue each Nursing Board Member in their official capacity.

## **FACTUAL ALLEGATIONS**

**I.     South Carolina Bans Abortion Early in Pregnancy Subject to Three Secular Exceptions.**

54.     South Carolina's Abortion Ban criminalizes abortion care after approximately nine weeks of pregnancy. *Id.* § 44-41-630(B).

55.     In addition to allowing abortion care before approximately nine weeks of pregnancy, the Ban permits abortion care in the following circumstances: 1) when it is necessary to avert some health risks, 2) for some fatal fetal anomalies, and 3) when the pregnancy was caused

by rape or incest that must be reported to law enforcement and the patient is less than twelve weeks pregnant. *See infra* ¶¶ 62-82.

### A.    South Carolina's Abortion Ban

56.    The South Carolina General Assembly enacted South Carolina's Abortion Ban on May 23, 2023.[8]

57.    The Abortion Ban criminalizes "perform[ing] or induc[ing] an abortion on a pregnant woman with the specific intent of causing or abetting an abortion" if an embryonic or "fetal heartbeat" has been detected on an ultrasound. S.C. Code Ann. §§ 44-41-630(B), 44-41-330(A). South Carolina defines "fetal heartbeat" as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." *Id.* § 44-41-610(6).

58.    Violations of South Carolina's Abortion Ban are felonies carrying penalties of not more than two years in prison, a fine of ten thousand dollars, or both. *Id.* § 44-41-630(B).

59.    In addition to criminal penalties, anyone who violates South Carolina's Abortion Ban can be sued for "actual and punitive damages" by anyone "upon whom an [unlawful] abortion has been performed, induced, or coerced." *Id.* § 44-41-680(B). The parent or guardian of a minor who obtains an unlawful abortion may also sue the abortion provider for injunctive relief. *Id.* § 44-41-680(C)(2). Additionally, both the South Carolina Attorney General and any prosecutor "with proper jurisdiction" may sue the abortion provider for injunctive relief. *Id.* § 44-41-680(C)(3), (4).

---

[8] *See* S.C. Code Ann. §§ 44-41-610–690. Earlier that year, the South Carolina Supreme Court held that a virtually identical version of South Carolina's Abortion Ban violated the South Carolina Constitution. *Planned Parenthood S. Atl. v. State*, 438 S.C. 188 (2023), *reh'g denied* (Feb. 8, 2023). The current version of the Ban lacks a finding in the previous version that professed a State interest in "informed maternal choice." *Planned Parenthood S. Atl. v. State*, 440 S.C. 465 (2023), *reh'g denied* (Aug. 29, 2023). The South Carolina Supreme Court later held that the current Abortion Ban complies with the South Carolina Constitution. *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 472 (2023), *reh'g denied* (Aug. 29, 2023).

60.     South Carolina's Abortion Ban subjects physicians who perform an unlawful abortion to discipline from the South Carolina Board of Medical Examiners. *See id.* § 44-41-690 (authorizing the Board to take licensure action, assess fines, and pursue "other disciplinary actions as it may deem appropriate" against such physicians). The Abortion Ban directs the Board of Medical Examiners to immediately revoke such a physician's license after due process in accordance with the Board's rules and procedures. *Id.*

61.     Likewise, any other "professionally licensed person" who violates the Abortion Ban (such as a nurse or physician's assistant) will have their license immediately revoked by the appropriate licensing board after due process and may face other professional discipline. *Id.*

## B.    Health Exception

62.     South Carolina's Abortion Ban "does not apply" if, in a physician's "reasonable medical judgment" or "according to standard medical practice," the physician makes at least one of three determinations.[9] *Id.* § 44-41-640(B)(1)–(C)(1).

63.     First, the Ban does not apply if the physician determines that the abortion is performed "to prevent the death of the pregnant woman." *Id.* §§ 44-41-640(A), (B)(1), (C)(1).

64.     Second, the Ban does not apply if the physician determines that "a medical emergency" exists. *Id.* §§ 44-41-640(B)(1), (A).

65.     Third, the Ban does not apply if the physician determines that the abortion is performed "to prevent the serious risk of a substantial or irreversible impairment of a major bodily function, not including psychological or emotional conditions." *Id.* § 44-41-640(B)(1).

---

[9] "'Reasonable medical judgement' means a medical judgement that would be made by a reasonably prudent physician who is knowledgeable about the case and the treatment possibilities with respect to the medical conditions involved." S.C. Code Ann. § 44-41-610(13).

66.    South Carolina's Abortion Ban defines "medical emergency" as when, "in reasonable medical judgment, a condition exists that has complicated the pregnant woman's medical condition and necessitates an abortion to prevent death or serious risk of a substantial and irreversible physical impairment of a major bodily function, not including psychological or emotional conditions." *Id.* § 44-41-610(9).

67.    The Ban identifies certain medical conditions that are "presumed" to "constitute a risk of death or serious risk of a substantial and irreversible physical impairment of a major bodily function," but notes that the list is not exhaustive. *Id.* § 44-41-640(C)(2).

68.    These conditions include: "molar pregnancy, partial molar pregnancy, blighted ovum, ectopic pregnancy, severe preeclampsia, HELLP syndrome, abruptio placentae, severe physical maternal trauma, uterine rupture, intrauterine fetal demise, and miscarriage." *Id.*

69.    South Carolina does not consider an abortion necessary if "performed based upon a claim or diagnosis that the woman will engage in conduct that she intends to result in her death or in a substantial physical impairment of a major bodily function." *Id.* § 44-41-640(B)(3); *see also id.* § 44-41-610(9).

70.    A physician who provides an abortion under the Health Exception must "make reasonable medical efforts under the circumstances to preserve the life" of the embryo or fetus "to the extent that it does not risk the death of the pregnant woman or the serious risk of a substantial and irreversible physical impairment of a major bodily function of the pregnant woman, not including psychological or emotional conditions and in a manner consistent with reasonable medical practices." *Id.* § 44-41-640(B)(3).

71.    A physician who provides an abortion under the Health Exception must also document certain information in the patient's medical record, *id.* § 44-41-640(B)(2), which must

be maintained for seven years, *id.* § 44-41-640(B)(4). A physician who violates this requirement is guilty of a felony and can be imprisoned for no more than two years, fined up to ten thousand dollars, or both. *Id.* § 44-41-640(B)(4)(b).

72.     Physicians must report an abortion provided under the Health Exception to the State Registrar, Department of Health and Environmental Control, within seven days after the abortion is performed. *Id.* § 44-41-60.

### C.     Fatal Fetal Anomaly Exception

73.     It is "not a violation" of South Carolina's Abortion Ban "if an abortion is performed or induced on a pregnant woman due to the existence of a fatal fetal anomaly." *Id.* § 44-41-660(A).

74.     South Carolina defines a "fatal fetal anomaly" as when, "in reasonable medical judgment, the unborn child has a profound and irremediable congenital or chromosomal anomaly that, with or without the provision of life-preserving treatment, would be incompatible with sustaining life after birth." *Id.* § 44-41-610(5).

75.     A physician must rely on "standard medical practice" to determine whether there is a "fatal fetal anomaly." *Id.* § 44-41-660(A).

76.     A physician who provides an abortion under the Fatal Fetal Anomaly Exception must document certain information in the patient's medical record and maintain the record for at least seven years after the abortion is performed. *Id.* § 44-41-660(B). A physician who violates this requirement is guilty of a felony and can be imprisoned for no more than two years, fined up to ten thousand dollars, or both. *Id.* § 44-41-660(C).

77.     Physicians must report an abortion provided under the Fatal Fetal Anomaly Exception to the State Registrar, Department of Health and Environmental Control, within seven days after the abortion is performed. *Id.* § 44-41-60.

### D.    Rape or Incest Exception

78.    Finally, South Carolina allows a physician to "perform, induce, or attempt to perform or induce an abortion" if the pregnancy was the result of rape or incest and "the probable gestational age of the unborn child is not more than twelve weeks" after the first day of the patient's last menstrual period ("LMP"). *Id.* § 44-41-650(A).

79.    The physician "must report the allegation of rape or incest to the sheriff in the county in which the abortion was performed" within 24 hours of performing the abortion. *Id.* § 44-41-650(B). The report must include the name and contact information of the patient. *Id.*

80.    Before providing the abortion, the physician must notify the patient that they will report the allegation of rape or incest to law enforcement. *Id.*

81.    A physician who provides an abortion under the Rape or Incest Exception must document certain information in the patient's medical record, including the report to law enforcement. *Id.* § 44-41-660(B). A physician who violates this requirement is guilty of a felony and must be imprisoned for no more than two years, fined ten thousand dollars, or both. S.C. Code Ann. § 44-41-660(C).

82.    Physicians must report an abortion provided under the Rape or Incest Exception to the State Registrar, Department of Health and Environmental Control, within seven days after the abortion is performed. *Id.* § 44-41-60.

## II.    The Vague and Discriminatory Exceptions to South Carolina's Abortion Ban Deeply Harm Plaintiff Physicians.

83.    The Health and Fatal Fetal Anomaly Exceptions to South Carolina's Abortion Ban are so unclear that they routinely force Plaintiffs to withhold abortion care necessary to prevent a

severe health risk and when a patient's fetus has been diagnosed with a fatal anomaly.[10] Because of the vagueness of the Exceptions, when Plaintiffs do provide such abortion care, they are frequently consumed with fear of criminal prosecution, incarceration, and the loss of their livelihood.

84.    Further, the Health, Fatal Fetal Anomaly, and Rape or Incest Exceptions to South Carolina's Abortion Ban often prevent Plaintiffs from providing abortion care to very ill, grieving, or traumatized patients contrary to their deeply held religious and conscientious beliefs in respecting everyone's dignity, alleviating others' suffering, and placing others before themselves.

85.    South Carolina's Abortion Ban is neither religiously neutral nor generally applicable. It allows people to terminate potential life for a wide variety of secular purposes. These allowances undermine South Carolina's purported interest in criminalizing the termination of potential life as much as abortion care compelled by Plaintiffs' deeply held beliefs would.

86.    In fact, South Carolina lacks a compelling interest in applying its Abortion Ban to Plaintiffs for practicing their faith. In any event, South Carolina's Abortion Ban is not narrowly tailored to advance such an interest.

---

[10] This Complaint defines "fatal fetal anomaly" consistent with the "life-limiting" conditions described in guidance from the American College of Obstetricians and Gynecologists. *See Perinatal Palliative Care*, ACOG Comm. Op'n No. 786 (Sept. 2019), available at https://www.acog.org/-/media/project/acog/acogorg/clinical/files/committee-opinion/articles/2019/09/perinatal-palliative-care.pdf?rev=24cbd2a8e658415fa1179a992add153f&hash=8CC8C074F91B6D4BF457DEEAC80195D1 ("ACOG's Clinical Guidance"). ACOG's Clinical Guidance accounts for fetal conditions for which there is "little . . . prospect of long-term survival . . . without severe morbidity or extremely poor quality of life." *Id.* at e85. These conditions include those for which "intervention is of questionable efficacy or deemed to be unacceptably burdensome to the neonate." *Id.* ACOG's Clinical Guidance recommends that patients with pregnancies complicated by such conditions be presented with information about a variety of options, including abortion and perinatal palliative comfort care. *Id.* at e84.

A. **The Health and Fatal Fetal Anomaly Exceptions Are So Unclear That Plaintiffs and Law Enforcement Officials Struggle to Determine When They Permit Abortion Care.**

87.     Two components of the Health Exception—"serious risk" and "substantial and irreversible impairment of a major bodily function"—provide Plaintiffs inadequate notice and law enforcement officials inadequate guidance of when a physician can perform an abortion necessary to prevent a severe health risk.

88.     It is unclear whether Plaintiffs can perform abortions necessary to address health conditions: 1) that cause extended and debilitating symptoms during pregnancy, 2) usually worsen during pregnancy and seriously threaten the patient's health during or after delivery, or 3) require treatments that would endanger the fetus, such that continuing the pregnancy would require forgoing the treatments.

89.     The "incompatible" and "sustaining life" provisions of the Fatal Fetal Anomaly Exception provide Plaintiffs inadequate notice and law enforcement officials inadequate guidance of when a physician can perform an abortion for a patient whose fetus has been diagnosed with a fatal fetal anomaly.

90.     It is unclear whether physicians can perform abortions for fetal anomalies that: 1) are likely to cause death within days, weeks, or months after birth, or 2) require a baby to undergo extensive surgeries or remain on life support to stay alive and, for many parents, therefore preclude a meaningful life.

91.     South Carolina's Abortion Ban thus forces Plaintiffs to: 1) deny abortion care to patients who need it to preserve their health or spare them further suffering after their fetus has been diagnosed with a fatal fetal anomaly, 2) delay that care, or 3) provide such care wracked with fear that it will result in criminal prosecution and professional discipline.

### i. The Health Exception is Ambiguous and Lacks a Medical Meaning.

92.     The Health Exception states in relevant part: "It is not a violation of Section 44-41-630 for a physician to perform a medical procedure necessary in his reasonable medical judgment to prevent . . . the *serious risk* of a *substantial and irreversible physical impairment of a major bodily function of the pregnant woman*, not including psychological or emotional conditions." S.C. Code Ann. § 44-41-640(C)(1) (emphasis added); *see also id.* § 44-41-640(B)(1).

93.     "[S]erious risk" does not address how likely the "impairment" must be to permit an abortion under the Health Exception. All but certain? Fifty-one percent? Twenty-five percent?

94.     For some patients, it is very difficult to predict whether a particular dangerous health condition will emerge during pregnancy, or when in pregnancy a particular health condition will become dangerous. This is true for patients at risk for or already afflicted with health conditions that cause extended and debilitating symptoms during pregnancy. Such conditions include heart disease and deep vein thrombosis, among other dangerous health conditions.

95.     Consequently, Plaintiffs struggle to determine whether or when during a pregnancy the Health Exception permits them to provide abortion care to patients at risk for or already afflicted with heart disease or deep vein thrombosis, among other dangerous health conditions.

96.     Additionally, "substantial and irreversible impairment of a major bodily function" has no inherent meaning in medicine.

97.     Some dangerous health conditions, including severe hypertension, kidney disease, diabetes, sickle cell disease, and asthma, usually worsen during pregnancy. These conditions can seriously threaten the patient's health during or after delivery.

98.     And some dangerous health conditions require treatments that would endanger the fetus, such that continuing the pregnancy would require forgoing the treatments. Such conditions

include cancer, epilepsy, and rheumatologic diseases, which are treated with chemotherapy or other teratogenic medications.

99.     Because "substantial and irreversible impairment of a major bodily function" is not a medical term, Plaintiffs struggle to determine whether or when the Health Exception permits them to provide abortion care to patients who are likely to suffer severe health risks during or after delivery. That includes patients living with severe hypertension, kidney disease, diabetes, sickle cell disease, or asthma, among other dangerous health conditions.

100.    For the same reason, Plaintiffs struggle to determine whether the Health Exception permits them to provide abortion care to patients requiring chemotherapy or other teratogenic medications.

101.    Physicians in their reasonable medical judgment often disagree about when an abortion is necessary to prevent a "serious risk of a substantial and irreversible impairment of a major bodily function."

102.    In fact, some of the hospitals where Plaintiffs practice require multiple physicians to conclude that the Health Exception permits an abortion in a particular instance before it can be performed under the Exception.

103.    Law enforcement officials face the same uncertainty that Plaintiffs do.

104.    Thus, the vagueness of the Health Exception creates a dilemma for Plaintiffs. If they provide an abortion under the Exception in good faith, a prosecutor or Medical Board Members could easily second-guess their medical judgment and subject them to criminal penalties and professional discipline.

105.    This concern is credible because South Carolina legislators and prosecutors have historically targeted people who are pregnant and abortion providers. For example, in the year

since the U.S. Supreme Court overturned *Roe v. Wade* in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), South Carolina prosecuted at least ten women for crimes related to their pregnancy or birth outcomes.[11] And well before *Dobbs*, South Carolina singled out abortion providers for medically unnecessary restrictions carrying criminal penalties.[12]

106.    The vagueness of the Health Exception, coupled with the steep consequences for violating South Carolina's Abortion Ban and the State's history of vigorously enforcing criminal laws targeting pregnant women, often force Plaintiffs to deny their patients abortions necessary to preserve their health or seriously delay that care.

107.    This forces Plaintiffs to send their patients the messages that they do not matter, their decision to end their pregnancy is wrong, and they are on their own. It condemns the patients to growing sicker and sicker and possibly losing their lives.[13] Or it relegates them to a costly and complicated trip in that condition that deprives them of the support of family and friends.

---

[11] *See* Pregnancy Justice, *Pregnancy as a Crime: A Preliminary Report on the First Year After* Dobbs (September 2024), https://www.pregnancyjusticeus.org/wp-content/uploads/2024/09/Pregnancy-as-a-Crime.pdf. In one instance, the State charged a woman with murder/homicide by child abuse for miscarrying during her second trimester and detained her for 22 days before a grand jury cleared her charges. *See* Lauren Sausser, *She was accused of murder after losing her pregnancy. SC woman now tells her story*, CNN (September 23, 2024), https://www.cnn.com/2024/09/23/health/south-carolina-abortion-kff-health-news-partner/index.html.

[12] *See, e.g.*, S.C. Code Ann. § 44-41-60. *Cf. Planned Parenthood S. Atlantic v. Baker*, 941 F.3d 687, 703 (4th Cir. 2019) (affirming preliminary injunction prohibiting South Carolina from terminating abortion provider's Medicaid provider agreement because the State's disapproval of abortion care does not permit it to disqualify a clinic that is "perfectly competent to perform the family-planning services . . . [it] is licensed to do").

[13] Criminal abortion bans have *killed at least five women*. *See* Lizzie Presser and Kavitha Surana, *A Third Woman Died Under Texas' Abortion Ban. Doctors Are Avoiding D&Cs and Reaching for Riskier Miscarriage Treatments.*, ProPublica (November 25, 2024), https://www.propublica.org/article/porsha-ngumezi-miscarriage-death-texas-abortion-ban.

108.    For example, one patient sought to end her much-desired pregnancy at the recommendation of her nephrologist (kidney specialist) and perinatologist because the pregnancy was precipitating her chronic kidney dysfunction. Dr. Seal lacked the approval needed to intervene until the patient was on the brink of needing dialysis. Until then, Dr. Seal's hospital could not conclude that her condition was "irreversible enough." Because of the delay in care, the patient's creatinine levels will never return to normal levels, which has further accelerated her disease and may require her to undergo a transplant.

109.    Withholding abortion care from very ill patients is deeply distressing to Plaintiffs in part because it defies their core medical ethics[14] of respecting patient autonomy, refraining from harming their patients, and acting in their patients' best interests.[15]

110.    When Plaintiffs do perform an abortion necessary to preserve a patient's health, the vagueness of the Health Exception, coupled with the steep consequences for violating South Carolina's Abortion Ban and the State's history of vigorously enforcing criminal laws targeting

---

[14] *See, e.g.*, Tom L. Beauchamp & James F. Childress, *Principles of Biomedical Ethics* (8th ed. 2019); Lois Snyder Sulmasy & Thomas A. Bledsoe, *American College of Physicians Ethics Manual: Seventh Edition*, 170 Annals of Internal Medicine (January 15, 2019), https://www.acpjournals.org/doi/10.7326/M18-2160.

[15] The inability to provide abortions necessary to prevent severe health risks also frustrates Plaintiffs' ability to ensure that their medical residents and students have the knowledge and skills necessary to care for pregnant patients. Because they rarely, if ever, have the opportunity to terminate a pregnancy in the second trimester, for example, Plaintiffs fear that future OB-GYNs will be unable to comprehensively manage acute pregnancy complications arising in second trimester. Medical residents and students committed to caring for people who are pregnant must leave South Carolina for adequate training, which is not always feasible. And because remaining in South Carolina requires them to compromise their medical ethics, some choose to practice out of state, which exacerbates maternity care deserts here. *See, e.g.,* Julie Rover & Rachana Pradhan, *Medical residents are starting to avoid states with abortion bans*, NPR (May 9, 2024), https://www.npr.org/sections/health-shots/2024/05/09/1250057657/medical-residents-starting-avoid-states-abortion-bans.

pregnant women, frequently saddle Plaintiffs with fear of criminal prosecution, incarceration, and the loss of their livelihood.[16]

111.    To illustrate, Dr. Tarleton once treated a patient who began to miscarry while driving through South Carolina en route to Florida. Apparently, someone in the emergency room had reported the patient to law enforcement for allegedly giving birth and leaving her child at a rest stop. Five armed police officers appeared at the hospital. They questioned the patient even as she sat in a pool of blood, and Dr. Tarleton repeatedly explained that the patient had miscarried in the first trimester of her pregnancy. The incident was a stark reminder that even an isolated and baseless accusation would be enough to subject Dr. Tarleton to criminal investigation. And this was for miscarriage care—how much more scrutiny for an abortion?[17]

112.    South Carolina has refused to address the chilling effects of the Abortion Ban's severe penalties despite ample evidence of how they imperil physicians and patients alike. For example, during the 2023-2024 legislative session, the South Carolina Committee on Medical Affairs rejected a bill that would have established civil and criminal immunity for physicians and their staff who provided an otherwise legal abortion "consistent with the current standard of care for the physician's specialty under the circumstances."[18]

---

[16] Plaintiffs work with countless administrative and medical professionals each day to perform their duties. Any one of these professionals could disagree with Plaintiffs' assessment that a particular abortion is permissible. This heightens the fear and anxiety that Plaintiffs suffer in caring for patients who are pregnant.

[17] According to a recent study of the impact of the *Dobbs* decision on OB-GYNs across the country, eighty-seven percent of the fifty-four doctors who participated reported fears of "criminal prosecution, loss of medical license, loss of income, or incarceration" because of an abortion ban. Erika Sabbath, Samantha McKetchnie, and Kavita Arora, *US Obstetrician-Gynecologists' Perceived Impacts of Post*-Dobbs v. Jackson *State Abortion Bans*, JAMA Network (Jan. 17, 2024), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2814017.

[18] S.B. 366, 2023 Leg., 125th Sess. (S.C. 2023).

### ii. The Fatal Fetal Anomaly Exception is Ambiguous.

113.    The Fatal Fetal Anomaly Exception allows an abortion if, "in [a physician's] reasonable medical judgment, the unborn child has a profound and irremediable congenital or chromosomal abnormality that, with or without the provision of life-saving treatment, would be *incompatible* with *sustaining life* after birth." S.C. Code Ann. § 44-41-610(5) (emphasis added), *id.* § 44-41-660.

114.    "[I]ncompatible" does not address how unlikely life must be to permit abortion care under the Fatal Fetal Anomaly Exception.

115.    To illustrate, some fetal anomalies, such as Trisomy 18, make life after birth very unlikely, but not impossible. Is that sufficient for the Fatal Fetal Anomaly Exception to apply?

116.    Nor does the Fatal Fetal Anomaly Exception address the time period that qualifies as "sustain[ed]." *See Id.* § 44-41-610(5); *see also id.* § 44-41-660. Are a few minutes enough? Weeks? Months? Further, how certain must a physician be about this time period? Reasonably sure? Very sure? Certain?

117.    The ambiguity of the "incompatible" and "sustaining life" provisions makes it extremely difficult for Plaintiffs to determine whether the Fatal Fetal Anomaly Exception permits them to provide abortion care for fetal anomalies: 1) likely to cause death within days, weeks, or months after birth, or 2) that require a baby to undergo extensive surgeries or remain on life support to stay alive and for many parents, therefore preclude a meaningful life.

118.    Physicians in their reasonable medical judgment often disagree about when such anomalies justify an abortion under the Fatal Fetal Anomaly Exception.

119.    In fact, some of the hospitals where Plaintiffs practice require multiple physicians to conclude that the Fatal Fetal Anomaly Exception permits an abortion in a particular instance before it can be performed under the Exception. *See supra* ¶¶ 73–77.

27

120.    Law enforcement officials face the same uncertainty as Plaintiffs do.

121.    Yet, South Carolina legislators have refused to clarify the scope of the Fatal Fetal Anomaly Exception despite ample opportunity to do so.

122.    In 2022, for example, a South Carolina hospital refused to provide an abortion to a patient whose fetus had been diagnosed with hypoplastic left heart syndrome ("HLHS").[19] This condition carries a risk of stillbirth, and babies born alive often live for a few days at most. While some babies born with HLHS are eligible for open-heart surgeries, most do not survive the surgeries, and those who do may require a heart transplant.

123.    As with many people in this heart-wrenching situation, the patient requested an abortion to shield her child from intense pain and suffering. But her healthcare team could not determine whether the Fatal Fetal Anomaly Exception permits abortion care in this circumstance.[20]

124.    The uncertainty of her healthcare team forced the patient to leave South Carolina for abortion care.

125.    A news outlet reporting on the patient's inability to obtain an abortion under the Fatal Fetal Anomaly Exception contacted sixteen legislators who sponsored South Carolina's Abortion Ban.

126.    In response to the news outlet's request for comment on the patient having to leave South Carolina for abortion care for her child's sake, the Abortion Ban's chief sponsor said he

---

[19] *See, e.g.*, Elizabeth Cohen *et al.*, *This conservative Christian couple in South Carolina have become outspoken advocates for abortion rights*, CNN (Dec. 23, 2022), https://www.cnn.com/2022/12/23/health/south-carolina-abortion-ivy-grace-project/index.html.

[20] The fatal fetal anomaly exception to the abortion ban in effect at that time was identical to the Fatal Fetal Anomaly Exception to the current Abortion Ban. *See* S.C. Code Ann. §§ 44-41-680(B)(4) (2021) (establishing an exception to the abortion ban if "there exists a fetal anomaly, as defined in Section 44-41-430"), 44-41-430 (2021) (defining "fetal anomaly" using the same definition as S.C. Code Ann. § 44-41-610 (2023)).

remains "committed to protecting the lives of children from those who would choose to end their lives."

127.     A co-sponsor stated that the Ban should have exceptions for "fatal fetal anomal[ies]."

128.     Yet another co-sponsor said he supports bills "which will allow those parents to make that tough decision when they have received a sad prognosis from the doctors about the pregnancy and their child has a fetal anomaly," but refused to define "fetal anomaly."

129.     The vagueness of the Fatal Fetal Anomaly Exception creates a dilemma for Plaintiffs. If they provide an abortion under the Exception in good faith, a prosecutor or Medical Board Members could easily second-guess their medical judgment and subject them to criminal penalties and professional discipline.

130.     This concern is credible because of South Carolina's history of prosecuting people for the outcomes of their pregnancies and targeting abortion providers. *See supra* ¶¶ 92–106.

131.     The vagueness of the Fatal Fetal Anomaly Exception, coupled with the steep consequences for violating South Carolina's Abortion Ban and the State's history of vigorously enforcing criminal laws targeting pregnant women, often force Plaintiffs to deny or delay abortion care for patients whose fetus has been diagnosed with: 1) an anomaly likely to cause death within days, weeks, or months after birth, or 2) an anomaly that requires the baby to undergo extensive surgeries or remain on life support to stay alive and for many parents, therefore precludes a meaningful life.

132.     This forces physicians to send their patients the messages that they do not matter, their decision to end their pregnancy is wrong, and they are on their own. It condemns the patients

to feeling that their child is suffering and the attendant anguish. Or it relegates them to a costly and complicated trip while grieving that deprives them of the support of family and friends.

133.     Withholding abortion care from grieving patients is deeply distressing to Plaintiffs in part because it defies their core medical ethics of respecting patient autonomy, refraining from harming their patients, and acting in their patients' best interests.[21]

134.     For instance, one of Dr. Seal's patients confirmed that her fetus was afflicted with Trisomy 13 after an amniocentesis that cannot even be offered before sixteen weeks of pregnancy—at least seven weeks after someone can legally end their pregnancy in South Carolina. Trisomy 13 causes profound brain, heart, and lung defects, among others; carries a high risk of miscarriage; and kills more than 90% of babies before their first birthday. The patient sought an abortion to shield her child from pain, distress, and futile medical interventions. The inability to determine whether Trisomy 13 is compatible with a "sustain[ed] life," however, required Dr. Seal to refer the patient out of state when she was eminently capable of caring for her. As a consequence, the patient remained pregnant against her will until she could leave South Carolina, tormented by the thought that her child was in anguish. And this tormented Dr. Seal, who felt she was harming her patient in defiance of the Hippocratic Oath.

135.     This distress is personal for Dr. Tarleton. In 2021, she went into preterm labor and suffered a serious surgical complication that caused her daughter to be born with hypoxic brain damage. Dr. Tarleton and her husband chose to give their daughter palliative care until she died twelve days after birth. It meant everything to them to be able to care for their daughter in that way. Seeing other parents stripped of the ability to make decisions to avoid the suffering of their own children is intolerable.

---

[21] *Supra* ¶ 109.

136.    When Plaintiffs do perform an abortion for a patient whose fetus has been diagnosed with a fatal anomaly they fear will subject their child to needless suffering, the vagueness of the Fatal Fetal Anomaly Exception, coupled with the steep consequences for violating South Carolina's Abortion Ban and the State's history of vigorously enforcing criminal laws targeting pregnant women, frequently saddle Plaintiffs with fear of criminal prosecution, incarceration, and the loss of their livelihood.[22]

> **B.    The Health, Fatal Fetal Anomaly, and Rape or Incest Exceptions Selectively Burden Plaintiffs' Deeply Held Religious Beliefs Without Advancing a Compelling State Interest.**

137.    Plaintiffs hold sincere religious and conscientious beliefs that they have unwavering duties to respect the dignity of every person, help people in critical need, and place others before themselves. For Plaintiffs, that includes using their medical training to honor a patient's request to end a pregnancy that threatens to deeply harm her.

138.    The Health, Fatal Fetal Anomaly, and Rape or Incest Exceptions to South Carolina's Abortion Ban prohibit or chill Plaintiffs from providing abortion care in the following circumstances: a) when an abortion is necessary to prevent a severe health risk, including for serious mental health conditions, health conditions that cause extended and debilitating symptoms during pregnancy, health conditions that may not seriously threaten the patient's health until or after delivery, and health conditions requiring treatments that would endanger the fetus; b) when a fetal anomaly is likely to cause death within days, weeks, or months after birth, or requires a baby to undergo extensive surgeries or remain on life support to stay alive and for many parents, therefore precludes a meaningful life; and c) when the pregnancy was caused by rape or incest

---

[22] *Supra* ¶ 110.

31

regardless of the patient's gestational age or whether the physician reports the abuse to law enforcement.

139.     Denying or delaying abortion care in these circumstances violates Plaintiffs' sincere religious beliefs in respecting everyone's dignity, helping people in critical need, and placing others before themselves.

140.     Accordingly, South Carolina's Abortion Ban forces Plaintiffs to make an impossible choice between practicing their faith and facing criminal penalties and professional discipline as a result, or defying their convictions and maintaining their freedom and livelihood.

141.     South Carolina's Abortion Ban is neither religiously neutral nor generally applicable. It allows abortion care for a wide variety of secular purposes: up to approximately nine weeks of pregnancy for any reason, when it is necessary to prevent some health risks, for some fatal fetal anomalies, and in some instances of rape or incest. South Carolina's Abortion Ban also allows IVF for secular purposes. These allowances undercut South Carolina's purported interest in criminalizing the termination of potential life as much as abortion care compelled by Plaintiffs' deeply held religious beliefs would.

142.     The circumstances in which South Carolina allows people to terminate potential life also betray that it lacks a compelling interest in applying its Abortion Ban to Plaintiffs for practicing their faith. In any event, South Carolina's Abortion Ban is not narrowly tailored to advance any such interest.

        i.    **The Health and Fatal Fetal Anomaly Exceptions Force Plaintiffs to Disregard Their Patients' Dignity, Abandon People in Acute Need, and Prioritize Themselves Contrary to Plaintiffs' Faith.**

143.     Although Plaintiffs belong to different faith traditions, they share the foundational religious and conscientious duties to 1) honor the inherent worth of every person, 2) help people

in critical need, and 3) place others before themselves. For Plaintiffs, that includes using their medical training to effectuate a patient's wish to end a pregnancy that threatens to profoundly harm her. *See supra* ¶¶ 1, 137.

144.    As discussed above, the Health and Fatal Fetal Anomaly Exceptions to South Carolina's Abortion Ban often force Plaintiffs to withhold abortion care 1) from patients who need it to preserve their health, or 2) that would spare patients further suffering after their fetus has been diagnosed with a fatal anomaly, for fear of criminal penalties and professional discipline.

145.    In fact, from August 23 through December 31, 2023, only thirteen abortions were performed in South Carolina after approximately six weeks of gestational age.[23]

146.    As discussed above, withholding abortion care from very ill patients forces Plaintiffs to send their patients the messages that they do not matter, their decision to end their pregnancy is wrong, and that they are on their own. It condemns them to grow sicker and sicker and possibly lose their lives. *Supra* ¶¶ 107, 132. Or it relegates them to a costly and complicated trip in that condition that deprives them of the support of family and friends. *Supra* ¶¶ 107, 122–124, 134.

147.    Withholding abortion care from patients whose fetus has been diagnosed with a fatal anomaly sends them the same messages. It condemns the patients to feeling that their child is suffering and the attendant anguish. Or it relegates them to a costly and complicated trip while grieving that deprives them of the support of family and friends.

148.    As the patients' physicians, Plaintiffs are charged with telling them that the Health and Fatal Fetal Anomaly Exceptions exclude them despite the devastating consequences to their

---

[23] *Id.* The data for the number of abortions performed in South Carolina under the Fatal Fetal Anomaly Exception for pregnancies with a probable gestational age of over twelve weeks is suppressed in the report.

lives. This heightens Plaintiffs' sense of complicity in their patients' dismissal, isolation, and suffering.

149.     In these ways, the Health and Fatal Fetal Anomaly Exceptions force Plaintiffs to forsake their foundational religious duties to 1) honor every person's inherent worth, 2) help people in critical need, and 3) place others before themselves. *See supra* ¶¶ 137–140.

> **ii.     The Rape or Incest Exception Forces Plaintiffs to Disregard Their Patients' Dignity, Abandon People in Acute Need, and Prioritize Themselves Contrary to Plaintiffs' Faith.**

150.     The Rape or Incest Exception to South Carolina's Abortion Ban prevents Plaintiffs from providing abortion care to most rape or incest survivors for two reasons.

151.     First, it arbitrarily excludes patients who are over twelve weeks pregnant. But many incest survivors are minors, who typically learn they are pregnant later in pregnancy than adults.[24] Additionally, the trauma associated with rape or incest often hinders survivors from seeking professional help soon after the abuse.[25] As a result, many patients who seek to end a pregnancy in South Carolina caused by rape or incest are over twelve weeks pregnant. The gestational age limit of the Rape or Incest Exception therefore forces Plaintiffs to deny abortion care to many rape or incest survivors.

---

[24] *See* Hannah Lantos et al., *State-level Abortion Restrictions will Negatively Impact Teens and Children*, ChildTrends, https://www.childtrends.org/publications/state-level-abortion-restrictions-will-negatively-impact-teens-and-children (finding that teens learn that they are pregnant at 7.4 weeks gestational age, on average, compared with 5.7 weeks for adults).

[25] *See, e.g.*, Courtney E. Ahrens, *Being Silenced: The Impact of Negative Social Reactions on the Disclosure of Rape*, Am. J. Community Psychol. (2006), https://pmc.ncbi.nlm.nih.gov/articles/PMC1705531/pdf/10464_2006_Article_9069.pdf (explaining that the fear of negative reactions from professionals, friends, and family often prevents rape or incest survivors from reporting their experiences to anyone, including law enforcement).

152.    Second, the Rape or Incest Exception requires a physician to report the abuse to "the sheriff in the county in which the abortion was performed." S.C. Code Ann. § 44-41-650(B). The report must include the patient's name and contact information. *Id.* Most patients seeking to end a pregnancy caused by rape or incest are unwilling to report the abuse in part because such violence is complex and devastating. To illustrate, the perpetrator may still be abusing the patient, making the patient fear retaliation. Or the patient depends on the perpetrator for housing, transportation, or other necessities.

153.    In a rare instance in which a rape survivor was willing to report the rape to law enforcement, the police insisted on coming to her home to complete the report. The experience was so degrading that the patient permanently left South Carolina.

154.    The Rape or Incest Exception's reporting requirement therefore forces Plaintiffs to deny abortion care to most rape or incest survivors.

155.    As with the other Exceptions to South Carolina's Abortion Ban, the Rape or Incest Exception unconscionably requires Plaintiffs to weigh the momentous costs to themselves of erroneously relying on it against their patients' suffering.

156.    In fact, from August 23 through December 31, 2023, fewer than five abortions were provided under the Rape or Incest Exception.[26]

157.    The inability to offer abortion care to most rape or incest survivors forces Plaintiffs to send their patients the messages that they do not matter, their decision to end their pregnancy is wrong, and that they are on their own. Plaintiffs' rape or incest survivor patients may give birth

---

[26] *A public report providing statistics compiled from all abortions reported to DHEC (Part Two)*, South Carolina Dept. of Health and Enviro. Control, 4 (2023), https://scdhec.gov/sites/default/files/media/document/Abortion-Report-2023-Part-2-Aug.22-Dec.31.pdf.

against their will or endure a costly and complicated process to obtain an abortion in another state deprived of the support of family and friends. Incest survivors who are minors are especially unlikely to overcome the challenges of having to leave the state for abortion care.

158.    As the patients' physicians, Plaintiffs are charged with telling them that the Rape or Incest Exception excludes them despite the devastating consequences to their lives. This heightens Plaintiffs' sense of complicity in their patients' dismissal, isolation, and suffering.

159.    As with the Health and Fatal Fetal Anomaly Exceptions to South Carolina's Abortion Ban, the Rape or Incest Exception forces Plaintiffs to disregard their patients' dignity, abandon people in acute need, and prioritize themselves contrary to Plaintiffs' faith.

160.    Having to routinely forsake their religious convictions has left Plaintiffs deeply conflicted, distressed, and for some, demoralized.

161.    Ultimately, South Carolina's Abortion Ban imposes a Hobson's Choice on the Plaintiffs. They can either practice their faith and face a real risk of imprisonment and losing their medical license, *see supra* ¶¶ 109, 133, 136, 139–140, 143, or renege on their deeply held beliefs with the attendant consequences but preserve their freedom and livelihood.

### iii.    South Carolina's Abortion Ban is Neither Religiously Neutral Nor Generally Applicable.

162.    South Carolina's Abortion Ban allows abortion care for a wide variety of secular purposes: 1) up to approximately nine weeks of pregnancy for any reason, S.C. Code Ann. § 44-41-630(B); 2) when an abortion is necessary to prevent some health risks, *id.* § 44-41-640(B); 3) for some fatal fetal anomalies, *id.* § 44-41-660; and 4) in some instances of rape or incest, *id.* § 44-41-650.

36

163.    In 2023, nearly 4,500 abortions occurred in South Carolina at or before approximately six weeks of pregnancy for any reason.[27]

164.    South Carolina's Abortion Ban also allows IVF.[28] "[D]iscarding embryos is inherent to the [IVF] process."[29] Only some fertilized eggs are capable of being frozen for storage or transferred to a patient. The remaining embryos are discarded. Likewise, a considerable share of embryos becomes nonviable upon thawing and patients ultimately have most of their embryos discarded after completing the process.

165.    In these ways, South Carolina acknowledges that its purported interest in criminalizing the termination of potential life is always contingent and never absolute.

166.    For example, all three Exceptions to South Carolina's Abortion Ban reveal that the State has made a value judgment that terminations for some health risks, some fatal fetal anomalies, and some rape or incest survivors are important enough to overcome its purported interest in criminalizing the termination of potential life.

167.    As discussed above, however, Plaintiffs' deeply held religious beliefs require them to be able to offer abortion care in broader circumstances. *See supra* ¶¶ 84–86.

---

[27] *See id.*; *see also A public report providing statistics compiled from all abortions reported to DHEC (Part One)*, South Carolina Dept. of Health and Enviro. Control, 4 (2023), https://dph.sc.gov/sites/scdph/files/media/Abortion-Report-2023-Part-1-Jan.1-Aug.22.pdf.

[28] Indeed, the South Carolina legislature considered legislation earlier this year to explicitly protect IVF from potential judicial rulings that would limit the ability to dispose an embryo. Emmy Ribero, *Bill aims to protect South Carolina IVF care from Alabama situation*, Carolina News & Reporter (March 1, 2024), https://carolinanewsandreporter.cic.sc.edu/south-carolina-ivf-care-safe-from-alabama-decision/. Nearly two percent of babies in South Carolina are born through Assisted Reproductive Technology. *Fact Sheet: In Vitro Fertilization (IVF) Use Across the United States*, U.S. Dept. Health and Hum. Serv. (March 13, 2024), https://www.hhs.gov/about/news/2024/03/13/fact-sheet-in-vitro-fertilization-ivf-use-across-united-states.html.

[29] *See* Roberson, *Why Discarding Embryos Is Inherent to the IVF Process,* MedPage Today (Feb. 24, 2024), https://www.medpagetoday.com/obgyn/infertility/108932.

168.    It is neither religiously neutral nor generally applicable for South Carolina to allow abortion under the Abortion Ban's secular Exceptions while criminalizing abortion when Plaintiffs' religious beliefs compel it in substantially similar circumstances.

169.    In sum, South Carolina has criminalized religious conduct while allowing secular conduct that undermines its purported state interest in similar ways. In doing so, the State has made a value judgment that secular motivations for abortion care are important enough to overcome this interest, but that religious motivations are not. South Carolina has thus singled out religious conduct for unfavorable treatment.

### III.    South Carolina Lacks a Compelling Interest in Fully Applying Its Abortion Ban to Plaintiff Adherents and the Ban Is Not Narrowly Tailored to Advance Any Such Interest.

170.    The circumstances in which South Carolina allows people to terminate potential life, *supra* ¶ 4, also betray that it lacks a compelling interest in applying its Abortion Ban to Plaintiffs for providing abortion care compelled by their faith.

171.    So, too, the appreciable damage that South Carolina allows to any broader interest it has in protecting potential life. For example, the State does not mandate comprehensive sex education, which is associated with reduced rates of unintended pregnancy, and instead requires public schools to strongly stress abstinence.[30] Moreover, South Carolina imposes a "family cap"

---

[30] *Global Review finds Comprehensive Sexuality Education key to gender equality and reproductive health*, UN (2016), https://www.un.org/youthenvoy/2016/03/comprehensive-sexuality-education/ (noting that comprehensive sex education "leads to […] the reduction of sexually transmitted infections (STIs), HIV, and unintended pregnancy."); *Sexual Risk Avoidance Education*, S.C. Dept. of Pub. Health (2024), https://dph.sc.gov/health-wellness/child-teen-health/teens/sexual-risk-avoidance-education; *South Carolina's Sex Education Snapshot*, SIECUS (2024), https://siecus.org/stateprofiles/south-carolina-state-profile/; *National Data Shows Comprehensive Sex Education Better at Reducing Teen Pregnancy than Abstinence-Only Programs*, SIECUS (2008), https://siecus.org/national-data-shows-comprehensive-sex-education-better-at-reducing-teen-pregnancy-than-abstinence-only-programs-2/.

on public benefits, meaning it denies additional cash benefits for families who have any children after their initial eligibility is determined.[31] And devastatingly, South Carolina has the eighth-highest maternal mortality rate in the country.[32]

172.    These failures also suggest some of the many ways that South Carolina could advance an interest in protecting potential life that are non-coercive and far less burdensome than the criminal Abortion Ban. Among other things, the State could mandate comprehensive sex education. It could expand rather than limit public benefits for expectant parents and families with children.[33] And it could adopt measures to reduce anti-Blackness in pregnancy care, which was "the most common circumstance associated with South Carolina maternal deaths from 2018 to 2020."[34]

173.    On the other hand, South Carolina's Abortion Ban is overinclusive. The statute prevents abortion care even when the fetus is not viable. *Supra* ¶¶ 114–124.

---

[31] *Frequently Asked Questions*, S.C. Dept. of Soc. Serv. (2024), https://dss.sc.gov/assistance-programs/tanf/faq/.

[32] *Maternal Mortality 2018-2022*, CDC (2023), https://www.cdc.gov/nchs/maternal-mortality/mmr-2018-2022-state-data.pdf.

[33] Sonya V. Troller-Renfree et al., *The impact of a poverty reduction intervention on infant brain activity*, Psychological and Cognitive Sciences (2022), https://www.pnas.org/doi/10.1073/pnas.2115649119.

[34] Lauren Sausser, *The South Can Be a Dangerous Place To Be Black and Pregnant*, KFF (May 24, 2024), https://kffhealthnews.org/news/article/health-brief-southern-black-women-maternal-mortality/.

## CLAIMS FOR RELIEF

### COUNT I
### Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, Vagueness
### (42 U.S.C. § 1983)

174.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 177. South Carolina's Abortion Ban is unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution because the Health and Fatal Fetal Anomaly Exceptions: a) fail to provide adequate notice of the conduct they permit, and b) are so standardless that they authorize and encourage arbitrary and discriminatory enforcement of South Carolina's Abortion Ban.

### COUNT II
### Violation of the Free Exercise Clause of the First Amendment to the U.S. Constitution
### (42 U.S.C. § 1983)

175.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 178.

176.    South Carolina's Abortion Ban violates Plaintiffs' right to practice their faith under the Free Exercise Clause of the First Amendment to the U.S. Constitution.

177.    Plaintiffs hold sincere religious and conscientious beliefs that they have unwavering duties: to 1) honor the inherent worth of every person, 2) help people in critical need, and 3) place others before themselves. For Plaintiffs, that includes using their medical training to effectuate a patient's wish to end a pregnancy that threatens to profoundly harm her.

178.    The Health, Fatal Fetal Anomaly, and Rape or Incest Exceptions to South Carolina's Abortion Ban burden Plaintiffs' deeply held religious beliefs by forcing Plaintiffs to choose between practicing their faith but risking imprisonment and professional discipline, or reneging on their deeply held beliefs but preserving their freedom and livelihood.

179.    South Carolina's Abortion Ban is neither religiously neutral nor generally applicable because it singles out religious conduct for unfavorable treatment.

180.    South Carolina's Abortion Ban fails strict scrutiny because it is not narrowly tailored to advance a compelling state interest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court:

A) Enter a declaratory judgment that South Carolina's Abortion Ban is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution and therefore unenforceable;

B) Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing South Carolina's Abortion Ban on its face;

C) Alternatively, enjoin Defendants and their employees, agents, and successors in office from enforcing South Carolina's Abortion Ban when, in the treating physician's good faith medical judgment, an abortion is necessary to prevent a severe health risk, including for health conditions that: 1) cause extended and debilitating symptoms during pregnancy, 2) may not seriously threaten the patient's health until or after delivery, or 3) require treatments that would endanger the fetus;

D) Alternatively, enjoin Defendants and their employees, agents, and successors in office from enforcing South Carolina's Abortion Ban when, in the treating physician's good faith medical judgment, a patient's fetus has been diagnosed with a "life-limiting" condition per ACOG's Clinical Guidance;

E) Enter a declaratory judgment that Plaintiffs' inability to provide an abortion in the following circumstances violates their right to practice their faith under the Free Exercise Clause of the First Amendment to the US Constitution: 1) when in the treating physician's good faith medical judgment, an abortion is necessary to prevent a severe health risk, including for serious mental health conditions, health conditions that cause extended and debilitating symptoms during pregnancy, health conditions that may not seriously threaten the patient's health until or after delivery, and health conditions requiring treatments that would endanger the fetus; 2) when in the treating physician's good faith medical judgment, the fetus has been diagnosed with a "life-limiting" condition per ACOG's Clinical Guidance; or 3) when the pregnancy was caused by rape or incest regardless of the patient's gestational age or whether the physician reports the abuse to law enforcement;

F) Permanently enjoin Defendants and their employees, agents, and successors in office from enforcing South Carolina's Abortion Ban, including any third-party criminal liability for violating the Ban, against Plaintiffs and any personnel necessary to provide an abortion in the circumstances set forth in paragraph E) and/or in any circumstances in which the Ban's enforcement would be unconstitutional;

G) Grant reasonable attorney's fees and costs; and

H) Grant Plaintiffs such further relief as the Court may deem just and proper.

Dated: January 8, 2025

Respectfully submitted,

*/s/ William N. Nettles*
William N. Nettles (Fed. ID No.: 6586)
bill@billnettleslaw.com
John L. Warren, III (Fed. ID No.: 12164)
jw@billnettleslaw.com
LAW OFFICE OF BILL NETTLES
2008 Lincoln Street
Columbia, SC 29201
Phone: (803) 814-2826

Rupali Sharma*
LAWYERING PROJECT
443 Western Ave., No. 1025
South Portland, ME 04106
Phone: (646) 490-1219
Fax: (646) 480-4622
rsharma@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
158 SW 148th Street, No. 1198
Burien, WA 98166
Phone: (347) 515-6073
psuelzle@lawyeringproject.org

Anita Yandle*
LAWYERING PROJECT
158 SW 148th Street, No. 1198
Burien, WA 98166
Phone: (646) 480-8942
Fax: (646) 480-8622
ayandle@lawyeringproject.org

Allison Zimmer*
LAWYERING PROJECT
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
Phone: (347) 515-6074
Fax: (646) 480-8622
azimmer@lawyeringproject.org

*Motion for admission pro hac vice forthcoming*

*Attorneys for Plaintiffs*

43