## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

NATALIE DAWN BINGHAM, *et al.*,

                *Plaintiffs*,

    v.

ALAN MCCRORY WILSON, in his official
capacity as Attorney General of South
Carolina, *et al.*,

                *Defendants*,

and

HENRY DARGAN MCMASTER, in his official
capacity as Governor of the State of South
Carolina,

           *Intervenor–Defendant.*

Civil Action No.: 2:25-cv-163-RMG

**MOTION TO DISMISS**

    Henry Dargan McMaster, in his official capacity as Governor of the State of South Carolina; Alan Wilson, in his official capacity as Attorney General of the State of South Carolina; David Pascoe, in his official capacity as Solicitor for South Carolina's First Judicial Circuit; Bill Weeks, in his official capacity as Solicitor for South Carolina's Second Judicial Circuit; Mike Burch, in his official capacity as Solicitor for South Carolina's Fourth Judicial Circuit; Randy E. Newman, Jr., in his official capacity as South Carolina's Sixth Judicial Circuit; Barry Barnette, in his official capacity as Solicitor for South Carolina's Seventh Judicial Circuit; David Stumbo, in his official capacity as Solicitor for South Carolina's Eighth Judicial Circuit; Micah Black, in his official capacity as Solicitor for South Carolina's Tenth Judicial Circuit; Rick Hubbard, in his official capacity as Solicitor for South Carolina's Eleventh Judicial Circuit; Edgar L. Clements, III, in his official capacity as Solicitor for South Carolina's Twelfth Judicial Circuit; W. Walter

Wilkins, in his official capacity as Solicitor for South Carolina's Thirteenth Judicial Circuit; Jimmy Arthur Richardson, II, in his official capacity as Solicitor for South Carolina's Fifteenth Judicial Circuit; and Kevin S. Brackett, in his official capacity as Solicitor for South Carolina's Sixteenth Judicial Circuit, move to dismiss the First Amended Complaint (ECF No. 10) under Federal Rules of Civil Procedure 12(b)(1) and (b)(6).[1]

## **INTRODUCTION**

"[T]he [federal] Constitution makes no mention of abortion," and the Supreme Court has "return[ed] the issue of abortion to the people's elected representatives." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 225, 232 (2022). Once the Court did so, South Carolina chose to protect unborn life after a fetal heartbeat is detected, subject to a few exceptions. *See* 2023 S.C. Acts No. 70.

Much like the State's first heartbeat law, the 2023 Act was quickly challenged, and the South Carolina Supreme Court held that the state constitution allowed the General Assembly to regulate abortion in this way. *See Planned Parenthood S. Atl. v. State* ("*Planned Parenthood II*"), 440 S.C. 465, 485, 892 S.E.2d 121, 132 (2023). In fact, that court "summarily reject[ed]" vagueness challenges to the 2023 Act's maternal health and fatal fetal anomaly exceptions under the South Carolina Constitution. *Id.* at 480 n.8, 892 S.E.2d at 130 n.8.

A different set of plaintiffs now challenges the Act on federal constitutional grounds, arguing that the Act's maternal health and fatal fetal anomaly exceptions are vague and that the Act violates their religious exercise. But these theories have no merit. The State's statutory framework for protecting unborn life once a fetal heartbeat is detected is constitutional.

---

[1] Under Local Civil Rule 7.04 (D.S.C.), a full explanation of the motion is provided in this document, so a separate memorandum would serve no useful purpose.

Plaintiffs' vagueness claim hinges on hypotheticals, which dooms it from the start: "Speculation about possible vagueness in hypothetical situations not before the Court *will not* support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill v. Colorado*, 530 U.S. 703, 733 (2000) (cleaned up) (emphasis added). Instead, a vagueness claim "consider[s] whether a statute is vague as applied to the particular facts at issue." *United States v. Hasson*, 26 F.4th 610, 616 (4th Cir. 2022).

Beyond their problem with hypotheticals, Plaintiffs' vagueness claim fails because both the maternal health and fatal fetal anomaly exceptions let "ordinary people" "understand what conduct is prohibited" without "encourag[ing] arbitrary and discriminatory enforcement." *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 680 (2023). The maternal health exception includes a long list of conditions that are "presumed" to meet this exception, S.C. Code Ann. § 44-41-640(C)(2), and it adopts common language used in such exceptions across the country.

Plaintiffs' challenge to the fatal fetal anomaly exception fares no better. Like the maternal health exception, the fatal fetal anomaly exception is readily understood and applied. For instance, a child with anencephaly cannot survive outside the womb. But a child with Down's Syndrome can. Given this clarity, Plaintiffs cannot "[h]astily resort[] to vagueness doctrine" by offering a hypothetical or two to plead a plausible facial challenge. *Dubin v. United States*, 599 U.S. 110, 132 n.10 (2023).

Perhaps most troubling with Plaintiffs' claim on the fatal fetal anomaly exception is their suggestion that this exception should apply to any child who has "life-limiting" conditions. ECF No. 10, ¶ 102 & n.10. That standard—based on a 2019 "committee opinion" from the American College of Obstetricians and Gynecologists ("ACOG")—would permit Plaintiffs to abort unborn children who are likely to be born alive and survive simply because they may face a "severe

morbidity or extremely poor quality of life." *Id.* Nothing in the Constitution permits Plaintiffs to substitute their judgment (or ACOG's definition) on this issue for the State's policy.

Turning to Plaintiffs' Free Exercise claim, even if abortion regulations can violate the First Amendment (they cannot), Plaintiffs have not alleged a sufficient burden on their religious exercise to get past the first step of a Free Exercise claim. But if they have, *Employment Division, Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990), provides the framework. Despite Plaintiffs' protestations to the contrary, the 2023 Act is neutral and generally applicable. "A law is considered neutral if it proscribes conduct without regard to whether that conduct is religiously motivated or not." *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998). Under the 2023 Act, it doesn't matter whether religion motivates a decision about abortion. All that matters is whether a fetal heartbeat exists and, if so, whether an exception applies. And the law is generally applicable because it includes no sort of "individualized exemptions" based on the discretion of some government official. *Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021).

Still, even if the Court were to apply strict scrutiny, the 2023 Act satisfies that review. The State "has a compelling interest from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child." 2023 Act, § 1(3). No one can credibly challenge the State's interest in protecting life and health. And none of the alternatives that Plaintiffs suggest can achieve the State's interests, while still reaching the necessary "political compromise" that abortion regulation requires. *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 995 (1992) (Scalia, J., concurring in part and dissenting in part). Every alternative that Plaintiffs suggest would leave unborn children without the protection the State provided to them in the 2023 Act.

This case, of course, involves "a profound moral issue on which Americans hold sharply

conflicting views." *Dobbs*, 597 U.S. at 223. But those policy disagreements have no bearing in this Court. The South Carolina General Assembly considered the competing policy views and, as "was possible" "[p]re-*Roe*," the legislature reached a "political compromise." *Casey*, 505 U.S. at 995. Plaintiffs may not like that compromise, but they cannot take the exceptions to protecting unborn life after detection of a fetal heartbeat and turn them into swords with which to attack laws that *Dobbs* recognizes the States have the authority to enact. The Court should therefore grant the Motion to Dismiss.

## **BACKGROUND**

### A.     The 2023 Fetal Heartbeat and Protection from Abortion Act

The General Assembly made three findings in passing the 2023 Act. First, a "fetal heartbeat is a key medical predictor that an unborn child will reach live birth." 2023 Act, § 1(1). Second, "[c]ardiac activity begins at a biologically identifiable moment in time." *Id.* § 1(2). Third, the State "has a compelling interest from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child." *Id.* § 1(3).

To appreciate these findings, understanding certain terms is critical. "Fetal heartbeat" is defined as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." S.C. Code Ann. § 44-41-610(6). And "unborn child" is "an individual organism of the species homo sapiens from conception until live birth." *Id.* § 44-41-610(14).

On a most basic level, the 2023 Act generally prohibits abortions after a fetal heartbeat is detected, and in no circumstance may an abortion be performed without a woman's consent. *Id.* § 44-41-620. Getting into the specifics, before proceeding with an abortion, the physician must perform an ultrasound, display the images to the pregnant woman if she wants to see them, and record a written medical description of the ultrasound (noting the presence of a fetal heartbeat, if

one exists). *Id.* § 44-41-630(A).

If a fetal heartbeat is detected, "no person shall perform or induce an abortion" unless a statutory exception applies. *Id.* § 44-41-630(B). Violating this prohibition is a felony, punishable by up to two years in prison and a $10,000 fine. *Id.* § 44-41-630(B). On top of criminal penalties, a physician or medical professional who violates the Act may lose her license. *Id.* § 44-41-690. And the Act provides a private right of action for actual, statutory, and punitive damages against a person who performs an abortion that violates the Act. *Id.* § 44-41-680.

The Act's exceptions fall into three categories. The first exception is for maternal health. An abortion may be performed for a "medical emergency" or "to prevent the death of the pregnant woman or to prevent the serious risk of a substantial and irreversible impairment of a major bodily function, not including psychological or emotional conditions, of the pregnant woman." *Id.* § 44-41-640(A); *id.* § 44-41-640(C)(1). A medical emergency is a defined term, meaning "in reasonable medical judgment, a condition exists that has complicated the pregnant woman's medical condition and necessitates an abortion to prevent death or serious risk of a substantial and irreversible physical impairment of a major bodily function, not including psychological or emotional conditions." *Id.* § 44-41-610(9). The 2023 Act includes a list of conditions that are "presumed" to satisfy this exception, including (as a few examples) ectopic pregnancy, severe preeclampsia, and uterine rupture. *Id.* § 44-41-640(C)(2). If performing an abortion under this exception, a physician must, "to the extent that it does not risk the death of the pregnant woman or the serious risk of a substantial and irreversible physical impairment of a major bodily function of the pregnant woman," try to save the unborn child's life during such a procedure. *Id.* § 44-41-640(B)(3).

A physician who performs an abortion based on this exception must document in the woman's medical record the physician's belief that the emergency existed, what the medical

condition was, and the "medical rationale" that supported the physician's conclusion that the exception applied. *Id.* § 44-41-640(B)(2). The physician must keep these records for seven years. *Id.* § 44-41-640(B)(4)(a). Violating this provision is a felony punishable by up to two years in prison and up to a $10,000 fine, *id.* § 44-41-640(B)(4)(b), and the maximum fine may go up to $50,000 for an entity that does not preserve records, *id.* § 44-41-640(B)(4)(c).

The second exception is for fatal fetal anomalies. *Id.* § 44-41-660(A). Such an anomaly is one that, "in reasonable medical judgment," means "the unborn child has a profound and irremediable congenital or chromosomal anomaly that, with or without the provision of life-preserving treatment, would be incompatible with sustaining life after birth." *Id.* § 44-41-610(5).

Like the exception for maternal health, a physician who performs an abortion under this exception must document the "presence" of the anomaly, the "nature" of the anomaly, and the "medical rationale" that supported the physician's conclusion that the exception applied. *Id.* § 44-41-660(B)(1). These records must be kept for seven years. *Id.* § 44-41-660(B)(2). Violating this provision is a felony punishable by up to two years in prison and by a fine of up to a $10,000. *Id.* § 44-41-660(C). The maximum fine again increases to up to $50,000 for an entity that does not preserve records. *Id.* § 44-41-660(D).

The third category is for rape and incest, exceptions that apply if the unborn child has not yet reached 12 weeks "probable gestational age." *Id.* § 44-41-650(A). The 2023 Act defines "gestational age" as "the age of an unborn child as calculated from the first day of the last menstrual period of a pregnant woman." *Id.* § 44-41-610(7).

Before proceeding with the abortion under this exception, a physician must inform the woman that the alleged rape or incest will be reported to law enforcement, and the physician must make that report to the sheriff within 24 hours. *Id.* § 44-41-650(B). The physician must document

the abortion, the exception, and the report in the woman's medical records. *Id.*

A violation of this provision is a felony and punishable by up to two years in prison and a fine up to $10,000. *Id.* § 44-41-650(C).

### B.    Plaintiffs file this lawsuit

Plaintiffs are five OB-GYN doctors. ECF No. 10, ¶¶ 15, 20, 25, 29, 32. Only four of them even mention providing "abortion care," *id.* ¶¶ 15, 20, 25, 32, though they never define that term or explicitly say that they have performed abortions.

They have sued a litany of state officials, including the Attorney General, the solicitors, and the members of the State's medical and nursing boards. They claim that the 2023 Act's exceptions for maternal health and fatal fetal anomaly are unconstitutionally vague and that all the exceptions result in the 2023 Act violating their religious exercise. *See generally* ECF No. 10. The Governor intervened to defend the 2023 Act. *See* ECF No. 58.

The Governor, the Attorney General, and 12 Solicitors now move to dismiss.

## LEGAL STANDARD

Under Rule 12(b)(1), a court must dismiss a claim if the court lacks subject-matter jurisdiction over that claim. A motion to dismiss for lack of subject-matter jurisdiction challenges a court's "power to adjudicate" a case. *United States v. Wilson*, 699 F.3d 789, 793 (4th Cir. 2012). Standing goes to subject-matter jurisdiction. *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003).

To survive a Rule 12(b)(6) motion, a complaint must contain factual allegations that state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009). Although well-pleaded factual allegations must be accepted as true, the Court need not accept as true legal conclusions, unwarranted inferences, or arguments cast as factual allegations. *See id.*

**ARGUMENT**

I.     **Doe, Tarleton, and Wyant lack standing.**

For all Plaintiffs say in their 50-page, 199-paragraph Complaint, what Doe, Tarleton, and Wyant do not say stands out: They *never* allege that they have performed abortions that the 2023 Act prohibits or that they intend to do so again. That creates an insurmountable standing problem.

An Article III requirement, standing requires a plaintiff to show that she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An injury must be both "'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 339 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A "particularized" injury "affect[s] the plaintiff in a personal and individual way." *Id.* And a "concrete" injury is one that "actually exist[s]." *Id.* at 340. Requiring this type of injury "keeps courts out of political disputes by denying private litigants the right to test the abstract legality of government action." *Id.* at 347 (Thomas, J. concurring).

The harm that Plaintiffs seem to complain of is that the 2023 Act prevents them from performing hypothetical abortions of unborn children that they would otherwise perform. Four Plaintiffs (Bingham, Doe, Seal, and Wyant) allege that they provide "abortion care," ECF No. 10, ¶¶ 15, 20, 25, 32, but they don't even try to describe what that means. (Meanwhile, the fifth Plaintiff, Tarleton, doesn't even allege that much. *Id.* ¶ 29.) Do they counsel women about how to get an abortion? Or do they perform abortions? If it's the former, then Plaintiffs can still do that under the 2023 Act. They may not like what the law is, but they can talk about the law, their opinions on it, and what options a pregnant woman has. If it's the latter, then why didn't they allege as much? *Cf.* Compl. ¶¶ 12–15, *Planned Parenthood S. Atl. v. Wilson*, No. 3:21-cv-508

(D.S.C. Feb. 18, 2021), ECF No. 1 (Planned Parenthood South Atlantic and Greenville Women's Clinic specifically proclaiming what abortions they perform).

This generic statement about "abortion care," ECF No. 10, ¶¶ 15, 20, 25, 32, permits no plausible inference that Plaintiffs have been harmed by the 2023 Act. "Abortion care" is a potentially sweeping term that encompasses far more than abortion. For instance, Planned Parenthood explains on its website that its "Abortion Services" include pregnancy testing, pregnancy dating via ultrasound, and abortion referral, among other things. *See* Planned Parenthood, *Abortion Services* (last visited Feb. 24, 2025), https://tinyurl.com/2vejtnde. The 2023 Act doesn't prohibit anyone from offering those services.

At least for Bingham and Seal, there is a "plausible inference," *Iqbal*, 556 U.S. at 682, from other allegations that they have performed (or at least want to continue performing) abortions that the 2023 Act prohibits, *e.g.*, ECF No. 10, ¶¶ 15 (Bingham), 127 (Seal). Yet no such allegations exist for Doe, Tarleton, and Wyant. In fact, the only time any of them is mentioned after the parties are introduced, *see* ECF No. 10, ¶¶ 15–34, is a story about Tarleton caring for a woman having a miscarriage, *id.* ¶ 130. But a miscarriage is statutorily "presumed" to be an exception to the Act's general prohibition, so it cannot be the basis for any injury. S.C. Code Ann. § 44-41-640(C)(2).

That's a telling omission. For doctors who have been practicing for some time (Doe, Tarleton, and Wyant do not claim to be new to the medical field), they need to allege more than "we want to perform abortions" to avoid dismissal. They need some action to back it up, such as a record of what now-prohibited abortions they performed before the 2023 Act took effect, *see, e.g.*, *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004, 1015 (D.C. Cir. 2022) (looking to past bids on similar contracts to determine whether a plaintiff was, in fact, "ready, willing and able to perform" the work for which the government sought a contract), or plausible

allegations that they intend to perform abortions that the Act prohibits. Doe, Tarleton, and Wyant have alleged nothing along those lines.

As the Supreme Court put it in another abortion case recently, standing asks, "What's it to you?" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (quoting A. Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U. L. Rev. 881, 882 (1983)). The Court held that the plaintiffs there lacked standing to challenge the FDA's regulation of mifepristone (a drug that can induce an abortion up to ten weeks) because those doctors did not perform the regulated medical service at issue; they did "not prescribe or use mifepristone." *Id.* at 385. So too here. Doe, Tarleton, and Wyant have not alleged that they perform the regulated medical service at issue: abortions that the 2023 Act prohibits.

To be sure, when Plaintiffs seek the same relief, "the Supreme Court has made it clear that the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Bostic v. Schaefer*, 760 F.3d 352, 370 (4th Cir. 2014) (cleaned up). The Governor, Attorney General, and Solicitors therefore do not seek to dismiss the entire case (at least at this stage) for lack of standing. Still, a "court's ultimate aim is to determine whether each plaintiff has a sufficiently personal stake in the lawsuit to justify the invocation of federal court jurisdiction." *Moss v. Spartanburg Cnty. Sch. Dist. No. 7*, 676 F. Supp. 2d 452, 457 (D.S.C. 2009). For Plaintiffs who have not met that threshold, this Court lacks the Article III authority to decide their claims or to grant them any relief.

## II.    Plaintiffs' claims fail on the merits.

Plaintiffs assert two claims: vagueness and Free Exercise. Neither facial challenge is plausible, so this case should be dismissed.

### A.     The exceptions can be fairly understood.

Plaintiffs' first claim is that the 2023 Act's exceptions for maternal health and fatal fetal anomalies are unconstitutionally vague. *See* ECF No. 10, ¶ 193. The S.C. Supreme Court was right to "summarily reject" vagueness challenges to the 2023 Act. *Planned Parenthood II*, 440 S.C. at 480 n.8, 892 S.E.2d at 130 n.8.

Due process requires that a law define what conduct is prohibited "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Sackett*, 598 U.S. at 680 (cleaned up). Still, any statute may raise "a close question" "in marginal situations." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016) (citing *Parker v. Levy*, 417 U.S. 733, 755–56 (1974)). As long as the law "appl[ies] without question to certain activities," *id.* (quoting *Parker*, 417 U.S. at 756), the law is constitutional. The 2023 Act meets that standard.[2]

From the start, the Court can reject Plaintiffs' vagueness claim because it is based mainly on hypothetical scenarios. "Not just any litigant can bring a facial vagueness challenge." *Lumumba v. Kiser*, 116 F.4th 269, 285 (4th Cir. 2024). Vagueness challenges need "particular facts" against which the "statute" can be "consider[ed]." *Hasson*, 26 F.4th at 616. Plaintiffs offer few such facts, more often relying on hypothetical conditions that patients or their unborn children might have. *E.g.*, ECF No. 10, ¶ 116. Those are not the allegations of a viable facial vagueness claim. *See Hill*, 530 U.S. at 733 (a plaintiff cannot "speculat[e] about possible vagueness in hypothetical situations

---

[2] On their challenges to both the maternal health and fatal fetal anomaly exceptions, Plaintiffs appear to conflate vagueness and ambiguity. Ambiguity is when a statute has two potential meanings, while vagueness is when a statute is simply unclear. *See* Antonin Scalia & Bryan Garner, *Reading Law* 31–33 (2012). Plaintiffs allege that the exceptions are vague, *e.g.*, ECF No. 10, ¶ 193, but in the next breath, they call these exceptions "[a]mbiguous," ECF No. 10, at 29, 34 (subheadings). At least for this Motion, the Governor, Attorney General, and Solicitors treat this claim as a vagueness one.

not before the Court" to "support a facial attack on a statute when it is surely valid in the vast majority of its intended applications" (cleaned up)); *SisterSong Women of Color Reprod. Just. Collective v. Governor of Ga.*, 40 F.4th 1320, 1327–28 (11th Cir. 2022) (explaining the standard for facial challenges to abortion laws after *Dobbs* and noting that there is no "abortion exceptionalism" in vagueness cases).

### 1. Exception for maternal health

The 2023 Act permits a doctor to perform an abortion "due to a medical emergency," "to prevent the death of the pregnant woman," or "to prevent the serious risk of a substantial and irreversible impairment of a major bodily function, not including psychological or emotional conditions, of the pregnant woman." S.C. Code Ann. § 44-41-640(A). The Act includes 11 examples (including miscarriage, ectopic pregnancy, and severe preeclampsia) of conditions that are "presumed" to satisfy this exception. *Id.* § 44-41-640(C)(2).

A doctor must determine that this exception is met based on "standard medical practice" and "reasonable medical judgment." *Id.* § 44-41-640(B)(1), (C)(1). The doctor must record her belief that a medical emergency required an abortion, what the medical condition was, and the medical rationale for the decision. *Id.* § 44-41-640(B)(2).

Coming at the maternal health exception from multiple perspectives confirms that Plaintiffs' claim fails.

**i.** Start with the Act's inclusion of certain examples. The 2023 Act identifies 11 conditions that are "presumed" to satisfy this exception. *Id.* § 44-41-640(C)(2). On the face of the statute, then, it is "without question" many cases in which the exception applies. *Doe*, 842 F.3d at 842. Plus, these instances can be used as analogies for other conditions. *See, e.g.*, *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011) (Selya, J.) ("The existence of clear

examples of conduct covered by a law may, in certain circumstances, help to insulate the law against an accusation of vagueness." (citing *Parker*, 417 U.S. at 754)).

No doubt, a lawyer could concoct some fact pattern that might pose a close question. "It will," after all, "always be true that the fertile legal imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question." *Grayned v. City of Rockford*, 408 U.S. 104, 112 n.15 (1972) (cleaned up). But such "speculation about possible vagueness in hypothetical situations" cannot be the basis for "a facial attack on a statute." *Hill*, 530 U.S. at 733. Plaintiffs cannot come up with hard fact patterns to strike down a law that is easily applied in the mine-run case. If "hard cases[] make bad law," *N. Sec. Co. v. United States*, 193 U.S. 197, 364 (1904) (Holmes, J., dissenting), hard hypothetical cases make even worse law.

**ii.** Turn next to Plaintiffs' questions about the maternal health exception. They ask how certain a doctor must be about the "serious risk" to a mother's health: "All but certain? Fifty-one percent? Twenty-five percent?" ECF No. 10, ¶ 112. Though they don't explicitly say so, it seems that Plaintiffs view the Act has permitting there to be one—and only one—correct medical decision in any case. That's not necessarily true. The exception requires a physician to use "reasonable medical judgment." S.C. Code Ann. § 44-41-640(C)(1). Sure, in some cases, all reasonable minds could reach only one decision. But in other cases, physicians might disagree. (Otherwise, why would patients ever seek a second opinion from a different doctor about whether a surgery is necessary or a plan for treating cancer or countless other issues?) "[T]he fact that one physician would choose to perform the emergency abortion under those circumstances while others would not, does not necessarily mean the former physician is acting unreasonably." *Karlin v. Foust*, 188 F.3d 446, 464 (7th Cir. 1999) (upholding the medical emergency exception in Wisconsin's abortion law).

The certainty issues carry over to the statutory text as well. "[W]e can never expect mathematical certainty from our language." *Grayned*, 408 U.S. at 110. That's why "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). The exception has a "plainly legitimate sweep," so Plaintiffs' "facial challenge must fail." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) (a facial challenge must show that a "law's unconstitutional applications substantially outweigh its constitutional ones").

Reinforcing that language is rarely (if ever) mathematically precise is Plaintiffs' request for relief. Twice, they ask the Court to enjoin Defendants from enforcing the Act when "an abortion is necessary to prevent a *severe* health risk." ECF No. 10, Prayer for Relief (C), (E) (emphasis added). But everything Plaintiffs say about "serious," *e.g.*, *id.* ¶ 106, could also be said about "severe." "Serious" means "having important or dangerous possible consequences." Merriam-Webster's (2025), https://tinyurl.com/d3nty86t. "Severe" means "very painful or harmful." *Id.* https://tinyurl.com/528wmrkm. It's not as if one term is obviously clearer than the other. If anything, perhaps "severe" is more extreme, which would make it harder for the maternal health exception to apply. But for now, all that matters is that Plaintiffs' own articulation of their preferred standard is, grammatically speaking, functionally the same as the General Assembly's choice of words.

And on top of that, the Supreme Court has recognized that "[m]any perfect constitutional statutes use imprecise terms"—including "serious." *Sessions v. Dimaya*, 584 U.S. 148, 159 (2018). Look no further than the Emergency Medical Treatment and Labor Act, better known as EMTALA. *See* 42 U.S.C. § 1395dd. That federal law uses "serious" three times in defining an

"emergency medical condition." *Id.* § 1395dd(e)(1)(A).

It's not just federal law or abortion-related statutes. For instance, South Carolina law allows a doctor to provide care to a person "without consent" if, in the doctor's "reasonable medical judgment," the person faces "a substantial risk of death" or a "serious threat to [his] health." S.C. Code Ann. § 44-66-40(A); *see also id.* § 44-66-50.

Making Plaintiffs' use of "severe" even more curious is that they attack the maternal health exception's "substantial and irreversible impairment of a major bodily function" as having "no inherent meaning in medicine." ECF No. 10, ¶ 115. Yet they never claim that "severe" is a special medical term. In any event, legislatures need not write in medical jargon. *Cf. Wag More Dogs Liab. Corp. v. Cozart*, 680 F.3d 359, 371 (4th Cir. 2012) (courts may use "[d]ictionary definitions and old-fashioned common sense" to resolve a vaguess challenge). And these words can be readily understood. "Substantial" means "important" or "essential." Merriam-Webster's, https://tinyurl.com/3ps4peb5. "Irreversible" is even easier: "not reversible." *Id.* https://tinyurl.com/mry8u2em. "Impairment" is defined as "diminishment or loss of function or ability." *Id.* https://tinyurl.com/bdfj2h44. And a "major bodily function" is a notable or conspicuous part, *id.* https://tinyurl.com/yeyrycbk, of "any of a group of related actions contributing to a larger action," *id.* https://tinyurl.com/ms8yvfzu, of the body. So perhaps the statute does not use a special medical phrase, but it does not have to. By using language that anyone can fairly understand, the statute satisfies due process's demand.

**iii.** Plus, it's not like South Carolina is an outlier in using the terms to which Plaintiffs object. Alabama uses these same two phrases in its definition of "medical emergency" in regulating abortion. Ala. Code § 26-22-2(6). And Arizona. Ariz. Rev. Stat. Ann. § 36-2321(7). And Idaho. Idaho Code Ann. § 18-8801(5). And Mississippi. Miss. Code Ann. § 41-41-405(j). And the list

goes on. *See, e.g.*, Mont. Code Ann. § 50-20-303(1); S.D. Codified Laws § 34-23A-1(5). Thus, although Plaintiffs attack only South Carolina's statute, they are effectively challenging language prevalent throughout the country in abortion regulation. The ubiquitousness of these phrases undermines any claim that they cannot be understood.

Lest there be any doubt that this common language is sufficient, Supreme Court decisions remove it. The District of Columbia once had an abortion law that prohibited taking unborn life unless it was done "for the preservation of the mother's life or health." *United States v. Vuitch*, 402 U.S. 62, 68 (1971). The law's opponents challenged the use of "health" as unconstitutionally vague. *Id.* The Court rejected that argument, recognizing that the lower court's interpretation of that term "accords with the general usage and modern understanding of the word 'health.'" *Id.* at 72. Though the Court's approach to statutory interpretation in *Vuitch* isn't consistent with today's accepted method of interpretation, what matters here is that the Court recognized that judges could interpret the single word "health" sufficiently such that it was not unclear as a constitutional matter. And so in *Doe v. Bolton*, 410 U.S. 179 (1973). There, the Court rejected a vagueness argument to a Georgia law that permitted abortion when it was "necessary" because "continuation of the pregnancy would endanger the life of the pregnant woman or would seriously and permanently injure her health." *Id.* at 191–92, 202.

**iv.** The examples that Plaintiffs offer confirm this analysis. Take Tarleton's experience with a woman having a miscarriage. *See* ECF No. 10, ¶ 130. Miscarriage is statutorily presumed to satisfy the maternal health exception. S.C. Code Ann. § 44-41-640(C)(2). That "someone" (Plaintiffs don't allege who) may have made a false accusation that an unlawful abortion was being performed doesn't mean that the Act is vague. Anyone can make an accusation. If an accusation is baseless, the remedy isn't striking down the 2023 Act. It's pursuing criminal charges, *id.* § 16-

17-722, or a civil action, *see Hawkins v. Greene*, 311 S.C. 88, 91, 427 S.E.2d 692, 693 (Ct. App. 1993) (intentional infliction of emotional distress).

The other example Plaintiffs cite (relating to Seal getting "approval" for a woman with "chronic kidney dysfunction"), ECF No. 10, ¶ 127, has nothing to do with Defendants here. This internal approval issue (presumably getting approval from a hospital) is about how Seal's employer handles (or handled) abortions. If that hospital system wants to sue about the exception's meaning, that system could try to bring that case. But Seal and the other Plaintiffs can't sue state officials based on a hospital's application of its own internal procedures. *Cf. Doe v. Va. Dep't of State Police*, 713 F.3d 745, 755 (4th Cir. 2013) (traceability requires the harm to be caused by the defendant, not a third party beyond the court's jurisdiction). Plus, this is a single example—hardly the stuff of a facial challenge.

## 2. Exception for fatal fetal anomalies

Under South Carolina law, a fatal fetal anomaly exists when, "in reasonable medical judgment, the unborn child has a profound and irremediable congenital or chromosomal anomaly that, with or without the provision of life-preserving treatment, would be incompatible with sustaining life after birth." S.C. Code Ann. § 44-41-610(5). The fatal fetal anomaly exception allows a doctor to perform an abortion at any time during a pregnancy if such an anomaly exists. *See id.* § 44-41-660(A). The doctor must use "standard medical practice" to make that determination, *id.*, and then she must record the presence and nature of the anomaly and explain "the medical rationale for making the determination that with or without the provision of life-preserving treatment life after birth would be unsustainable," *id.* § 44-41-660(B)(1).

**i.** As a textual matter, *see Smith v. Tiffany*, 419 S.C. 548, 555, 799 S.E.2d 479, 483 (2017) ("statutory interpretation begins (and often ends) with the text"), this exception can be understood.

"Profound" means "all encompassing." Merriam-Webster's, https://tinyurl.com/5n7fdzfa. "Irremediable" means "not remedial," as in something that cannot be cured. *Id.* https://tinyurl.com/3z9ru9fe. A "congenital" anomaly is "acquired during development in the uterus and not through heredity." *Id.* https://tinyurl.com/y3n3evnx. A "chromosomal" anomaly exists in the "rod-shaped or threadlike DNA-containing structures" in the nucleus of a cell. *Id.* https://tinyurl.com/5t4f3z6v.

These terms are clear enough, so Plaintiffs instead focus on "incompatible" and "sustaining life." ECF No. 10, ¶ 136. But these terms are also clear, and Plaintiffs cannot read them unfairly to make the exception vague. "Incompatible" means "unsuitable for use together" or "incapable of association or harmonious existence." Merriam-Webster's, https://tinyurl.com/3rdnnsnj. And "sustaining" means "to give support to" or "supply with." *Id.* https://tinyurl.com/4mrtrnks. So if the physician determines that the anomaly means that a child cannot live (no matter what care the child receives), this exception would apply.

"Incompatible" and "sustaining life" are also terms used in other States' abortion laws. Georgia uses them. Ga. Code Ann. § 31-9B-1(3); *id.* § 16-12-141(a)(4). As does Oklahoma. Okla. Stat. Ann. tit. 63, § 1-746.1(3).

**ii.** For most conditions, there's no debate whether this standard is met, which means the exception cannot be unconstitutionally vague. A child with anencephaly (when the child is missing part of the brain and skull), for instance, cannot live outside the womb. *See Anencephaly*, CDC, https://tinyurl.com/ys4yf6ne (last visited Jan. 18, 2025).

On the other hand, some anomalies are not fatal. Down's Syndrome is the "most common chromosomal condition diagnosed in the United States," but these children "can lead healthy lives with supportive care." *Down's Syndrome*, CDC, https://tinyurl.com/4we5c67j (last visited Jan. 18,

2025). Spina bifida is another example. It is "caused by the incomplete development of the fetus' spine during the first months of pregnancy." *Spina Bifida*, Cleveland Clinic, https://tinyurl.com/ywzpyykz (last visited Jan. 19, 2025). The condition, however, is not fatal. "There is help available for all children affected by spina bifida and with the right care, most can lead active lives." *Id.*

In fact, even Plaintiffs' example in their Complaint about this exception is obviously not a fatal anomaly. *See* ECF No. 10, ¶ 141. Hypoplastic left heart syndrome isn't the automatic death sentence Plaintiffs suggest. The Cleveland Clinic observes that the condition "is usually fatal *if babies don't receive treatment*." *Hypoplastic Left Heart Syndrome*, Cleveland Clinic, https://tinyurl.com/c3bnf72p (last visited Jan. 18, 2025) (emphasis added). But these children can be treated—the Cleveland Clinic explains the medications and surgery involved. *Id.* No doubt, this is a hard diagnosis for parents, but it's not a fatal one for their child.

**iii.** Given this much clarity in the fatal fetal anomaly exception, the Court should not find this exception unconstitutionally vague. "Striking down" a law on a facial void-for-vagueness claim "is a disfavored judicial exercise." *Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998). "Of course there will be hard cases under any law." *Id.* But courts should decide these hard cases "as those challenges arise." *Id.* That "is part of the judicial job description," and courts should not "[h]astily resort[] to vagueness doctrine." *Dubin*, 599 U.S. at 132 n.10; *see also Hill*, 530 U.S. at 733 (speculation about hypotheticals cannot be the basis for a facial challenge); *Moody*, 603 U.S. at 724 (law is unconstitutionally vague only if its "unconstitutional applications substantially outweigh its constitutional ones").

Rather than litigating a hard case in the abstract, Plaintiffs could bring that case if it ever arises. Then a court would have specific facts to determine whether, in that case, the exception

applied. An as-applied lawsuit might have come, for example, based on the facts of Seal's patient whose unborn child had Trisomy 13, if Seal or her patient lacked clarity about whether the exception applied. *See* ECF No. 10, ¶ 153. Plaintiffs never explain why they didn't seek any declaratory relief then. Yet even now, Plaintiffs' allegations about this situation are curious. They note that Trisomy 13 cannot be confirmed until 16 weeks, which they say is "at least seven weeks after someone can legally end their pregnancy in South Carolina." *Id.* Not so. Unlike the rape and incest exceptions, which can be invoked only through 12 weeks in pregnancy, *see* S.C. Code Ann. § 44-41-650(A), the fatal fetal anomaly exception contains no such time limit, *see id.* § 44-41-660(A). Plaintiffs' suggestion that Seal's patient did not have time to get an abortion in South Carolina had Seal determined in her "reasonable medical judgment," *id.* § 44-41-610(5), that the unborn child had a fatal fetal anomaly is false.

**iv.** What's particularly troubling with Plaintiffs' attack on the fatal fetal anomaly exception is their attempt to impose their own views about which lives are "meaningful" enough to protect. They want the power to abort children who may have to "undergo extensive surgeries or remain on life support to stay alive" because those children are "preclude[d]" from having "a meaningful life." ECF No. 10, ¶ 136. They point to the "life-limiting" conditions standard from ACOG, which would allow Plaintiffs to abort unborn children who may have a "severe morbidity or extremely poor quality of life." ECF No. 10, ¶ 102 & n.10.

But South Carolina need not delegate such important policy decisions to any interest group. ACOG's (and presumably Plaintiffs') view of human life contradicts South Carolina's public policy. "[B]eing born is not a legally cognizable injury" because recognizing that injury "amounts to a repudiation of the value of human life." *Willis v. Wu*, 362 S.C. 146, 157–58, 607 S.E.2d 63, 69 (2004) (refusing to recognize the tort of wrongful life). Life is life. That is the simple, yet

inestimable declaration South Carolina has made. The exception for fatal fetal anomalies exists for the sad (and thankfully rare) instance when life outside the womb cannot exist given an unborn child's condition. It is not—as Plaintiffs want it to be—an exception to end a hard life early. Indeed, there's only a small step from Plaintiffs' argument to physician-assisted suicide to help people end (what they say) is a hard life. *See* S.C. Code Ann. § 16-3-1090(B) (prohibiting physician-assisted suicide).

One final observation on this claim: Plaintiffs (rightfully) never assert that the Constitution requires South Carolina to include a fatal fetal anomaly exception. Thus, were the Court to agree with them that this exception is somehow unintelligible, the exception would be severable from the 2023 Act. The rest of the Act "remains complete in itself" and is "wholly independent of" the fatal fetal anomaly exception. *Pinckney v. Peeler*, 434 S.C. 272, 288, 862 S.E.2d 906, 915 (2021). And if the choice were "no fetal anomaly exception" or "no heartbeat act," "it may fairly be presumed the legislature would" prefer not having this exception to not having the Act at all. *Id.*

## B.     The 2023 Act does not violate the Free Exercise Clause.

The First Amendment prohibits Congress from "mak[ing any] law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I; *see also Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940) (incorporating the Free Exercise Clause). The Free Exercise Clause guarantees a person "the right to believe and profess whatever religious doctrine one desires." *Smith*, 494 U.S. at 877.

### 1.     Plaintiffs' claim is inconsistent with the original understanding of the First Amendment.

The Constitution provides a "fixed standard." *Dobbs*, 597 U.S. at 235 (quoting 1 J. Story, *Commentaries on the Constitution of the United States* § 399, p. 383 (1833)). The First Amendment was adopted in 1791, but it was not incorporated by the Fourteenth Amendment until

1868 (though that fact wasn't judicially recognized for another 72 years). No matter whether one looks to 1791 or 1868 (or even to 1940 with *Cantwell*—which seems the most unlikely point to look), *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 82 (2022) (Barrett, J., concurring) (noting the open question), the answer is the same: States are free to regulate abortion without implicating Free Exercise.

In 1791, abortion was largely governed by the common law, which made abortion post-quickening a crime and did not provide any right to abortion even before that point. *See Dobbs*, 597 U.S. at 242–46 (discussing English and American law, including Blackstone, Coke, and Hale). By 1868, 28 of 37 States had statutorily criminalized abortion (including before quickening). *Id.* at 248–49. South Carolina did so in 1883, banning abortion unless an abortion was "necessary to preserve her life or the life of such child." 1883 S.C. Acts No. 354, § 1. That law remained in effect for almost a century, until South Carolina added exceptions for rape, incest, and fetal anomaly. *See* 1970 S.C. Acts No. 821.

States have therefore consistently regulated abortion from conception until birth. There do not appear to be any cases even discussing the First Amendment and abortion until just a few years before *Roe*. With about 180 or 90 years (depending on whether one looks to 1791 or 1868) of established practice, Plaintiffs cannot credibly claim that South Carolina's regulation of abortion implicates their Free Exercise rights. *Cf. Bruen*, 597 U.S. at 36 (majority opinion) ("where a governmental practice has been open, widespread, and unchallenged since the early days of the Republic, the practice should guide our interpretation of an ambiguous constitutional provision").

### 2. Plaintiffs have not alleged a sufficient burden on their religious exercise.

Plaintiffs "bear[] certain burdens to demonstrate an infringement of [their] rights under the Free Exercise [Clause]." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022). No Plaintiff

has met that burden.

Two Plaintiffs don't even claim to have a religious belief to be burdened. Tarleton cites a "matter of conscience" as her basis for providing "abortion care," ECF No. 10, ¶ 30, and Wyant likewise claims only to hold a "conscientious belief" for providing such care, *id.* ¶ 33. "There is," however, "no doubt that only beliefs rooted in religion are protected by the Free Exercise Clause." *Frazee v. Ill. Dep't of Emp. Sec.*, 489 U.S. 829, 833 (1989) (cleaned up). So Tarleton and Wyant cannot even get past the starting gate on a Free Exercise claim.

As for the remaining three Plaintiffs, what they allege—and what they do not allege—is telling. "*Smith* held that laws *incidentally burdening* religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so long as they are both neutral and generally applicable." *Fulton*, 593 U.S. at 523 (emphasis added). The 2023 Act does not incidentally burden these three Plaintiffs' religion. They never allege that performing an abortion itself is the exercise of their religious beliefs. It's hard to understate how significant that detail is. Rather than performing abortions being their religious act, Bingham, Seal, and Doe claim things like "withholding abortion care from very ill patients forces Plaintiffs to send their patients the messages that they do not matter, their decisions to end their pregnancy is wrong, and that they are on their own." ECF No. 10, ¶ 165; *see also id.* ¶ 175. Although the Act may not let them perform abortions that they would be willing to do, the Act does not stop Plaintiffs from telling patients that, but for the Act, they would perform the abortion or from expressing support for patients' wishes and choices. In other words, Bingham, Seal, and Doe may still exercise their religious beliefs, and the 2023 Act does not sufficiently burden those beliefs to give rise to a Free Exercise claim.

### 3.    The 2023 Act is neutral and generally applicable.

But even if Plaintiffs had sufficiently alleged a burden on their religious exercise, their

claim still fails. "[N]eutral and generally applicable" laws do not trigger strict scrutiny. *Fulton*, 593 U.S. at 533 (citing *Smith*, 494 U.S. at 878–82);[3] *cf. Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 531 (1993) ("Neutrality and general applicability are interrelated"). "[T]he right of free exercise," in other words, "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Smith*, 494 U.S. at 879 (cleaned up).

Plaintiffs claim that the 2023 Act is not such a law because the law "allows people to terminate potential life for a wide variety of secular purposes" but not for religious reasons. ECF No. 10, ¶ 104. But this allegation reveals Plaintiffs' fundamental misunderstanding of what a neutral and generally applicable law is.

**i.** A law may lack general applicability in several ways. One, "[a] law is not generally applicable if it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions." *Fulton*, 593 U.S. at 533 (cleaned up). For instance, an unemployment law was not generally applicable because that law's "'good cause' standard permitted the government to grant exemptions based on the circumstances underlying each application." *Id.* at 534 (discussing *Sherbert v. Verner*, 374 U.S. 398 (1963)). And in *Fulton* itself, the city had to approve individual applications for foster-placement agencies. *Id.* at 530.

Unlike those laws, the 2023 Act does not involve government officials exercising "sole discretion" to determine whether a pregnant woman may receive an "individual exemption[]" to

---

[3] *Smith* has, no doubt, been criticized. *See, e.g.*, *Fulton*, 593 U.S. at 543 (Barrett, J., concurring). But the Court hasn't overruled *Smith* yet, and "it remains the Supreme Court's prerogative alone to overrule one of its precedents." *Payne v. Taslimi*, 998 F.3d 648, 654 (4th Cir. 2021). In any event, Plaintiffs have even not asked to overrule *Smith*, so *Smith* provides the framework for analyzing this claim.

the 2023 Act. *Fulton*, 593 U.S. at 535. That the 2023 Act includes exceptions that permit abortions in specific and defined situations does not preclude it from being generally applicable. The exceptions, in other words, apply to everyone the same way. Were it otherwise, the Free Exercise Clause would dictate that many laws never permit exceptions to a general rule to survive constitutional challenge. And that logic would force States to go all-or-nothing on abortion, which the Supreme Court has never seemed to contemplate being the States' only option for regulating abortion. *See, e.g.*, *Roman Cath. Diocese of Albany v. Vullo*, 242 N.E.3d 1174, 1182–83 (N.Y. 2024) (rejecting an argument like Plaintiffs' because the challenged exemptions were "objective criteria delineated in the regulation itself and once met," could be "claim[ed]" without any discretionary decision by government officials).

    **ii.** A second way a law is not generally applicable is if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). For purposes of Free Exercise, "[c]omparability is concerned with the risks various activities pose, not the reasons why people [act]." *Id.* So a law that addressed disposing of animal carcasses after ritualistic animal sacrifice but not after hunting or by restaurants was too underinclusive of the government's public health interest to pass constitutional muster. *Fulton*, 593 U.S. at 534 (discussing *Church of Lukumi Babalu Aye, Inc.*, 508 U.S. 520).

    The 2023 Act is not underinclusive like laws in other cases. For instance, the local ordinances in *Church of Lukumi Babalu Aye* were "drafted with care to forbid few killings but those occasioned by religious sacrifice. Many types of animal deaths or kills for nonreligious

reasons [we]re either not prohibited or approved by express provision." 508 U.S. at 543. As a second illustration, during COVID, California's restrictions treated religious gatherings less favorably than secular gatherings (such as hair salons, retail stores, and movie theaters) despite the conduct being the same. *See Tandon*, 593 U.S. at 63–64. Put bluntly, those laws specifically, though not explicitly, targeted religious exercise.

Nothing about the 2023 Act is so underinclusive of the State's interest of protecting life. Start with the general line of "fetal heartbeat."[4] That line is based on the detection of "cardiac activity," S.C. Code Ann. § 44-41-610(6), which the General Assembly has found is a "key medical predicator that an unborn child will reach live birth," 2023 Act, § 1(1). It is, in other words, not a random time in pregnancy, but is instead a point that usually means an unborn child will survive. *See id.* § 1.

As for the rape and incest exception, it allows abortions up to 12 weeks of pregnancy. S.C. Code Ann. § 44-41-650(a). That exception seeks to balance protecting unborn life with the trauma that a rape or incest survivor suffers. How to balance those two interests is in the General Assembly's "plenary authority to make policy decisions." *ArrowPointe Fed. Credit Union v. Bailey*, 438 S.C. 573, 581, 884 S.E.2d 506, 510 (2023). Plaintiffs fare no better by mentioning the reporting requirement. Ever since South Carolina first permitted abortions for rape survivors, it has required that the allegation be reported to law enforcement. *See* 1970 S.C. Acts No. 821, § 1. And for good reason: The State has a "legitimate and compelling state interest in protecting the community from crime" that "cannot be doubted." *Schall v. Martin*, 467 U.S. 253, 264 (1984).

---

[4] Plaintiffs say that line is around nine weeks. *E.g.*, ECF No. 10, ¶¶ 73, 181. That's wrong. A "fetal heartbeat" under the Act exists around six weeks, when cardiac activity is typically first detectable. But this Court need not resolve that issue because the S.C. Supreme Court heard oral argument on that question in *Planned Parenthood South Atlantic v. State*, No. 2024-000997 (S.C.), just over a month ago.

After all, no one wants rapists roaming the streets.

Turning to the fatal fetal anomaly and maternal health exceptions, the General Assembly drew lines that protect life and health. The fatal fetal anomaly exception protects unborn children who will be able to live outside the womb. *See* S.C. Code Ann. § 44-41-610(6). And the maternal health exception ensures that a mother will not die (in which case the unborn child would too) or suffer some grievous, life-altering harm because of the pregnancy. *See id.* § 44-41-640(B)(1).

**iii.** Finally, Plaintiffs claim the 2023 Act is not neutral because it permits abortion "for a wide variety of secular purposes." ECF No 10, ¶ 181. They are, again, incorrect. "A law is considered neutral if it proscribes conduct without regard to whether that conduct is religiously motivated or not." *Hines*, 148 F.3d at 357. The 2023 Act never looks to anyone's motivation for aborting an unborn child. Instead, it applies neutral rules: If a pregnancy is far enough along, no abortion (unless certain exceptions apply). Whether an abortion provider wants to abort the unborn child for religious reasons or any other reason does not matter.

That a State does not take an all-or-nothing approach to abortion is no surprise. "A State need not," of course, "address all aspects of a problem in one fell swoop," and legislators must often "focus on their most pressing concerns." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015). That's what South Carolina did with the 2023 Act

And that's what States have long done on abortion. "Pre-*Roe*, political compromise was possible" on this issue, *Casey*, 505 U.S. at 995 (Scalia, J., concurring in part and dissenting in part), and States could legislate "on their most pressing concerns," *Williams-Yulee*, 575 U.S. at 449. Indeed, South Carolina was such an example. Before *Roe* took the issue away from the States, South Carolina enacted an updated abortion law in 1970 that generally prohibited abortion but included exceptions for maternal health, rape, incest, and fatal fetal anomaly. *See* 1970 S.C. Acts

No. 821. And after *Dobbs*, that compromise approach was possible again. Indeed, the 2023 Act came after "vigorous debate and compromise." *Planned Parenthood II*, 440 S.C. at 485, 892 S.E.2d at 132.

Because the 2023 Act is neutral and generally applicable, Plaintiffs cannot insist that the State must allow them to perform abortions motivated by their religious beliefs. *See Smith*, 494 U.S. at 882 (rejecting the argument that "when otherwise prohibitable conduct is accompanied by religious convictions, not only the convictions but the conduct itself must be free from governmental regulation"). Instead, the Act is subject merely to rational basis review. *See Canaan Christian Church v. Montgomery Cnty., Maryland*, 29 F.4th 182, 199 (4th Cir. 2022). The Act easily clears that bar, as prohibiting many abortions after a fetal heartbeat is detected is "rationally related to" the State's "legitimate" interest in protecting life. *Id.*; *see also* 2023 Act, § 1(3) (declaring the State's interest in life and health). Plaintiffs' Free Exercise claim thus fails.

### 4.     The 2023 Act survives strict scrutiny.

Even if the Court did not apply *Smith* but subjected the 2023 Act to strict scrutiny, Plaintiffs' Free Exercise claim cannot prevail.

**i.** Start with the compelling interest prong. The State has made clear its interest: "The State of South Carolina has a compelling interest from the outset of a woman's pregnancy in protecting the health of the woman and the life of the unborn child." *Id.* Protecting life from conception is a compelling interest. "If, as *Roe* held, a State's interest in protecting prenatal life is compelling after viability," the Supreme Court recently explained, "why isn't that interest equally compelling before viability? *Roe* did not say, and no explanation is apparent." *Dobbs*, 597 U.S. at 275 (majority opinion) (cleaned up). Protecting health is also a compelling interest. *E.g.*, *June Med. Servs. L.L.C. v. Russo*, 591 U.S. 299, 428 (2020) (Gorsuch, J., dissenting) ("And no one doubts

29

that women's health can be such a[ compelling state] interest."), *abrogated by Dobbs*, 597 U.S. 215. And although not mentioned in the 2023 Act, South Carolina enjoys "a significant role . . . in regulating the medical profession." *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007).

Faced with this blackletter law, Plaintiffs try a sleight of hand with the State's interest. Rather than acknowledging the State's express declaration of protecting "*the life* of the unborn child," 2023 Act, § 1(3) (emphasis added), Plaintiffs repeatedly talk about the State trying to "protect[] *potential life*," ECF No. 10, ¶ 191 (emphasis added); *see also id.* ¶¶ 8, 104, 184, 190. Unborn children do not have the "potential" to be alive. They are alive. True, they may not yet (at least early in pregnancy) be able to survive without their mother, but they are already alive. Plaintiffs seek to impose their own views of when life begins. "Nothing in the Constitution or in our Nation's legal traditions," however, "authorizes the [federal courts] to adopt that 'theory of life.'" *Dobbs*, 597 U.S. at 263.

**ii.** The State prevails on the narrow tailoring prong as well. Plaintiffs propose various things they say that the State could have done, but none would achieve the State's interest in protecting unborn life. For instance, "comprehensive sex education," ECF No. 1, ¶ 191, might prevent some pregnancies, but it has nothing to do with protecting life once a woman is pregnant. Although "expand[ing] . . . public benefits for expectant parents," *id.*, may ease those parents' financial burden (whether by adding to the taxpayers' burden or taking money away from other public goals), that does not guarantee that unborn children will not be aborted. And "reduc[ing] anti-Blackness in pregnancy care," *id*, doesn't guarantee that some mothers still wouldn't abort their children after a heartbeat exists. In short, none of these alternatives would help the State "achieve *that* interest" that it expressed in the 2023 Act. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 171 (2015) (emphasis added).

Looking to other States confirms this conclusion. Plaintiffs' argument amounts to a claim that comprehensive sex education, more social welfare, and reduced "anti-Blackness" would protect unborn life as effectively as the 2023 Act. In that case, California should have similar statistics for protecting unborn life, despite permitting abortions before viability. *See* Cal. Health & Safety Code § 123468(b). After all, California (1) has "comprehensive sexual health education," Cal. Dep't of Ed., *California's Health Education Initiatives*, https://tinyurl.com/mr3z6hb4 (last visited Mar. 1, 2025), (2) funds robust social-welfare programs, *see* Cal. Dep't of Soc. Servs., *Benefits and Services*, https://tinyurl.com/zb7ayd5b (last visited Mar. 1, 2025), and (3) puts "equity, diversity, and inclusion practices at the forefront of [its] daily work" on public health, Cal. Dep't of Pub. Health, *About Us: Focus on Equity*, https://tinyurl.com/38x8y9rv (last visited Mar. 1, 2025). Yet California has an abortion rate "significantly higher than the nationwide rate." Phillip Reese, *California Abortion Rate Rises to Highest Level in a Decade. What Experts Say*, Sacramento Bee (May 8, 2024), https://tinyurl.com/yeydz7b3. So none of these initiatives could replace the 2023 Act as more effective means of achieving the State's interest in protecting unborn life.

### 5.     Recognizing Plaintiffs' Free Exercise claim would lead to absurd results.

To illustrate further the problems with Plaintiffs' sweeping Free Exercise theory, consider what their argument would mean for other laws. For instance, South Carolina has outlawed polygamy since 1712. *See* 1 J. 1. C. 11, § 1 (1712), in 2 *Statutes at Large of South Carolina* 508 (Thomas Cooper ed. 1837). And the U.S. Supreme Court has long upheld laws banning polygamy, specifically rejecting Free Exercise objections. *See Reynolds v. United States*, 98 U.S. 145, 166–67 (1878). But if Plaintiffs are right, these polygamy bans prohibit someone else's religious exercise. *Cf. Obergefell v. Hodges*, 576 U.S. 644, 704 (2015) (Roberts, C.J., dissenting) ("It is

striking how much of the majority's reasoning would apply with equal force to the claim of a fundamental right to plural marriage."). Although the State has (very) good reasons for prohibiting polygamy, Plaintiffs' Free Exercise theory, if adopted, would cast doubt on the State's three centuries of prohibiting polygamy.

To be sure, the hypotheticals could get more extreme. South Carolina also prohibits physician-assisted suicide. *See* S.C. Code Ann. § 16-3-1090(B). Some people with terminal conditions (cancer, muscular dystrophy, or Alzheimer's, to name just a few potential ones) might want to end their lives. Bingham says her "faith informs her medical practice" as she seeks to "empower her patients to make healthcare decisions consistent . . . with . . . their values and wishes." ECF No. 10, ¶ 18. Doe alleges that her "faith commands her to . . . alleviat[e] human suffering." *Id.* ¶ 22. Seal claims a "cornerstone[] of" her "faith [is] that God has entrusted each person with the ability to direct the course of their lives." *Id.* ¶ 26. And Wyant insists that she holds the "conscientious belief that women are capable moral agents who should be trusted to make important decisions about their bodies[ and] lives." *Id.* ¶ 33. All these claims of faith could easily be interpreted as requiring Plaintiffs to help a patient end her life. And under Plaintiffs' view of Free Exercise, South Carolina would have to permit them to do so. After all, physician-assisted suicide is like abortion: Both terminate a life. (Even if Plaintiffs would prefer to use "fetus" or "embryo" to describe the unborn child, that unborn child is alive—they cannot dispute that.)

And the examples do not stop there. For example, "a *per se* rule that secular exceptions require religious exemptions would mean that religiously motivated killing—honor killing, stoning, child sacrifice—must be permitted because of these exceptions." Br. of Amici Curiae Professors Stephanie H. Barclay and Richard W. Garnett in Support of Appellants-Defendants' Petition to Transfer, *Individual Members of Med. Licensing Bd. of Ind. v. Anonymous Plaintiff 1*,

No. 22A-PL-2938, 2024 WL 2863289, at *17–18 (Ind. Ct. App. May 20, 2024). But courts have never suggested that laws against murder violate Free Exercise. "Similarly, if the law allowed a doctor to perform an osteotomy (a procedure that requires the breaking of a bone to reshape or realign a bone), a per se rule triggering accommodations based on secular exemptions would mean that a parent could seek a religious accommodation to beat and break the child's bones for religious reasons." *Id.* at *18. In other words, if all secular exceptions must be accompanied by unbridled religious exceptions, the imagination is the limit on what First Amendment claims might look like.

Plaintiffs' Free Exercise theory lacks any limiting principle. Under their view, is there any limit on when they can perform abortions? Would they admit the State's interest is compelling enough sometime in pregnancy to overcome their religious exercise of aborting unborn children? And if so, at what point? And on what theory?

\*    \*    \*

None of Plaintiffs' claims has merit. But before moving on, it's worth a more general observation. Having lost on the federal level (in *Dobbs*) and on the state level (in *Planned Parenthood II*), abortion advocates are now left to attack laws regulating abortion with new legal theories. Of course every law must comply with the Constitution, but these advocates should not be allowed to transmogrify constitutional doctrines to force States to let them abort unborn children whenever they see fit. That's not consistent with the Constitution's original meaning or the Supreme Court's reminder that decisions about abortion belong to the People.

## III. Plaintiffs seek overly broad relief.

Even if Plaintiffs had standing and meritorious claims, they still seek relief that the Court cannot grant.

An injunction is "an equitable remedy." *Great-W. Life & Annuity Ins. v. Knudson*, 534 U.S.

204, 211 n.1 (2002). "Equity originated in England as a means for the Crown to dispense justice by exercising its sovereign authority." *Trump v. Hawaii*, 585 U.S. 667, 716 (2018) (Thomas, J., concurring). This field "allowed the sovereign to afford discretionary relief to parties where relief would not have been available under the rigors of the common law." *Id.* at 716–17 (cleaned up). Federal courts are limited to exercising the power that English equity courts possessed when the Constitution was adopted. *Grupo Mexicano de Desarrollo S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999).

"The English system of equity did not contemplate universal injunctions." *Hawaii*, 585 U.S. at 717. And American courts have followed this rule by "not provid[ing] relief beyond the parties to the court." *Id.* Thus, "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief *to the plaintiffs*." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added).

Plaintiffs are five doctors. No one else. Yet Plaintiffs seek a jurisdiction-wide injunction. *See* ECF No. 10, Prayer for Relief (B). That is relief the Court lacks the power to grant. Enjoining state officials from enforcing the 2023 Act "on its face," *id.*, not only goes beyond relief to Plaintiffs but also beyond the claims in the Amended Complaint. They have not challenged the entire Act, so they should not get relief on the entire Act. *See Gill v. Whitford*, 585 U.S. 48, 66 (2018) ("a plaintiff's remedy must be limited to the inadequacy that produced his injury in fact" (cleaned up)). Granting Plaintiffs the relief that they seek would "def[y] these foundational principles" about federal jurisdiction, *Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring in grant of stay), and rest on a "legally and historically dubious" foundation, *Hawaii*, 585 U.S. at 721.

Even Plaintiffs' fallback relief is too broad. That request still seeks an injunction that would

amount to a de facto class action, benefiting every abortion provider in South Carolina. *See* ECF No. 10, Prayer for Relief (C), (D). If Plaintiffs wanted such broad relief, they could have used Rule 23, but they haven't done so. (And for good reason. Showing numerosity, commonality, typicality, and adequacy would all have been hard. *See* Fed. R. Civ. P. 23(b).) Because they haven't done so, they cannot get relief that amounts to class relief.

Plaintiffs' requested relief gets no better even when they limit it to themselves. They ask for a permanent injunction "in any circumstances in which the [2023 Act]'s enforcement would be unconstitutional." ECF No. 10, Prayer for Relief (F). Courts do not grant such vague or follow-the-law injunctions. "[B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). That's why injunctions must "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1)(C). It's Plaintiffs' requested relief—not the 2023 Act—that's vague.

## <u>CONCLUSION</u>

The Court should grant the Motion to Dismiss.

Respectfully submitted,

s/Thomas T. Hydrick
Robert D. Cook (Fed. Bar. No. 285)
*Solicitor General*
J. Emory Smith, Jr. (Fed. Bar. No. 3908)
*Deputy Solicitor General*
Thomas T. Hydrick (Fed. Bar. No. 13322)
*Asst. Dep. Solicitor General*
Joseph D. Spate (Fed. Bar. No. 13100)
*Asst. Dep. Solicitor General*
Benjamin M. McGrey (Fed Bar No. 14374)
*Asst. Dep. Solicitor General*
OFFICE OF THE
SOUTH CAROLINA ATTORNEY GENERAL
1000 Assembly St.
Columbia, South Carolina 29201
(803) 734-4127
rcook@scag.gov
esmith@scag.gov
thomashydrick@scag.gov
josephspate@scag.gov
benmcgrey@scag.gov

*Counsel for Attorney General Wilson and Solicitors Pascoe, Weeks, Burch, Newman, Barnette, Stumbo, Black, Hubbard, Clements, Wilkins, Richardson, and Brackett*

March 17, 2025
Columbia, South Carolina

s/Wm. Grayson Lambert
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)
*Chief Legal Counsel*
Wm. Grayson Lambert (Fed. Bar No. 11761)
*Chief Deputy Legal Counsel & Senior Litigation Counsel*
Erica W. Shedd (Fed. Bar No. 13206)
*Deputy Legal Counsel*
Tyra S. McBride (Fed. Bar No. 13324)
*Deputy Legal Counsel*
OFFICE OF THE GOVERNOR
South Carolina State House
1100 Gervais Street
Columbia, South Carolina 29201
(803) 734-2100
tlimehouse@governor.sc.gov
glambert@governor.sc.gov
eshedd@governor.sc.gov
tmcbride@governor.sc.gov

*Counsel for Governor McMaster*