# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### Charleston Division

NATALIE DAWN BINGHAM, M.D., M.P.H., *et al.*,

                    *Plaintiffs*,

  v.

ALAN McCRORY WILSON, in his official capacity as Attorney General of South Carolina, *et al.*,

                    *Defendants,*

and

HENRY DARGAN McMASTER, in his official capacity as Governor of the State of South Carolina,

                    *Intervenor-Defendant.*

CASE NO. 2:25-cv-00163-RMG

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ iv

INTRODUCTION ......................................................................................................... 1

STATEMENT OF FACTS ............................................................................................ 5

    I.     Plaintiffs Hold Sincere Religious and Conscientious Beliefs That Compel Them
         to Honor a Patient's Request To End A Pregnancy When It Threatens to Profoundly
         Harm Her .................................................................................................................... 5

         A.  Dr. Natalie Dawn Bingham.......................................................................... 5

         B.  Dr. Jane Doe................................................................................................. 5

         C.  Dr. Patricia Seal .......................................................................................... 6

         D.  Dr. Jessica Tarleton...................................................................................... 7

         E.  Dr. Katee L. Wyant...................................................................................... 7

    II.    South Carolina Bans Abortion Early in Pregnancy Subject to Three Secular
         Exceptions.................................................................................................................. 8

         A.  Health Exception.......................................................................................... 8

         B.  Fatal Fetal Anomaly Exception ................................................................... 9

         C.  Rape or Incest Exception ............................................................................. 9

LEGAL STANDARDS ................................................................................................ 10

    I.     Plaintiffs State a Facially Plausible Vagueness Claim .................................... 10

         A.  Health Exception........................................................................................ 12

          B.  Fatal Fetal Anomaly Exception ................................................................. 17

    II.    Plaintiffs State a Facially Plausible Free Exercise Claim ................................ 21

         A.  The Free Exercise Clause Does Not Categorically Exclude Abortion from Its
            Ample Protections...................................................................................... 21

         B.  Plaintiffs Have Sufficiently Alleged that South Carolina's Abortion Ban Burdens
            Their Sincere Religious Practice................................................................ 24

         C.  Plaintiffs Have Sufficiently Alleged that South Carolina's Abortion Ban Is Not
            Generally Applicable ................................................................................. 25

         D.  South Carolina's Abortion Ban Fails Strict Scrutiny................................. 28

         E.  Plaintiffs' Free Exercise Claim and the Binding Precedent Underlying It Include
            an Effective Limiting Principle................................................................. 30

    III.   Plaintiffs Have Standing to Assert Each Claim ............................................... 31

    IV.   Plaintiffs Have Requested Proper Relief ........................................................ 34

CONCLUSION.................................................................................................................. 35

# TABLE OF AUTHORITIES

*Page(s)*

*Cases*

*Access Indep. Health Servs., Inc. v. Wrigley,*
  08-2022-CV-01608 (S. Cent. Jud. Dist., Burleigh Cnty., N.D., June 12, 2023) ....................... 15

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ............................................................................................. 32

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ............................................................................................. 13

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ............................................................................................. 10

*Biden v. Nebraska,*
  143 S. Ct. 2355 (2023) ......................................................................................... 32

*Bing v. Brivo Sys.,*
  959 F.3d 605 (4th Cir. 2020) ................................................................................ 10

*Brownback v. King,*
  592 U.S. 209 (2021) ............................................................................................. 10

*Bryant v. Woodall,*
  1 F.4th 280 (4th Cir. 2021) ............................................................................. 32, 33

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ....................................................................... 22, 23, 25, 30

*Cantwell v. Connecticut,*
  310 U.S. 296 (1940) ............................................................................................. 21

*Carolina Youth Action Project; D.S. by & through Ford v. Wilson,*
  60 F.4th 770 (4th Cir. 2023) .......................................................... 13, 14, 15, 19

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ....................................................................................*passim*

*City of Chicago v. Morales,*
  527 U.S. 41 (1999) .................................................................................. 11, 13, 19

*Coal. of MISO Transmission Customers v. FERC,*
  45 F.4th 1004 (D.C. Cir. 2022) ........................................................................... 33

*Colautti v. Franklin,*
  439 U.S. 379 (1979) ............................................................................................. 12

*Crawford v. Marion Cnty. Election Bd.,*
  553 U.S. 181 (2008) ............................................................................................. 14

*Dobbs v. Jackson Women's Health Org.,*
  597 U.S. 215 (2022) ................................................................................ 2, 4, 12, 22

iv

*Doe v. Cooper*,
 842 F.3d 833 (4th Cir. 2016) ..................................................... 11, 15

*Dubin v. United States*,
 599 U.S. 110 (2023) ............................................................... 20

*F.C.C. v. Fox Television Stations, Inc.*,
 567 U.S. 239 (2012) ............................................................... 35

*Food & Drug Admin. v. All. For Hippocratic Med.*,
 602 U.S. 367 (2024) ............................................................... 33

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*,
 170 F.3d 359 (1990) ............................................................... 26

*Fulton v. City of Philadelphia*,
 593 U.S. 522 (2021) ..........................................................*passim*

*Gonzales v. O Centro Espírita Beneficente União do Vegetal*,
 546 U.S. 418 (2006) ............................................................ 3, 29

*Grayned v. City of Rockford*,
 408 U.S. 104 (1972) ........................................................... 11, 17

*Karlin v. Foust*,
 188 F.3d 446 (1999) ............................................................... 17

*Hill v. Colorado*,
 530 U.S. 703 (2000) ............................................................... 13

*Moore–King v. Chesterfield*,
 708 F.3d 560 (4th Cir. 2013) ................................................... 2, 24

*Johnson v. United States*,
 576 U.S. 591 (2015) ....................................................... 11, 14, 19

*Johnson v. Wyoming*
 2023-CV-18853 (9th Jud. Dist. Ct., Teton Cnty., Wyo. Mar. 21, 2023).............. 15

*Jordan v. De George*,
 341 U.S. 223 (1951) ..........................................................*passim*

*Kennedy v. Bremerton Sch. Dist.*,
 597 U.S. 507 (2022) ....................................................... 22, 23, 28

*Kenny v. Wilson*,
 885 F.3d 280 (4th Cir. 2018) ..................................................... 34

*Kolender v. Lawson*,
 461 U.S. 352 (1983) ........................................................... 10, 21

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
 2 F.4th 330 (4th Cir. 2021) ...................................................... 35

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992) ........................................................... 32, 34

*Lumumba v. Kiser*,
116 F.4th 269 (2024) ........................................................... 13

*Manning v. Caldwell for City of Roanoke*,
930 F.3d 264 (4th Cir. 2019) ..................................... 14, 18

*McCormack v. Herzog*,
788 F.3d 1017 (9th Cir. 2015) ............................................ 14

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ......................................................... 11

*Moyle v. United States*,
603 U.S. 324 (2024) ......................................................... 16

*N. Hess' Sons, Inc. v. Hess Apparel, Inc.*,
738 F.2d 1412 (4th Cir. 1984) ........................................... 35

*Obergefell v. Hodges*,
576 U.S. 644 (2015) ......................................................... 30

*Pinckney v. Peeler*,
434 S.C. 272 (2021) ........................................................... 4

*Planned Parenthood S. Atl. v. State*,
438 S.C. 188 (Jan. 5, 2023) ................................................ 3

*Planned Parenthood S. Atl. v. State*,
440 S.C. 465 (S.C. 2023) .................................................... 3

*Roman Catholic Diocese of Albany v. Vullo*,
242 N.E.3d 1174 (N.Y. 2024) ...................................... 25, 26

*Singleton v. Wulff*,
428 U.S. 106 (1976) ......................................................... 20

*Susan B. Anthony List v. Driehaus*,
573 U.S. 1498 (2014) .................................................. 31, 32

*Tandon v. Newsom*,
593 U.S. 61 (2021) ..................................................... *passim*

*United States v. Seeger*,
380 U.S. 163 (1965) ......................................................... 24

*United States v. Vuitch*,
402 U.S. 62 (1971) ........................................................... 14

*United States v. Williams*,
553 U.S. 285 (2008) ................................................... *passim*

*URI Student Senate v. Town of Narragansett*,
631 F.3d 1 (1st Cir. 2011) ................................................. 16

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) ................................................... *passim*

*Wag More Dogs, Ltd. Liability Corp. v. Cozart*,
 680 F.3d 359 (4th Cir. 2012) ............................................................ 15

*Women's Med. Pro. Corp. v. Voinovich*,
 130 F.3d 187 (6th Cir. 1997) ........................................................ *passim*

**Statutes**

Ala. Code § 26-22-2(6) .................................................................... 14

Ariz. Rev. Stat. § 36-2321(7) ........................................................... 14

Miss. Code Ann. § 41-41-405(j) ....................................................... 14

S.C. Code Ann. § 16-11-440(C) ....................................................... 31

S.C. Code Ann. § 44-41-330(A) ......................................................... 8

S.C. Code Ann. §§ 44-41-610-690 ............................................... *passim*

S.C. Code Ann. § 44-66-40(A) ......................................................... 15

S.C. Code Ann. § 44-66-50 ............................................................. 15

U.S. Const. amend. I ................................................................. *passim*

**Other Authorities**

Cleveland Clinic, *Anencephaly*, https://my.clevelandclinic.org/health/diseases/15032-anenceph-aly (last visited Apr. 14, 2025) ......................................................... 19

Csaba Siffel et al., *Survival of Children with Hypoplastic Left Heart Syndrome*, PEDIATRICS (Oct. 2015), https://doi.org/10.1542/peds.2014-1427 ........................................ 20

Opinion 5.7 Physician-Assisted Suicide, *AMA Code of Medical Ethics*, (Am. Med. Ass'n) https://code-medical-ethics.ama-assn.org/ethics-opinions/physician-assisted-suicide (last visited Apr.. 14, 2025) ........................................................... 30

*Understanding Second-Trimester Miscarriage*, UC Davis Health, https://health.ucdavis.edu/obgyn/specialties/family-planning/early-pregnancy-miscarriage/second-trimester-miscarriage ...................................................... 28

## INTRODUCTION

Plaintiff physicians provide obstetrical and gynecological care, including abortions, to patients throughout South Carolina. First Amended Compl., ECF No. 10 ("Compl.") ¶¶ 15, 20, 25, 29, 32. They hold sincere religious and conscientious beliefs that command them to respect every person's inherent worth, help people in critical need, and place others before themselves. *Id.* ¶¶ 16–17, 22, 26, 30, 33. That includes using their medical training to honor a patient's request to end a pregnancy that threatens to profoundly harm her. *Id.* ¶¶ 18–19, 23–24, 27–28, 30–31, 33–34. Plaintiffs have challenged South Carolina's Abortion Ban, S.C. Code Ann. §§ 44-41-610–690, in part because it regularly forces them to violate their faith. *Id.* ¶¶ 19, 24, 28, 31, 34.

Defendants' motion to dismiss Plaintiffs' challenge lacks merit because Plaintiffs state facially plausible free exercise and vagueness claims and have standing to bring the challenge.[1]

Plaintiffs have alleged that South Carolina's Abortion Ban routinely forces them to deny abortion care to 1) those who need it to preserve their health, 2) those who seek to spare a child born with a fatal anomaly needless suffering, and 3) most rape or incest survivors for fear of imprisonment and professional discipline contrary to their deeply held religious beliefs. *Id.* ¶¶ 125, 150, 168–169, 178; *see id.* ¶¶ 114, 118–119, 136, 170–171. Yet the State allows people to end potential life for a wide variety of secular purposes, including abortions for any reason before fetal cardiac activity can be detected by ultrasound; the Health, Fatal Fetal Anomaly, and Rape or Incest Exceptions; and in vitro fertilization ("IVF"). *Id.* ¶ 181; *see Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (per curiam) (emphasizing that a law is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise").

---

[1] For the purposes of this brief, "Defendants" are the Governor, Attorney General, and Circuit Solicitors who have erroneously moved to dismiss Plaintiffs' case.

In claiming that *no abortion regulation* can *ever* violate *any* aspect of the First Amendment, Defendants profoundly misread both *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022), and decades of free exercise precedent. *See* Mot. to Dismiss, ECF No. 70 ("Defs' Br.") 23. The fact that a government has the police power to legislate on a certain issue does not insulate the resulting statutes from constitutional scrutiny. *See Kovacs v. Cooper*, 336 U.S. 77, 83 (1949) ("The police power of a state extends beyond health, morals and safety, and comprehends the duty, *within constitutional limitations*, to protect the well-being and tranquility of a community." (emphasis added)). Indeed, it defies reason to believe that the Supreme Court took the unprecedented step of excluding an entire class of activity (abortion) and an entire class of people (anyone providing, facilitating, or obtaining an abortion) from the ample protections of the right to religious freedom without expressly saying so.

Defendants concede the sincerity of Plaintiffs' beliefs and that some of them are religious in nature. Defs' Br. 24. But they ignore that the Free Exercise Clause protects sincerely held conscientious beliefs on par with sincerely held religious beliefs. *Id.*; *Moore–King v. Chesterfield*, 708 F.3d 560, 571 (4th Cir. 2013), *abrogated on other grounds by Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018). Defendants also wrongly maintain that South Carolina's Abortion Ban is generally applicable based on the misconception that laws must target religion to lack general applicability. Defs' Br. 27. In defending the Ban's line-drawing, Defendants actually demonstrate how it is not generally applicable. *See id.* at 27–28. Finally, Defendants' conclusory assertion that "[n]o one can credibly challenge the State's interest in protecting life and health" falls flat.[2] *Id.* at 4. The question is not whether South Carolina has a compelling interest in

---

[2] Defendants neglect to address how South Carolina's Abortion Ban protects patients' health even in theory.

protecting potential life generally, but whether it has a compelling interest in protecting potential life by criminalizing Plaintiffs for providing abortion care that their faith mandates. *See Gonzales v. O Centro Espírita Beneficente União do Vegetal*, 546 U.S. 418, 431 (2006). The State's failure to advance its alleged interest in numerous ways dooms its application to Plaintiffs in circumstances governed by their faith. *See Lukumi*, 508 U.S. at 547.

As for unconstitutional vagueness, Plaintiffs have alleged that the ambiguity and non-medical language of the Health and Fatal Fetal Anomaly Exceptions routinely prevent them from determining whether the Exceptions permit an abortion in a particular situation, or whether Plaintiffs will instead be criminally and professionally liable for providing an abortion in that circumstance.[3] Compl. ¶¶ 114, 118–119, 136. Thus, there is nothing "[s]peculat[ive]" or "hypothetical" about the Ban's vagueness. Defs' Br. 3 (citation omitted). Plaintiffs' allegations support a facially plausible claim that South Carolina's Abortion Ban fails the heightened standard of clarity for criminal laws that threaten a constitutional right. *See Jordan v. De George*, 341 U.S. 223, 230 (1951); *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982). Defendants ignore this heightened standard.

Defendants also mistakenly cite as confirmation of the Ban's clarity 1) a non-exhaustive list of eleven conditions "presumed" to qualify for the Health Exception, and 2) one condition that clearly qualifies for the Fatal Fetal Anomaly Exception (anencephaly), and one that does not

---

[3] The disposition of previous vagueness challenges to the Abortion Ban and a version of it under South Carolina's Constitution has no bearing on this case. *See* Defs' Br. 2. In 2022, the South Carolina Supreme Court declined to address a vagueness challenge to a version of the Abortion Ban based on the ban's alleged conflicts with other South Carolina laws, not the scope of the ban's exceptions. *Planned Parenthood S. Atl. v. State*, 438 S.C. 188 (Jan. 5, 2023). Later, the South Carolina Supreme Court summarily dismissed a vagueness challenge to the Abortion Ban's Health and Fatal Fetal Anomaly Exceptions under the South Carolina Constitution without any analysis. *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 480 n.8 (Aug. 23, 2023).

(Down Syndrome). Defs' Br. 3. This neglects the complexity and uncertainty of medicine overall, and pregnancy in particular, in which the potential risks to the patient and their pregnancy are much vaster and harder to pin down. *See* Compl. ¶¶ 114, 118–119, 134, 136, 153 (recounting Plaintiffs' struggles to determine whether or when to provide an abortion pursuant to the Health or Fatal Fetal Anomaly Exception in cases of heart disease, deep vein thrombosis, severe hypertension, kidney disease, diabetes, sickle cell disease, asthma, cancer, epilepsy, rheumatologic diseases, Trisomy 13, and Trisomy 18, "among other dangerous health conditions.").[4]

Defendants' reliance on the appearance of some language from the Health and Fatal Fetal Anomaly Exceptions in other abortion bans is equally misplaced. *See* Defs' Br. 3. Those bans may differ meaningfully from South Carolina's Abortion Ban in ways that mitigate their vagueness. *Infra* 14 n.9. In any event, the fact that other states may also be violating the right to be free of unduly vague laws scarcely absolves South Carolina of its own obligation to comply with the Constitution.

Finally, although the question of severability, which is a question of remedy, *see United States v. Booker*, 543 U.S. 220, 245 (2005), is not currently before this Court, the Abortion Ban is not "wholly independent" of the Fatal Fetal Anomaly Exception, *Pinckney v. Peeler*, 434 S.C. 272, 288 (2021). Invalidation of the Ban as a whole is the appropriate remedy for its unconstitutional vagueness. *See, e.g.*, *Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 206 (1997), *abrogated on other grounds by Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022) ("[W]e conclude that the *medical emergency and medical necessity exceptions* are unconstitutional. Accordingly, we hold unconstitutional the Act's *post-viability ban* and regulations." (emphasis added)).

---

[4] The sheer range and uncertainty of the medical risks to Plaintiffs' patients and their pregnancies are why Plaintiffs have asked this Court for alternative relief for *categories* of serious medical conditions rather than *specific medical conditions*. *See* Compl. at 48.

<u>**STATEMENT OF FACTS**</u>

I.    **Plaintiffs Hold Sincere Religious and Conscientious Beliefs That Compel Them to Honor a Patient's Request To End A Pregnancy When It Threatens to Profoundly Harm Her**

Plaintiffs are five obstetrician-gynecologists ("OB-GYNs") who hold sincere religious and conscientious beliefs that command them to respect every person's inherent worth, help people in critical need, and place others before themselves. Compl. ¶¶ 16–17, 22, 26, 30, 33. That includes using their medical training to honor a patient's request to end a pregnancy that threatens to profoundly harm her. *Id.* ¶¶ 18–19, 23–24, 27–28, 30–31, 33–34. Plaintiffs seek to provide abortion care that their faith mandates. *Id.* ¶¶ 19, 24, 28, 31, 34.

A.    **Dr. Natalie Dawn Bingham**

Natalie Dawn Bingham, M.D., M.P.H., is a board-certified OB-GYN licensed to practice medicine in South Carolina since 2005. *Id.* ¶ 15. She provides sexual health, contraceptive, prenatal, labor, delivery, and abortion care to patients from throughout the state. *Id.*

Dr. Bingham is a life-long Christian and has been a Presbyterian since her marriage in 1998. *Id.* ¶ 16. Her faith commands her to respect others' ability to direct the course of their lives. *Id.* This includes not judging others for their values and choices and using her talents and resources to care for her fellow human beings. *Id.* ¶ 16–17. Dr. Bingham's faith informs her medical practice. *Id.* ¶ 18. She has always tried to empower her patients to make healthcare decisions consistent not only with evidence-based medicine, but also their values and wishes. *Id.* These decisions include the decision to end a pregnancy. *Id.*

B.    **Dr. Jane Doe**

Jane Doe, M.D., M.P.H., is a board-certified OB-GYN and Complex Family Planning specialist. *Id.* ¶ 20. She is licensed to practice medicine in South Carolina. *Id.* Dr. Doe provides sexual

health, complex family planning, routine gynecologic, prenatal, labor, delivery, and abortion care at an academic health center in Charleston to patients from throughout the state. *Id.*

Dr. Doe is a life-long committed Christian. *Id.* ¶ 21. She grew up attending church and currently belongs to the Grace Church Cathedral in Charleston, where she and her family are involved in a number of church activities. *Id.* Dr. Doe's faith commands her to serve others in a nonjudgmental, honest, and compassionate manner. *Id.* ¶ 22. This includes alleviating human suffering and maximizing justice in the world. *Id.* Dr. Doe's Christian convictions are what called her to obstetrics and gynecology and complex family planning. *Id.* ¶ 23. These religious convictions encompass her belief that she must provide abortion care in accordance with her patients' wishes and to alleviate their suffering. *See id.* ¶ 24.

### C.   Dr. Patricia Seal

Patricia Seal, M.D., is a board-certified OB-GYN and Complex Family Planning specialist. *Id.* ¶ 25. She is licensed to practice medicine in South Carolina. *Id.* Dr. Seal provides sexual health, complex family planning, prenatal, labor, delivery, and abortion care at an academic health center in Columbia to patients from throughout the state. *Id.* Dr. Seal is also the Medical Director of a health center in Columbia. *Id.*

Dr. Seal belongs to the Incarnation Lutheran Church, where she and her family are active members. *Id.* ¶ 26. The cornerstones of Dr. Seal's Christian faith are that God has entrusted each person with the ability to direct the course of their lives and that God extends unconditional acceptance, support, and love to every person. *Id.* Dr. Seal tries to follow Jesus's example in everything she does. *Id.* The opportunity to care for people and their families throughout their lives is what drew Dr. Seal to obstetrics and gynecology and complex family planning. *Id.* ¶ 27. Allowing

a patient to endure pain and suffering when Dr. Seal could use her medical training to avert it, including by performing an abortion, is anathema to her faith. *Id.*

### D. Dr. Jessica Tarleton

Jessica Tarleton, M.D., M.P.H., is a board-certified OB-GYN and Complex Family Planning specialist. *Id.* ¶ 29. She is licensed to practice medicine in South Carolina. *Id.* Dr. Tarleton provides hospital-based emergency gynecologic, prenatal, labor, and delivery care at a regional medical center in Florence to patients from throughout the state. *Id.*

Dr. Tarleton was raised by parents with Methodist and Catholic backgrounds who taught her strong values of ethical and altruistic living. *Id.* ¶ 30. She is working with her husband, who is Jewish, to raise their children in the Jewish tradition, instilling values of altruism, justice, and compassion in them. *Id.* Dr. Tarleton herself has a deeply held conscientious belief that she was put on this Earth to directly serve others, particularly marginalized, stigmatized, and underserved people. *Id.* This conviction is what drove her to practice medicine, obtain a Master's degree in global health, and focus on women's health. *Id.* Dr. Tarleton believes as a matter of conscience that having the knowledge, ability, and resources to provide abortion care obligates her to do so when an abortion is necessary to preserve a woman's health and well-being. *Id.*

### E. Dr. Katee L. Wyant

Katee L. Wyant, M.D., is a board-certified OB-GYN licensed to practice medicine in South Carolina. *Id.* ¶ 32. Dr. Wyant provides sexual health, cancer, contraceptive, infertility, prenatal, labor, delivery, and abortion care at a health center in Manning to patients from throughout the state. *Id.*

Dr. Wyant believes as a matter of conscience that the measure of a person's virtue is how they treat others. *Id.* ¶ 33. Thus, it is a conscientious imperative for her to provide the best possible

medical care to her patients. *Id.* Dr. Wyant also holds the conscientious belief that women are capable moral agents who should be trusted to make important decisions about their bodies, lives, and families. *Id.* For this reason, it is morally repugnant to her to impose choices on her patients, including whether to continue a pregnancy that threatens to seriously harm the patient or their future child. *Id.*

## II.  South Carolina Bans Abortion Early in Pregnancy Subject to Three Secular Exceptions

South Carolina's Abortion Ban criminalizes "perform[ing] or induc[ing] an abortion on a pregnant woman with the specific intent of causing or abetting an abortion" if an embryonic or "fetal heartbeat" has been detected on an ultrasound. S.C. Code Ann. §§ 44-41-630(B), 44-41-330(A). South Carolina defines "fetal heartbeat" as "cardiac activity, or the steady and repetitive rhythmic contraction of the fetal heart, within the gestational sac." *Id.* § 44-41-610(6).

A violation of the Ban is a felony, carrying penalties of not more than two years in prison, a fine of ten thousand dollars, or both. *Id.* § 44-41-630(B). The Ban also provides a civil cause of action, *id.* § 44-41-680(B), authorizes the South Carolina Attorney General or any prosecutor with jurisdiction to sue an abortion provider for injunctive relief, *id.* § 44-41-680(C)(3), (4), and directs professional licensing boards (such as the South Carolina Board of Medical Examiners or the Board of Nursing) to immediately revoke a physician's or other professionally licensed person's license, among other disciplinary measures, *id.* § 44-41-690.

### A.  Health Exception

South Carolina's Abortion Ban "does not apply" if, in a physician's "reasonable medical judgment" or "according to standard medical practice," the physician determines that the abortion is performed "to prevent the serious risk of a substantial or irreversible impairment of a major bodily function, not including psychological or emotional conditions." *Id.* § 44-41-640(B)(1).

The Ban identifies certain medical conditions "presumed" to "constitute a risk of death or serious risk of a substantial and irreversible physical impairment of a major bodily function," but notes that the list is not exhaustive. *Id.* § 44-41-640(C)(2). These conditions are: "molar pregnancy, partial molar pregnancy, blighted ovum, ectopic pregnancy, severe preeclampsia, HELLP syndrome, abruptio placentae, severe physical maternal trauma, uterine rupture, intrauterine fetal demise, and miscarriage." *Id.* South Carolina does not consider an abortion necessary if "performed based upon a claim or diagnosis that the woman will engage in conduct that she intends to result in her death or in a substantial physical impairment of a major bodily function." *Id.* § 44-41-640(B)(3); *see id.* § 44-41-610(9).

## B. Fatal Fetal Anomaly Exception

Nor is it a violation of South Carolina's Abortion Ban "if an abortion is performed or induced on a pregnant woman due to the existence of a fatal fetal anomaly." *Id.* § 44-41-660(A). South Carolina defines a "fatal fetal anomaly" as when, "in reasonable medical judgment, the unborn child has a profound and irremediable congenital or chromosomal anomaly that, with or without the provision of life-preserving treatment, would be incompatible with sustaining life after birth." *Id.* § 44-41-610(5). A physician must rely on "standard medical practice" to determine whether there is a "fatal fetal anomaly." *Id.* § 44-41-660(A).

## C. Rape or Incest Exception

Finally, South Carolina allows a physician to "perform, induce, or attempt to perform or induce an abortion" if the pregnancy was the result of rape or incest and "the probable gestational age of the unborn child is not more than twelve weeks" after the first day of the patient's last menstrual period ("lmp"). *Id.* § 44-41-650(A). The physician "must report the allegation of rape or incest to the sheriff in the county in which the abortion was performed" within 24 hours of

performing the abortion. *Id.* § 44-41-650(B). The report must include the name and contact information of the patient. *Id.*

## LEGAL STANDARDS

To survive a motion to dismiss, the Complaint need only contain "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The purpose of a Rule 12(b)(6) motion is to 'test the sufficiency of a complaint,' not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Bing v. Brivo Sys.*, 959 F.3d 605, 616 (4th Cir. 2020) (citation omitted). "Thus, when considering [Defendants'] motion to dismiss, [this Court] must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the [P]laintiff[s]." *Id.* Likewise, "[d]ismissal for lack of subject-matter jurisdiction [under Rule 12(b)(1)] . . . is proper only when the claim is so . . . completely devoid of merit as not to involve a federal controversy." *Brownback v. King*, 592 U.S. 209, 217 (2021) (cleaned up).

## I.     Plaintiffs State a Facially Plausible Vagueness Claim

A state law violates due process if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Importantly, context matters when evaluating a vagueness claim. *See Vill. of Hoffman Ests.*, 455 U.S. at 498–99. Criminal laws like South Carolina's Abortion Ban are subject to exacting scrutiny because "[t]he essential purpose of the 'void for vagueness' doctrine is to warn individuals of the criminal consequences of their conduct." *Jordan*, 341 U.S. at 230; *see Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). Likewise, vagueness concerns are heightened when a statute "threatens to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Ests.*, 455 U.S. at 499; *infra* 21–31.

Defendants misrepresent the vagueness standard, arguing that a law with a "plainly legitimate sweep" cannot be void for vagueness. Defs' Br. 15 (citation omitted).[5] But the Supreme Court has flatly rejected the theory that a law is constitutional merely because some conduct "clearly falls within [its] grasp." *Johnson v. United States*, 576 U.S. 591, 602–03 (2015). *Cf. City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) ("[E]ven if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague . . . ."). For example, a law that forbids grocers from charging an "unjust or unreasonable rate" is void for vagueness, "even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable." *Johnson*, 576 U.S. at 602–03 (citation omitted).

Here, the Health and Fatal Fetal Anomaly Exceptions fail to provide adequate notice of what they proscribe and permit, leaving Plaintiffs unable to "steer between lawful and unlawful conduct" and vulnerable to discriminatory enforcement. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972). As a result, they chill Plaintiffs from providing abortion care to patients who need it to preserve their health or those seeking to spare a child born with a fatal anomaly needless suffering, Compl. ¶ 5, rendering the Abortion Ban unconstitutionally vague and unenforceable. *See Vill. of Hoffman Ests.*, 455 U.S. at 494 n.6 ("[A]mbiguous meanings cause citizens to steer far wider of the unlawful zone than if the boundaries . . . were clearly marked." (cleaned up)).[6]

---

[5] The cases Defendants rely on for this standard do not involve vagueness challenges. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 202 (2008) (discussing a facial challenge in the context of a voting rights law); *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024) (discussing a facial challenge in the context of a First Amendment overbreadth claim). In any event, the Health and Fatal Fetal Anomaly exceptions have no "plainly legitimate sweep" because they "specif[y] no standard of conduct." *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016) (cleaned up); *infra* 12–21. Thus, they are unconstitutional no matter what standard this Court applies.

[6] In objecting to Plaintiffs' use of "ambiguous," *see* Defs' Br. 12 n.2, Defendants dwell on a distinction without a difference. Supreme Court cases confirm that ambiguity is often one of the features of an unconstitutionally vague law. *See, e.g.*, *Vill. of Hoffman Ests.*, 455 U.S. at 494 n.6;

### A. Health Exception

Plaintiffs state a plausible claim that two features of the Health Exception render South Carolina's Abortion Ban unconstitutionally vague: 1) "serious risk" is so standardless that it is very difficult to determine how likely an impairment must be to qualify, and 2) "substantial and irreversible impairment of a major bodily function" has no inherent meaning in medicine, leaving Plaintiffs with inadequate notice of which dangerous health conditions the Exception covers. *See* Compl. ¶¶ 111–31. Both features of the Health Exception therefore encourage discriminatory enforcement. *See id.* ¶¶ 122–124; *see Williams*, 553 U.S. at 304.

Although Defendants accuse Plaintiffs of relying on "hypothetical scenarios," Defs' Br. 12, their Amended Complaint identifies concrete examples rooted in Plaintiffs' years of medical practice to show the lack of clarity in the Health Exception. Plaintiffs refer to discrete categories of conditions to demonstrate the Abortion Ban's vagueness, including health conditions that: 1) cause extended and debilitating symptoms during pregnancy, 2) usually worsen during pregnancy and seriously threaten the patient's health during or after delivery, or 3) require treatments that would endanger the fetus, such that continuing the pregnancy would require forgoing the treatments. Compl. ¶¶ 113–14, 118–19. And the Amended Complaint contains specific examples of health conditions that fit within each category, including heart disease, deep vein thrombosis, kidney disease, diabetes, sickle cell disease, asthma, cancer, and many more. *Id.* ¶¶ 114, 118–19.[7]

---

*Colautti v. Franklin*, 439 U.S. 379, 393–94 (1979), *abrogated by Dobbs*, 597 U.S. 215 (2022). And Plaintiffs are abundantly clear that they assert a vagueness challenge. *See, e.g.*, Compl. ¶ 193.

[7] Defendants misrepresent Plaintiffs' request for relief. Defs' Br. 15. As an alternative to facial invalidation, Plaintiffs seek a limiting construction that would allow them to apply the Health Exception to patients with *specific categories of health conditions*. Compl. at 48. As Plaintiffs have alleged, the Health Exception's vague language makes it very difficult to determine whether it permits an abortion for patients with such conditions. *Id.* ¶¶ 113–14, 118–19. Therefore, Plaintiffs do not seek to replace the word "serious" with "severe." To the contrary, Plaintiffs' limiting

Plaintiffs' examples are exactly the kind that courts rely on as evidence of a statute's lack of clarity. *See, e.g.*, *Baggett v. Bullitt*, 377 U.S. 360, 370 (1964) (holding law requiring loyalty oath unconstitutionally vague because, for example, it was unclear whether it would "prevent a professor from criticizing his state judicial system . . ."); *Carolina Youth Action Project; D.S. by & through Ford v. Wilson*, 60 F.4th 770, 783 (4th Cir. 2023) (expressing concern that children playing in "a schoolyard during recess" could be considered "disorderly" under South Carolina's vague law). Unlike the hypothetical in *Hill v. Colorado*, the examples Plaintiffs identify are derived from their medical practice, not hypotheticals untethered from reality. *See* 530 U.S. 703, 733 (2000) (denouncing "hypertechnical theories as to what the statute covers, such as whether an outstretched arm constitutes 'approaching'"). Likewise, Defendants' reliance on cases where the plaintiffs' own conduct indisputably fit within a statute's allegedly vague terms is misplaced. *See* Defs' Br. 12; *Lumumba v. Kiser*, 116 F.4th 269, 285 (4th Cir. 2024). Plaintiffs have not violated the Abortion Ban; they filed this lawsuit because they are unable to apply the Ban's vague language to the heartbreaking medical conditions they regularly encounter.

Contrary to Defendants' arguments, the Health Exception is not constitutional merely because its terms can be defined in isolation. *See* Defs' Br. 15–16. The vagueness inquiry asks whether words in a statute are clear *in context* to the people they regulate and those tasked with enforcement. *See City of Chicago*, 527 U.S. at 57 ("[T]he vagueness that dooms this ordinance is not the product of uncertainty about the normal meaning of 'loitering,' but rather about what loitering is covered by the ordinance and what is not."). Because the Health Exception's terms lack a medical meaning, they are incomprehensible to physicians—the people most in need of clarity.

---

construction would allow them to provide abortions to patients whose health conditions are not clearly covered by the Exception's vague language.

*See* Compl. ¶¶ 118–121.[8] *See, e.g.*, *McCormack v. Herzog*, 788 F.3d 1017, 1031 (9th Cir. 2015); *abrogated by Dobbs*, 597 U.S. 215 (2022) (invaliding law because its words were not "terms of art with specific definitions in the medical context"). Likewise, because the Health Exception's words are not medical terms of art, they provide few guidelines for enforcement officers. *Carolina Youth Action Project*, 60 F.4th at 784 ("Lacking any meaningful standards, . . . officers deploy a glorified smell test.").

The terms in the Health Exception are "susceptible to numerous interpretations," *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274 (4th Cir. 2019), raising more questions than answers: How imminent must a risk be to be "serious"? How severe must an impairment be to be "substantial"? *See* Compl. ¶¶ 112–19. These terms necessarily involve subjective judgments that can result in widely divergent interpretations, and the Health Exception provides "no reliable way to choose between . . . competing accounts." *Johnson*, 576 U.S. at 598; *see Williams*, 553 U.S. at 306 ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.").[9] In fact, Defendants' dictionary definitions only emphasize the

---

[8] Defendants misread *United States v. Vuitch*, 402 U.S. 62 (1971). *See* Defs' Br. 17. There, the Supreme Court rejected a vagueness challenge to a law that allowed abortions "for the preservation of the mother's life or health," but only after giving "health" a broad interpretation that would cover "psychological as well as physical well-being." *Vuitch*, 402 U.S. at 72. The Court emphasized that "society's notions of the responsibilities of the medical profession" require doctors to have flexibility to promote patient well-being. *Id.* at 71. By contrast, the Health Exception constrains Plaintiffs by chilling them from providing an abortion even if they believe in good faith that an Exception applies. *Infra* 17–18. And despite their knowledge of the chilling effect of the law, Defendants have failed to provide clarity. Compl. ¶¶ 140–147.

[9] That abortion bans in other states use some of the same language proves nothing. *See* Defs' Br. 16–17. Some of these bans may differ from South Carolina's in ways that mitigate the bans' vagueness. For example, Alabama, Arizona, and Mississippi all allow physicians to provide abortion care in "medical emergenc[ies]" pursuant to their "good-faith clinical judgment." Ala. Code § 26-22-2(6); Ariz. Rev. Stat. § 36-2321(7); Miss. Code Ann. § 41-41-405(j). And providers in other

problem, as they are far too broad to provide sufficient guidance. *See Carolina Youth Action Project*, 60 F.4th at 783 (invalidating law where each term's definition underscored its lack of clarity).

*Wag More Dogs, Ltd. Liability Corp. v. Cozart*, 680 F.3d 359 (4th Cir. 2012), does not compel a different conclusion. In that case, the statutory definition of "sign" used language that "the ordinary person exercising ordinary common sense can sufficiently understand and comply with," and its meaning was further clarified by the word's relationship to other language in the statute. *Id.* at 371–72 (cleaned up). By contrast, the terms in the Health Exception provide "no principled standard at all" for determining whether many health conditions qualify.[10] *Cooper*, 842 F.3d at 843 (holding term "regularly scheduled" unconstitutionally vague because it was not clear how frequent a program must be to be "regular"). As in *Carolina Youth Action Project*, where the Fourth Circuit held that "interfere" and "disturb" "utter[ly] fail[ed] to describe the specific conduct covered by the statute," the Health Exception ties criminal culpability to "wholly subjective judgments." 60 F.4th at 786–87 (quoting *Williams*, 553 U.S. at 306).

For similar reasons, Defendants wrongly suggest that the Abortion Ban's inclusion of a discrete set of conditions "presumed" to meet the Health Exception, S.C. Code Ann. 44-41-640(C)(2), saves it from unconstitutional vagueness. The complex and often unpredictable field of medicine is simply not one of the "circumstances" where "[t]he existence of clear examples of

---

states have challenged other abortion bans based on the vagueness of their exceptions. *See, e.g.*, Am. Compl., *Johnson et al. v. Wyoming et al.*, 2023-CV-18853, ¶ 23 (9th Jud. Dist. Ct., Teton Cnty., Wyo. Mar. 21, 2023); Am. Compl., *Access Indep. Health Servs., Inc. et al. v. Wrigley et al.*, 08-2022-CV-01608, ¶ 70 (S. Cent. Jud. Dist., Burleigh Cnty., N.D., June 12, 2023).

[10] Defendants mistakenly cite two South Carolina statutes that use similar, but not identical, language as the Health Exception. *See* Defs' Br. 16 (citing S.C. Code Ann. §§ 44-66-40(A), 44-66-50). Unlike the Abortion Ban, neither statute carries criminal penalties, so they are subject to less stringent vagueness standards. *See Jordan*, 341 U.S. at 230. Even if that were not the case, the fact that similar language exists in another statute does not make the terms in the Health Exception any clearer. *See Vill. of Hoffman*, 455 U.S. at 498.

conduct covered by a law . . . insulate the law against an accusation of vagueness," *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011) (explaining that statutory examples "*may*, in certain circumstances" help create clarity (emphasis added)). The eleven conditions listed in South Carolina's Abortion Ban fail to provide any notice of how the Health Exception applies to the countless other medical scenarios that sometimes unexpectedly arise during pregnancy. *See supra* 4, 12; *Moyle v. United States*, 603 U.S. 324, 328 (2024) (Kagan, J., concurring) (describing many serious health conditions that arise "as a matter of medical reality" during pregnancy).

Nor does the fact that physicians sometimes disagree about the proper course of medical treatment indicate that the Health Exception overcomes the heightened standard of clarity for criminal laws that threaten a constitutional right. *See* Defs' Br. 14. Plaintiffs do not challenge the Health Exception because of the possibility of reasonable disagreements among physicians; they challenge it because its ambiguous and non-medical language gives prosecutors unbridled discretion to accuse them of acting unreasonably. Under the Health Exception, one physician's good faith belief that the Exception applies "could easily [be] second-guess[ed]" by "a prosecutor or Medical Board Members." Compl. ¶ 123. "In this area where there is such disagreement, it is unlikely that the prosecution could not find a physician willing to testify that the physician did not act reasonably." *Voinovich*, 130 F.3d at 205 (invalidating a similar health exception because "[t]he determination of whether a medical emergency or necessity exists . . . is fraught with uncertainty and susceptible to being subsequently disputed by others"). Likewise, that "some of the hospitals where Plaintiffs practice require multiple physicians to conclude that the Health Exception permits an abortion" highlights the difficulty that physicians have applying the Health Exception's terms to real medical diagnoses. Compl. ¶ 121.

The risks of prosecution and incarceration under the Abortion Ban distinguish this case from *Karlin v. Foust*, where the Seventh Circuit upheld a medical emergency exception to an abortion waiting period requirement that posed only civil penalties and potential monetary forfeiture. 188 F.3d 446, 464–68 (1999); *see Jordan*, 341 U.S. at 230. Unlike the law in *Karlin*, the Abortion Ban carries severe criminal penalties and is enforced by South Carolina state officials who have "historically targeted . . . abortion providers" and have "refused to address the chilling effects of the Abortion Ban's severe penalties." Compl. ¶¶ 124, 131.

Because physicians face criminal liability under South Carolina's Abortion Ban even when they act in good faith, *id.* ¶ 123, this case is more like *Voinovich* than *Karlin*. In *Voinovich*, the Sixth Circuit held that an abortion exception was unconstitutionally vague because, like the Health Exception, it lacked a scienter requirement. 130 F.3d at 204 ("[A] physician need not act wilfully (sic) or recklessly . . . in order to be held criminally or civilly liable.").[11] Plaintiffs allege that the threat of prosecution chills them from providing an abortion even if they believe a condition qualifies for the  Health Exception, and when they do provide an abortion, they are "frequently saddle[d] . . . with fear" that they could be held liable later. Compl. ¶ 129; *see Grayned*, 408 U.S. at 108 (explaining that an unconstitutionally vague law is a "trap [for] the innocent").

### B.    Fatal Fetal Anomaly Exception

Plaintiffs state a plausible claim that two terms in the Fatal Fetal Anomaly Exception—"incompatible" and "sustaining life"—render the Abortion Ban unconstitutionally vague. Compl.

---

[11] Defendants incorrectly take issue with Dr. Tarleton's allegation about a patient who was questioned by "[f]ive armed police officers" while miscarrying. Compl ¶ 130; *see* Defs' Br. 17–18. That example reinforces the serious threat of criminal investigation and prosecution physicians face under South Carolina's Abortion Ban. If "an isolated and baseless accusation" about a miscarriage can subject someone to criminal investigation in South Carolina, the threats to physicians who act under the Abortion Ban in good faith are even higher. Compl. ¶ 130.

¶¶ 132–55. As with the terms in the Health Exception, "incompatible" and "sustaining life" provide no meaningful standards to assess which fetal conditions qualify under the Fatal Fetal Anomaly Exception. *See Williams*, 553 U.S. at 304.[12] Both terms are susceptible to a wide variety of interpretations and raise many unresolved questions. How unlikely must life be for a condition to be "incompatible" with life? How long must life last to qualify as "sustain[ed]"? *See Manning*, 930 F.3d at 274 (invalidating law because the term "habitual" failed to provide "any principles or standards for determining how often or regularly" an act must be performed).

Although invalidating a law as vague may be "disfavored," Defs' Br. 20 (citation omitted), it is the proper remedy for a law that provides insufficient standards of interpretation. *See Voinovich*, 130 F.3d at 206. Here, Plaintiffs allege adequate facts to support their argument that the Fatal Fetal Anomaly Exception is unconstitutionally vague. They allege that "physicians in their reasonable medical judgment often disagree about when [fatal fetal anomalies] justify an abortion under the Fatal Fetal Anomaly Exception," and "[l]aw enforcement officials face the same uncertainty as Plaintiffs do." Compl. ¶¶ 137, 139. As with the Health Exception, the vagueness of the Fatal Fetal Anomaly Exception, coupled with its steep criminal penalties, often forces Plaintiffs to withhold abortion care even when they believe in good faith that a fetal diagnosis should qualify under the Exception. *Id.* ¶ 150.

The Exception's vagueness routinely chills Plaintiffs from providing abortions to patients diagnosed with fetal anomalies: 1) "likely to cause death within days, weeks, or months after

---

[12] Defendants erroneously accuse Plaintiffs of seeking unrealistic precision from a statute. *See* Defs' Br. 15–16. Not so. Plaintiffs are asking neither for perfect clarity nor precise guidance. Instead, they ask the Court to hold South Carolina's Abortion Ban to the high standard required of laws that impose criminal penalties and impinge on constitutional rights. *See Vill. of Hoffman Ests.*, 455 U.S. at 498. For the same reasons, Plaintiffs do not ask the Court to apply "abortion exceptionalism" in the vagueness context. Defs' Br. 13 (citation omitted).

birth," and 2) "that require a baby to undergo extensive surgeries or remain on life support to stay alive and for many parents, therefore preclude a meaningful life." Compl. ¶ 136. Defendants' rote recitation of dictionary definitions fails to clarify how Plaintiffs should apply the Exception in these scenarios. *See* Defs' Br. 19; *Carolina Youth Project*, 60 F.4th at 784. Both "incompatible" and "sustaining life" are "elastic" and subjective terms that can be interpreted differently by different people. *City of Chicago*, 527 U.S. at 59.[13] The high potential that abortion providers and enforcement officials will interpret the terms in the Fatal Fetal Anomaly Exception inconsistently renders the Abortion Ban unconstitutionally vague. *See, e.g.*, *Jordan*, 341 U.S. at 230.

Defendants try in vain to legitimize the Fatal Fetal Anomaly Exception by pointing to two starkly different fetal diagnoses: Down Syndrome and anencephaly. Defs' Br. 19–20. In doing so, Defendants attempt to make the difficult decisions physicians routinely face seem easy. But these examples merely prove the point. That anencephaly, a condition that is fatal in *all* cases,[14] qualifies under the Fatal Fetal Anomaly Exception is not disputed. Nor are Plaintiffs seeking clarity as to whether Down Syndrome, a condition that is not fatal, qualifies under the Exception. *See Johnson*, 576 U.S. at 602 ("[T]he existence of *some* obvious[]" applications of a statute does not render it constitutional.). But many conditions Plaintiffs encounter are not so easily assessed under the Fatal Fetal Anomaly Exception because of the uncertainty and complexities that are inherent to medicine, and pregnancy in particular. *Supra* 4, 18–19. These conditions may be very likely to cause death, but it is unclear whether death will occur within days, weeks, or months after birth. Compl.

---

[13] That two other states use similar language in their abortion bans is irrelevant to the vagueness inquiry in this case. Defs' Br. 19; *see supra* 4, 14 n.9.

[14] *See Anencephaly*, https://my.clevelandclinic.org/health/diseases/15032-anencephaly (last visited Apr. 14, 2025).

¶ 136. Or, like hypoplastic left heart syndrome, there may be a possibility for surgical treatment, but a slim chance of survival even after intervention. Compl. ¶ 141.[15]

As they do when discussing the Health Exception, Defendants ignore the serious criminal penalties physicians face if they provide an abortion under the Fatal Fetal Anomaly Exception that is later determined not to qualify. *Supra* 16–17. Dr. Seal's experience of being forced to turn away a patient whose fetus was diagnosed with Trisomy 13 illustrates the difficulty that physicians have interpreting the Fatal Fetal Anomaly Exception. Compl. ¶ 153. Although more than 90% of babies diagnosed with Trisomy 13 die before their first birthday, it is difficult to determine whether three months of life, for example, constitutes "sustain[ed] life." *Id.* Defendants' flippant assertion that Dr. Seal should have provided an abortion to her patient ignores the criminal stakes of the law and the likelihood that it will be arbitrarily enforced. *See* Defs' Br. 21.[16] And unlike the cases Defendants cite, *id.* at 20, this is not merely a one-off hypothetical, *see Dubin v. United States*, 599 U.S. 110, 132 n.10 (2023), but a real situation Plaintiffs face in their practice. Moreover, the suggestion that Dr. Seal's patient should have filed a lawsuit seeking an abortion immediately after learning devastating news about her fetus is cruel and overlooks an important element of third-party standing. *See* Defs' Br. 21; *Singleton v. Wulff*, 428 U.S. 106, 117 (1976) (holding that abortion patients

---

[15] Defendants' insistence that hypoplastic left heart syndrome can always be treated, Defs' Br. 20, belies the research, which demonstrates that some infants with the condition die soon after birth, and some do not survive surgical intervention. *See, e.g.*, Csaba Siffel et al., *Survival of Children with Hypoplastic Left Heart Syndrome*, PEDIATRICS (Oct. 2015), doi:10.1542/peds.2014-1427. It also contradicts the allegations in the Amended Complaint, which must be accepted as true at this stage of the litigation. *See* Compl. ¶ 141; *supra* 10.

[16] Defendants wrongly suggest that Plaintiffs misrepresent the gestational age cutoff in the Abortion Ban. Defs' Br. 21. Plaintiffs merely note that, because Dr. Seal's patient learned of the fetal diagnosis after a "fetal heartbeat" was detected, the only way an abortion could have been provided to her was under the unconstitutionally vague Fatal Fetal Anomaly Exception.

are hindered in their ability to raise their own interests in court "by a desire to protect the very privacy of [their] decision from the publicity of a court suit").

Finally, Defendants conflate Plaintiffs' vagueness and First Amendment claims when they argue that Plaintiffs seek to "impose their own views about which lives are 'meaningful' enough to protect." Defs' Br. 21–22. To the contrary, Plaintiffs resist Defendants' efforts to substitute *their* views for Plaintiffs' deeply held religious beliefs. *Infra* 27–29. Plaintiffs do not seek to define "meaningful" for their patients, but rather—in keeping with their faith—seek to effectuate their patients' wishes to "shield [their] child[ren] [born with a fatal anomaly] from pain, distress, and futile medical interventions." Compl ¶ 153. Plaintiffs refer to the ACOG guidance, which uses medical terms comprehensible to the physicians subject to the Fatal Fetal Anomaly Exception, *supra* 13–14, as an alternative basis for relief that would provide the clarity they need. *See id.* at 48. Although Defendants feel strongly about the underlying values of the Abortion Ban, *see* Defs' Br. 21–22, State interests, no matter how "weighty," "cannot justify legislation that . . . fail[s] to meet constitutional standards for definiteness and clarity." *Kolender*, 461 U.S. at 361.

## II.  Plaintiffs State a Facially Plausible Free Exercise Claim

### C.  The Free Exercise Clause Does Not Categorically Exclude Abortion from Its Ample Protections

The Free Exercise Clause provides that "Congress shall make no law ... prohibiting the free exercise" of religion, U.S. Const. amend. I, and the Supreme Court has held that the Free Exercise Clause applies to the states through the Fourteenth Amendment, *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly. It does perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance

of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Emp't Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)).

Defendants' claim that **"**[s]tates are free to regulate abortion without implicating Free Exercise" is fundamentally flawed. Defs' Br. 23. *Dobbs* held that states may prohibit abortion in most circumstances without violating the federal Constitution because a broad right to abortion is not rooted in the country's history and tradition. 597 U.S. at 231. *Dobbs* did not address whether a particular abortion ban impermissibly burdens anyone's personal religious beliefs, nor could it have. Relying on states' general authority to regulate abortion pursuant to *Dobbs*, as Defendants do, dodges a constitutional right "indispensable to life in a free and diverse Republic." Defs' Br. 23 ("States have therefore consistently regulated abortion from conception until birth."); *Kennedy*, 597 U.S. at 543. In fact, most religious freedom cases involve a challenge rooted in a plaintiff's particular convictions to a regulation that is lawfully applied to non-adherents. *See, e.g.*, *Fulton v. Philadelphia,* 593 U.S. 522, 526–28 (2021) (involving a city's generally lawful ability to refuse to contract with particular private agencies); *Burwell v. Hobby Lobby Stores,* 573 U.S. 682, 688–90 (2014) (involving an otherwise lawful mandate to provide health insurance coverage for contraceptives). Examining whether someone's free exercise claim is rooted in the country's history and tradition, as *Dobbs* did for the abortion right, and Defendants would have this Court do, makes no sense given the highly personal nature of a free exercise claim. Defs' Br. 23 ("There do not appear to be any cases even discussing the First Amendment and abortion until just a few years before *Roe.*"). At bottom, accepting Defendants' argument requires this Court to accept that the Supreme Court tacitly carved out an entire class of activity (abortion) and an entire class of people (anyone providing, facilitating, or obtaining an abortion) from the Free Exercise Clause's fulsome protections for the very first time.

Thus, Plaintiffs can prevail on their free exercise claim "by showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy*, 597 U.S. at 525. "Should [they] make a showing like that, th[e] Court will find a First Amendment violation unless the government can satisfy 'strict scrutiny.'" *Id.* (citation omitted).

A challenged law need not categorically prevent a claimant from practicing their faith to qualify as a burden on free exercise. In *Burwell*, for example, the Supreme Court treated the Hobson's choice between facilitating what the companies believed to be immoral conduct and bearing the economic costs of dropping insurance coverage as an infringement on the companies' religious liberty. 573 U.S. at 720. Similarly, in *Fulton*, the Supreme Court held that "putting [Catholic Social Services] to the choice of curtailing its mission or approving relationships inconsistent with its beliefs" burdened its religious exercise. 593 U.S. at 532. And in *Kennedy*, the Supreme Court held that a policy that prevented a football coach from praying at midfield after games—even though it allowed him to pray in nearby locations—infringed on his religious freedom. 597 U.S. at 514–18.

A law is not generally applicable if it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon*, 593 U.S. at 62. "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* "A law . . . lacks general applicability if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 593 U.S. at 534. In *Tandon*, for instance, the Supreme Court held that a measure purportedly intended to contain COVID-19 was not generally applicable because California limited the number of people who could gather for religious exercise in their homes to three households while permitting more than three households to gather in retail stores, hair salons,

indoor restaurants, and movie theatres. 593 U.S. at 63–64; *see Lukumi*, 508 U.S. at 543–44 (holding that a law supposedly intended to prevent animal cruelty was not generally applicable because it prohibited religiously-motivated killings while permitting hunting, the extermination of rodents, and the euthanasia of abandoned animals).

### B. Plaintiffs Have Sufficiently Alleged that South Carolina's Abortion Ban Burdens Their Sincere Religious Practice

Defendants concede that Plaintiffs hold sincere religious and conscientious beliefs that command them to respect every person's inherent worth, help people in critical need, and place others before themselves. *See* Defs' Br. 24; Compl. ¶¶ 15–34. Defendants also concede that this includes using their medical training to honor a patient's request to end a pregnancy that threatens to profoundly harm her. *See* Defs' Br. 24; Compl. ¶¶ 15–34.

Defendants are flatly wrong, however, that the Free Exercise Clause does not protect deeply held conscientious beliefs. In *Moore–King*, for example, the Fourth Circuit determined whether a plaintiff's "set of beliefs deserves constitutional protection as a religion" by analyzing whether "her beliefs occupy a place in her life 'parallel to that filled by the orthodox belief in God.'" 708 F.3d at 570–71 (quoting *United States v. Seeger*, 380 U.S. 163, 166 (1965)). Drs. Tarleton and Wyant, the only Plaintiffs who have alleged sincere conscientious rather than religious convictions, handily meet this standard because an "organizing principle . . . other than [themselves]" prescribes their conduct. *Id.* at 571; *see* Compl. ¶ 30 (alleging that Dr. Tarleton's "deeply held conscientious belief that she was put on this Earth to directly serve others . . . *drove her* to practice medicine, obtain a Master's degree in global health, and focus on women's health" (emphasis added)); Compl. ¶ 33 (alleging that "it is a conscientious *imperative* for [Dr. Wyant] to provide the best possible medical care to her patients" (emphasis added)).

As for the Abortion Ban's burden on Plaintiffs' free exercise, Plaintiffs have alleged that the Health and Fatal Fetal Anomaly Exceptions often chill them from providing abortion care to patients who need it to preserve their health and patients seeking to spare a child born with a fatal anomaly needless suffering. Compl. ¶ 5. Additionally, the Health Exception clearly excludes serious mental health conditions. *Id.* ¶ 157. Plaintiffs have also alleged that the Rape or Incest Exception prevents them from providing abortion care to most patients who became pregnant by rape or incest. *Id.* ¶ 6. Accordingly, South Carolina's Abortion Ban routinely forces Plaintiffs to deny an abortion to very sick, grieving, or traumatized patients for fear of criminal and professional penalties contrary to their deeply held religious beliefs. *Id.* ¶¶ 5–7. Ultimately, the Abortion Ban subjects Plaintiffs to the sort of Hobson's Choices held unconstitutional in *Fulton* and *Burwell. See Fulton*, 593 U.S. at 533; *Burwell*, 573 U.S. at 720. They can either practice their faith and risk imprisonment and loss of their medical license, or renege on their deeply held religious beliefs and preserve their freedom and livelihood.[17]

### C. Plaintiffs Have Sufficiently Alleged that South Carolina's Abortion Ban Is Not Generally Applicable

South Carolina's Abortion Ban is not generally applicable because it prohibits Plaintiffs from providing abortions that their religious convictions mandate while permitting people to end potential life, including perform abortions, for a wide variety of secular purposes.[18] *See Tandon*,

---

[17] Plaintiffs' Amended Complaint belies Defendants' claim that Drs. Bingham, Doe, and Seal "never allege that performing an abortion itself is the exercise of their religious beliefs." *See, e.g.*, Compl. ¶ 4 ("South Carolina's Abortion Ban does not allow physicians to provide abortion care mandated by their religious beliefs.").

[18] Defendants' reliance on *Roman Catholic Diocese of Albany v. Vullo*, and their corresponding discussion of individualized exemptions, is inapposite because Plaintiffs do not attribute the Abortion Ban's lack of general applicability to individualized exemptions. 242 N.E.3d 1174, 1182–83 (N.Y. 2024); Defs' Br. 26. *Vullo* is also distinguishable because "secular employees [had to]

593 U.S. at 64. That includes 1) abortions for any reason before fetal cardiac activity can be detected by ultrasound, S.C. Code Ann. § 44-41-630(B); 2) abortions necessary to prevent some health risks, *id.* § 44-41-640(B); 3) abortions for some fatal fetal anomalies, *id.* § 44-41-660; 4) abortions in some instances of rape or incest, *id.* § 44-41-650; and 5) IVF, Compl. ¶ 183.

Importantly, this "secular conduct . . . undermines [South Carolina's] asserted interest[]" in preserving potential life in ways that are "similar" to the abortions that Plaintiffs' faith compels. *Fulton*, 593 U.S. at 534. Put simply, every abortion ends a potential life, whether the abortion has secular or religious motivations. *See Tandon*, 593 U.S. at 63 (noting that the lower court "did not conclude that [secular] activities pose a lesser risk of [COVID-19] transmission than *applicants'* proposed religious exercise at home"). In 2023 alone, nearly 4,500 abortions occurred in South Carolina for any reason at or before six weeks of pregnancy pursuant to South Carolina's Abortion Ban. Compl. ¶ 182. Likewise, IVF patients ultimately have most of their embryos discarded after completing the process. *Id.* ¶ 183.

Thus, South Carolina has made a value judgment that secular (e.g., procreative) motivations for ending a potential life are important enough to overcome its asserted general interest in preserving it, but that religious motivations are not. *See Fraternal Order of Police Newark Lodge No. 12 v. Newark*, 170 F.3d 359, 366 (3d Cir. 1990) (holding that permitting police officers "to wear beards for medical reasons undoubtedly undermine[d] the [Police] Department's interest in fostering a uniform appearance through its 'no-beard' policy'" because "it indicate[d] that the Department ha[d] made a value judgment that secular (i.e., medical) motivations for wearing a beard

---

comply with the insurance mandate for medically necessary abortion services" at issue in the case. 242 N.E.3d at 1186.

are important enough to overcome its general interest in uniformity but that religious motivations are not").

Defendants' contention that South Carolina's Abortion Ban is generally applicable suffers from two flaws. First, laws do not have to target religion to lack general applicability. Defs' Br. 26–27. In fact, the portion of *Lukumi* that Defendants rely on specifies: "In this case we need not define with precision the standard used to evaluate whether a prohibition is of general application, for these ordinances fall well below the minimum standard necessary to protect First Amendment rights." 508 U.S. at 543. And by Defendants' own telling, *Tandon* did not hold that the measure at issue targeted the Plaintiffs' religious conduct. Defs' Br. 27 ("As a second illustration, during COVID, California's restrictions treated religious gatherings less favorably than secular gatherings (such as hair salons, retail stores, and movie theaters) despite the conduct being the same."). Other recent free exercise cases confirm that a law can lack general applicability without targeting religious practice. *See, e.g.*, *Fulton*, 593 U.S. at 537.

Second, each of Defendants' explanations for why South Carolina allows abortions for a particular secular purpose betrays a value judgment that a secular motivation for an abortion is important enough to overcome its asserted general interest in preserving potential life, but that a religious motivation is not.[19]

There is no dispute that abortions at five weeks of pregnancy, for example, or for certain fetal anomalies end potential lives, but the State has determined that prioritizing embryos or fetuses allegedly likely to be born is important enough to overcome its asserted general interest in

---

[19] Defendants' omission of IVF all but confirms that South Carolina has made an impermissible value judgment that procreative motivations for ending a potential life are important enough to overcome the State's asserted general interest in preserving potential life, but that religious motivations are not.

preserving potential life.[20] *See* Defs' Br. 27–28. Likewise, abortions for rape or incest survivors who are less than twelve weeks pregnant and able to make a police report undoubtedly end potential lives, but the State has determined that the trauma that these particular survivors suffer outweighs its asserted general interest in preserving potential life.[21] *See* Defs' Br. 27. And abortions for some serious health risks certainly end potential lives, but the State has determined that some patients' health is important enough to overcome its asserted general interest in preserving potential life. *See* Defs' Br. 28. Religious motivations for providing an abortion, however, are not important enough to overcome the State's asserted general interest in preserving potential life.

Defendants' discussion of the General Assembly's authority to make policy decisions is misplaced. *See* Defs' Br. 28–29. Legislatures can and do balance important interests all the time. What the Free Exercise Clause forbids is line-drawing that disfavors religious conduct that would not undermine the State's alleged compelling interest any more than the allowances it already makes. *See Fulton*, 593 U.S. at 534.

### D. South Carolina's Abortion Ban Fails Strict Scrutiny

Because South Carolina's Abortion Ban burdens Plaintiffs' sincere religious practice, but is not generally applicable, it is subject to strict scrutiny. *See Kennedy*, 597 U.S. at 532. "[S]trict scrutiny requires the State to further 'interests of the highest order' by means 'narrowly tailored in

---

[20] In any event, the General Assembly's assessment of the point at which a pregnancy is likely to result in a live birth is medically unsound. That point is generally understood as twenty weeks lmp. *See Understanding Second-Trimester Miscarriage*, UC Davis Health, https://health.ucda-vis.edu/obgyn/specialties/family-planning/early-pregnancy-miscarriage/second-trimester-miscar-riage.

[21] Defendants' discussion of the requirement that a rape or incest survivor report the incident to law enforcement is immaterial to whether South Carolina's Abortion Ban is generally applicable. *See* Defs' Br. 27–28. Plaintiffs' allegations about the requirement address how the Ban prevents them from providing abortion care to most rape or incest survivors contrary to Plaintiffs' faith. Compl. ¶¶ 171–73.

pursuit of those interests.'" *Tandon*, 593 U.S. at 65 (citation omitted). "That standard 'is not watered down;' it 'really means what it says.'" *Id.* Further, "broadly formulated interests justifying the general applicability of government mandates" are not considered compelling. *Gonzales*, 546 U.S. at 430–31. And "[i]t is established in [the Supreme Court's] strict scrutiny jurisprudence that 'a law cannot be regarded as protecting an interest "of the highest order" . . . when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Lukumi*, 508 U.S. at 547 (citation omitted); *see Gonzales*, 546 U.S. at 433 (holding that the federal Government failed to demonstrate a compelling interest in uniform enforcement of drug laws by barring a sect's sacramental use of hoasca in part because it allowed such use of peyote).

The question then is not, as Defendants claim, whether South Carolina has a compelling interest in preserving potential life generally, but whether it has a compelling interest in doing so by prohibiting the Plaintiffs from providing an abortion that their faith compels.[22] *See* Defs' Br. 29–30. The application of the Abortion Ban to Plaintiffs in circumstances governed by their faith cannot be regarded as protecting an interest in preserving potential life because the Ban leaves appreciable damage to that supposedly vital interest unprohibited. *See Lukumi*, 508 U.S. at 547. That includes allowing abortions for any reason before fetal cardiac activity can be detected by ultrasound; the Health, Fatal Fetal Anomaly, and Rape or Incest Exceptions; and IVF. *Supra* 26–28.

Likewise, South Carolina "does not mandate comprehensive sex education, which is associated with reduced rates of unintended pregnancy, and instead requires public schools to strongly stress abstinence." Compl. ¶¶ 190–91. Defendants neglect the simple truth that some people would

---

[22] Contrary to Defendants' assertion, Plaintiffs take "potential life" and "life of the unborn child" to mean the same things. *See* Defs' Br. 30.

not seek an abortion if they did not have an unintended pregnancy. *See* Defs' Br. 30. Moreover, South Carolina imposes a "family cap" on public benefits, meaning it denies additional cash benefits for families who have any children after their initial eligibility is determined. Compl. ¶ 190. The fact that lifting this cap would "not *guarantee* that unborn children will not be aborted" does not negate the fact that some people would not seek an abortion if they had the resources to care for a child. Defs' Br. 30 (emphasis added). And reducing implicit racial biases in pregnancy care would not only protect some women's lives, but also their pregnancies. *See* Compl. ¶ 191.

The Abortion Ban's underinclusiveness also betrays that it is not narrowly tailored. *See, e.g.*, *Burwell*, 573 U.S. at 731–732. Yet another reason that the Ban is not narrowly tailored is that it is overinclusive. It prevents abortions even when the fetus is not viable. Compl. ¶ 192.

### E. Plaintiffs' Free Exercise Claim and the Binding Precedent Underlying It Include an Effective Limiting Principle

Defendants' parade of horribles[23] rests both on a distortion of Plaintiffs' deeply held religious beliefs and free exercise doctrine. Plaintiffs' imperatives to empower their patients and alleviate human suffering are consistent with their commitment to medical ethics, which regard physician-assisted suicide as incompatible with the physician's role as healer.[24] *See, e.g.*, Compl. ¶ 152. And far from rejecting "any limit on when they can perform abortions," Plaintiffs seek to do so in narrow circumstances in which the rejection of their patients' inherent worth and the gravity of their patients' suffering is intolerable to their most cherished beliefs. *See, e.g.*, Compl. ¶ 126

---

[23] Defendants do not even try to explain why granting Plaintiffs relief on their free exercise claim would jeopardize polygamy bans, and certainly no more so than *Obergefell v. Hodges*, 576 U.S. 644 (2015). *See* Defs' Br. 31–32.

[24] Opinion 5.7 Physician-Assisted Suicide, AMA Code of Medical Ethics, https://code-medical-ethics.ama-assn.org/ethics-opinions/physician-assisted-suicide.

(alleging that denying an abortion to very sick patients sends them "the messages that they do not matter, their decision to end their pregnancy is wrong, and they are on their own").

More importantly, neither their free exercise claim nor the binding precedent underlying it involves a "per se rule that secular exceptions require religious exemptions" or that "all secular exceptions must be accompanied by unbridled religious exceptions." Defs' Br. 32–33. As case after case has demonstrated, the "limiting principle" is whether the challenged law's privileging of secular conduct over religious conduct "undermines the government's asserted interests" in a manner similar to the religious conduct. *Fulton*, 593 U.S. at 534.

Take Defendants' physician-assisted suicide example. Laws prohibiting killing typically exempt killing for self-defense or the defense of others, but not for religious reasons. *See, e.g.*, S.C. Code Ann. §§ 16-11-440(C) (authorizing deadly force if a person "reasonably believes it is necessary to prevent death or great bodily injury to himself or another person"). A free exercise challenge to such a law should fail because the law's privileging of secular conduct over religious conduct does not undermine the government's interest in protecting people's lives in a manner similar to the religious conduct. In fact, the secular exceptions *further* the government's interest in protecting people's lives.

## III.  Plaintiffs Have Standing to Assert Each Claim

Plaintiffs have standing to challenge the Abortion Ban because they have shown "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (internal quotations omitted). An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual

or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

"Establishing standing does not require that a litigant fly as a canary into a coal mine before she may enforce her rights." *Bryant v. Woodall*, 1 F.4th 280, 286 (4th Cir. 2021), *as amended* (June 23, 2021) (holding that abortion providers had standing in a pre-enforcement challenge to North Carolina's abortion laws). An "intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and "a credible threat of prosecution thereunder" is sufficient. *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

As Defendants concede, "[i]f at least one plaintiff has standing, the suit may proceed." *Biden v. Nebraska*, 600 U.S. 477, 489 (2023); Defs' Br. 11. Because Defendants admit that Drs. Bingham and Seal have standing to bring this lawsuit, there is no actual dispute as to this Court's jurisdiction. Defs' Br. 10.

In any event, all five Plaintiffs have alleged an injury in fact: South Carolina's Abortion Ban unconstitutionally forces them to choose between practicing their faith on the one hand and avoiding imprisonment and the loss of their livelihood on the other. *See* Compl. ¶¶ 102, 159, 197. It also fails to provide adequate notice or guidance for when Plaintiffs can provide an abortion for a severe health risk or fatal fetal anomaly. *Id.* ¶ 10. Plaintiffs have an "intention to engage in a course of conduct arguably affected with a constitutional interest," *Susan B. Anthony List*, 573 U.S. at 159, because they seek to provide abortion care in South Carolina in accordance with their

deeply held religious and conscientious beliefs and free from fear of prosecution and professional discipline, but the Abortion Ban prevents them from doing so.[25] Compl. ¶¶ 10–11.

Defendants miss the mark in asserting that Drs. Doe, Tarleton, and Wyant have not alleged that they have performed or would like to perform abortions that the Abortion Ban prohibits. *See* Defs' Br. 9. Although not required for standing, every Plaintiff except Dr. Tarleton has alleged that she provides abortions that South Carolina's Abortion Ban clearly permits. Compl. ¶¶ 15, 20, 25, 32. More importantly, Plaintiffs have alleged that they seek to provide abortions, consistent with their faith, in a broader range of circumstances than South Carolina's Abortion Ban clearly allows.[26] *See, e.g.*, *id.* ¶¶ 2, 5, 6, 11.[27]

---

[25] Despite Defendants' protestations, the meaning of "abortion care" is clear. *See* Defs' Br. 9. The Amended Complaint reflects that Plaintiffs seek to provide abortions that the Abortion Ban certainly prohibits or may prohibit and are not using "abortion care" to mean "a potentially sweeping term that encompasses far more than abortion." *See id.* at 9–10; Compl. ¶¶ 2, 5, 6, 11.

[26] Because Plaintiffs seek to provide the care at issue here, *Food & Drug Admin. v. All. For Hippocratic Med.*, 602 U.S. 367 (2024), has no bearing on their standing. In that case, the plaintiff physicians challenged the Food and Drug Administration's approval and regulation of mifepristone. But the plaintiffs in that case did not seek to prescribe mifepristone, and the agency actions they challenged did not require them to do or refrain from doing anything. *Id.* at 374.

[27] Plaintiffs do not have to provide "a record of what now-prohibited abortions they performed before the 2023 Act took effect." *See* Defs' Br. 10. No court requires this sort of heightened showing for standing. *Supra* 31–32. The case Defendants cite for this ill-founded assertion, *Coal. of MISO Transmission Customers v. FERC*, 45 F.4th 1004 (D.C. Cir. 2022), does not contradict this. That case did not review a decision on a motion to dismiss, and the Court applied a different injury in fact standard than the pre-enforcement standard that applies here. *Coal. of MISO Transmission Customers*, 45 F.4th at 1015 ("[T]o establish the type of injury that Article III requires for standing in this context, [Petitioner] need only show that (1) it 'was ready, willing and able to perform' the construction contracts for which it wished to compete, and (2) the challenged action 'deprived the company of the opportunity to compete for the work.'"). Nevertheless, the court did not require evidence of past bids to prove the company was ready, willing, and able to perform the work in question. *See id.* at 1015 ("It is undisputed that [Petitioner] is an active transmission development company 'that is qualified to participate in . . . [the] transmission process.'").

Plaintiffs also face a credible threat of enforcement. The Abortion Ban was enacted in 2023, and "laws that are 'recent and not moribund' typically do present a credible threat." *Bryant*, 1 F.4th at 286 (citation omitted). Additionally, "[w]hile this conversation [about abortion] rages around us, this court cannot say that the threat of prosecution to abortion providers who violate the law is not credible." *Id.* at 288. "Threat of prosecution is especially credible when defendants have not 'disavowed enforcement' if plaintiffs engage in similar conduct in the future." *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (citation omitted). Far from disavowing enforcement, Defendants have made it clear that they intend to enforce the Abortion Ban. *See, e.g.*, Defs' Br. 4.

Plaintiffs have also sufficiently alleged that their injury is "fairly traceable" to the challenged conduct. *See Lujan*, 504 U.S. at 560 (citation omitted). Plaintiffs' injuries are caused by the credible threat of Defendants enforcing South Carolina's Abortion Ban against them for providing abortions that their faith compels. *See supra* 25.

Lastly, Plaintiffs' injuries would be redressed by an order of this Court enjoining South Carolina's Abortion Ban and declaring it unconstitutional because that would allow Plaintiffs to provide abortion care in accordance with their deeply held religious beliefs.

## IV. Plaintiffs Have Requested Proper Relief

A request for improper relief is not a basis for dismissing a lawsuit. *See* Rule 54(c) (providing that every "final judgment" other than a "default judgment" "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings"). Even if it were, Defendants take no issue with the relief that Plaintiffs have requested on their free exercise claim. They do, however, incorrectly argue that this Court cannot grant the relief that Plaintiffs have requested on their vagueness claim because the relief is "jurisdiction-wide." Defs' Br. 34. The proper remedy for an unconstitutionally vague provision of a statute is enjoining enforcement

of the entire statute. *See, e.g.*, *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) ("This requirement of clarity in regulation . . . . requires the invalidation of laws that are impermissibly vague."); *Voinovich*, 130 F.3d at 206. Moreover, none of the cases that Defendants cite in support of their faulty argument involve a vagueness claim. *See* Defs' Br. 34.

Defendants also incorrectly assert that Plaintiffs' alternative relief is too broad because it would benefit every abortion provider in the state. But if Plaintiffs show that the Health and Fatal Fetal Anomaly Exceptions to South Carolina's Abortion Ban are unconstitutionally vague, which they will, Defendants lack the authority to enforce those provisions against anyone. Governmental officials lack the authority to enforce unconstitutional laws. *See Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) ("[O]ur precedent counsels that a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional.") (citation omitted).

Lastly, Plaintiffs' request for alternative relief on their vagueness claim is carefully crafted. It identifies specific categories of severe health risks and references medical practice guidelines. Compl. at 48. This belies Defendants' contention that the request is "vague." Defs' Br. 35. Plaintiffs' reference to "any circumstances in which the Ban's enforcement would be unconstitutional" simply acknowledges the discretion this Court has to fashion relief in response to evidence of a constitutional violation. *See N. Hess' Sons, Inc. v. Hess Apparel, Inc.*, 738 F.2d 1412, 1414 (4th Cir. 1984); Compl. at 48.

## **CONCLUSION**

For the reasons set forth above, the Court should deny Defendants' motion to dismiss. Counsel for Plaintiffs believe that oral argument would aid the deliberative process in this case and request that this Court grant oral argument.

Dated: April 14, 2025

Respectfully submitted,

*/s/ John L. Warren III*
William N. Nettles (Fed. ID No.: 6586)
bill@billnettleslaw.com
John L. Warren, III (Fed. ID No.: 12164)
jw@billnettleslaw.com
LAW OFFICE OF BILL NETTLES
2008 Lincoln Street
Columbia, SC 29201
Phone: (803) 814-2826

Rupali Sharma*
LAWYERING PROJECT
443 Western Ave., No. 1025
South Portland, ME 04106
Phone: (646) 490-1219
Fax: (646) 480-8622
rsharma@lawyeringproject.org

Paige Suelzle*
LAWYERING PROJECT
158 SW 148th Street, No. 1198
Burien, WA 98166
Phone: (347) 515-6073
Fax: (646) 480-8622
psuelzle@lawyeringproject.org

Allison Zimmer*
LAWYERING PROJECT
3157 Gentilly Blvd., No. 2231
New Orleans, LA 70122
Phone: (347) 515-6074
Fax: (646) 480-8622
azimmer@lawyeringproject.org

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*