IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| NATALIE DAWN BINGHAM, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> ALAN MCCRORY WILSON, in his official capacity as Attorney General of South Carolina, *et al.*, <br><br> *Defendants*, <br><br> and <br><br> HENRY DARGAN MCMASTER, in his official capacity as Governor of the State of South Carolina, <br><br> *Intervenor–Defendant*. | Civil Action No.: 2:25-cv-163-RMG <br><br> **REPLY IN SUPPORT OF MOTION TO DISMISS** |

Governor McMaster, Attorney General Wilson, and Solicitors Pascoe, Weeks, Burch, Newman, Barnette, Stumbo, Black, Hubbard, Clements, Wilkins, Richardson, and Brackett submit this Reply in support of their Motion to Dismiss (ECF No. 70).

**REPLY**

**I.     Three Plaintiffs lack standing.**

Although federal courts have long held that they "may not overlook" "threshold" questions of "jurisdiction," *Andrews v. Virginian Ry. Co.*, 248 U.S. 272, 274 (1919), Plaintiffs tellingly bury their standing argument at the end of their Responses, *see* ECF No. 81, at 38–41.[1] And they quickly say that "there is no actual dispute" over jurisdiction because (at least at this stage) Defendants

---

[1] Page cites are to the ECF-generated page numbers at the top of the page.

have not challenged that Bingham and Seal have standing. *Id.* at 39.

That rejoinder, however, ignores that "*each* party seeking to invoke the authority of the federal courts" must allege a "personal injury." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615–16 (1989) (emphasis in original). In other words, even if this case were to proceed, it could not do so with all five Plaintiffs.

Start with Tarleton. Plaintiffs concede she lacks an injury when they admit that she does not provide "abortion care." ECF 81, at 40. If she doesn't do that (assuming "abortion care" even means "providing abortions"), then there's no way that the 2023 Act can injure her.

For Doe and Wyant, the most Plaintiffs can muster—from their 50-page, 199-paragraph Complaint—are a few generalized paragraphs from the introduction. *See id.* (citing ECF No. 1, ¶¶ 2, 5, 6, 11). Those paragraphs offer no "plausible inference" that Doe or Wyant has suffered an injury-in-fact. *Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009). For one, these paragraphs speak only generally of "Plaintiffs." That provides no help when later each Plaintiffs details what she has done or intends to do. *Cf.* ECF No. 10, ¶¶ 15 (Bingham), 127 (Seal).

And for another, these paragraphs speak only of "abortion care." *Id.* ¶¶ 5, 6. In one of their more than two dozen footnotes, Plaintiffs try to brush aside the question of what "abortion care" means. ECF No. 81, at 40 n.25. But it's not at all obvious that "abortion care" must mean an abortion itself, particularly when the nation's largest abortion provider uses the term to include something as routine as pregnancy testing (which would happen even if a woman did not want an abortion). *See* Planned Parenthood, *Abortion Services* (last visited Apr. 25, 2025), https://tinyurl.com/2vejtnde. Doe or Wyant could have directly alleged that they had performed or intend to perform abortions that the 2023 Act prohibits. But they didn't—even though they are "the master[s] of the complaint." *Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025).

This case cannot proceed (if it proceeds at all) with Doe, Tarleton, and Wyant as parties. They cannot piggyback on someone else's standing to challenge a law they don't like but that does not harm them and with which they have only a generalized grievance.

## II.   The 2023 Act is not unconstitutionally vague.

At the start, it's important to clarify two things about facial challenges. *First* is the law governing them. Plaintiffs resist the "plainly legitimate sweep" language, ECF No. 81, at 17–18, but recent decisions confirm that is the correct standard. For instance, circuit courts continue to apply that standard on facial vagueness challenges. *E.g.*, *Fabrizius v. Dep't of Agric.*, 129 F.4th 1226, 1238 (10th Cir. 2025); *Thayer v. City of Chicago, Ill.*, 110 F.4th 1040, 1042 (7th Cir. 2024); *Diamond S.J. Enter., Inc. v. City of San Jose*, 100 F.4th 1059, 1068 (9th Cir. 2024). The Fourth Circuit recently applied it to other facial challenges. *See, e.g.*, *United States v. Canada*, 123 F.4th 159, 161 (4th Cir. 2024) (challenge to § 922(g)(1)); *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024) (challenge to a Maryland "assault weapons" law). And the Supreme Court used this language just last year in describing the bar a plaintiff must meet for facial challenges in cases "other" than facial First Amendment ones. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024).

On top of this caselaw, Plaintiffs overread snippets in *Johnson v. United States*, 576 U.S. 591 (2015). All that case said was that a law didn't have to be "vague[] in all its applications" to be unconstitutional and that "some conduct that clearly falls within the provision's grasp" isn't enough to save it. *Id.* at 602–03. That's not some doctrinal sea change. And it necessarily leaves in place a higher bar for a facial vagueness challenge than the "singular context" of First Amendment claims, which use the "lower[]" standard that a law may be struck down when its "unconstitutional applications substantially outweigh its constitutional ones." *Moody*, 603 U.S. at 724.

3

*Second* is that "facial challenges" are "hard to win" because they threaten the democratic process by "preventing duly enacted laws from being implemented in constitutional ways." *Id.* at 723. "[A] challenger must" therefore "prove that the statute is vague as applied to him." *Sessions v. Dimaya*, 584 U.S. 148, 220 (2018) (Thomas, J., dissenting) (collecting cases and explaining the limits of *Johnson*); *see also United States v. Hasson*, 26 F.4th 610, 618 (4th Cir. 2022) (explaining that Justice Thomas's dissent accurately describes Supreme Court precedent). So courts may not "speculate about hypothetical or imaginary cases" when deciding a facial challenge. *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008).

### A.     Maternal health exception

**1.** Plaintiffs complain that the exception does not use medical terms of art. *See* ECF No. 81, at 20–21. But they never point to a case requiring a legislature to do so. All a legislature must do to satisfy due process is define "what conduct is prohibited" "with sufficient definiteness that ordinary people can understand" it and do so in a way "that does not encourage arbitrary and discriminatory enforcement." *Sackett v. Env't Prot. Agency*, 598 U.S. 651, 680 (2023).

South Carolina has met that bar. Consider Plaintiffs' challenge to "serious." They have no rejoinder to Defendants' invocation of EMTALA (which uses "serious" not just once but *three* times). *See* ECF No. 70, at 15–16. And the best they can muster on state law is that those statutes don't impose criminal penalties, not that they are unclear. *See* ECF No. 81, at 22 n.10. Nor do Plaintiffs even try to explain how "serious" is vague. Of course, it's not—a point Plaintiffs confirm in the relief they seek. *See infra* p. 5.

As for "substantial and irreversible impairment of a major bodily function," Plaintiffs apparently reject Defendants' definition, *see* ECF No. 81, at 20, but (again) they never explain why they can't understand the exception or Defendants' explanation of it. They just summarily

say the statutory text is "incomprehensible to physicians." *Id.* Far from "plausible," that's a "conclusory" allegation that is "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681–82.

**2.** Plaintiffs say that the exception's presumed conditions don't provide any clarity. That argument suffers from at least two flaws. One, Plaintiffs fail to show how those conditions cannot be used as analogies for the "countless other medical scenarios" that they say can arise during pregnancy. ECF No. 81, at 23. No doubt, situations may vary, but the types of harm the presumed conditions cause illustrate what types of harms satisfy the maternal health exception. Contrary to Plaintiffs' protestations, this list does "help[] to insulate" the exception from a vagueness challenge. *URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011).

Two, Plaintiffs insist that, as an alternative to facial relief, they want the Court to add categories of conditions to this list. *See* ECF No. 81, at 19 & n.7. So despite Plaintiffs' other argument, a list may, in fact, be useful. In any event, Plaintiffs' proposed categories would encompass "many more" unnamed conditions that would satisfy the exception. *Id.* at 19. That hardly provides clarity, and Plaintiffs never articulate how their categories are any clearer than the statutory text. For instance, Plaintiffs don't say that "extended and debilitating symptoms" is a term of art or explain how "seriously threaten" in their requested relief is understandable but "serious risk" in the Act is unconstitutionally flawed. ECF No. 10, Prayer for Relief (C).

**3.** Plaintiffs fare no better when they claim the exception "gives prosecutors unbridled discretion to accuse them of acting unreasonably." ECF No. 81, at 23. Just look at the Act. It criminalizes acting with the "*specific intent* of causing or abetting an abortion if the unborn child's fetal heartbeat has been detected." S.C. Code Ann. § 44-41-630(B) (emphasis added). That's the mens rea requirement to convict an abortion provider under the Act. As for whether the maternal health exception applied, it's an objective inquiry. Nothing is exceptional about that. Parts of

5

criminal cases often involve "an objective test." *United States v. Smith*, 54 F.4th 755, 769 (4th Cir. 2022) (materiality of statement in a § 1001 charge); *see also, e.g.*, *State v. Douglas*, 411 S.C. 307, 328, 768 S.E.2d 232, 244 (Ct. App. 2014) ("the standard for evaluating whether an accused [in a murder case] had a reasonable belief that deadly force was necessary is an objective standard").

So too with abortion statutes. In fact, the medical exception in Wisconsin's law that the Seventh Circuit upheld was "an objective one," *Karlin v. Foust*, 188 F.3d 446, 464 (7th Cir. 1999), as are exceptions in other States, *e.g.*, Idaho Code Ann. § 18-8801(5). Plaintiffs thus get nowhere by suggesting that a medical exception must be exclusively subjective. (To be sure, there is a subjective component: An abortion provider must record her "*belief* that a medical emergency . . . existed." S.C. Code Ann. § 44-41-640(B)(2)(a) (emphasis added).)

It makes sense that the test includes an objective aspect. In the first place, it's necessary to accomplish the State's goals. Without an objective standard, pro-abortion providers could too readily find the exception met and undermine the State's goal of protecting unborn life. In the second, logic supports this conclusion. "Experts" will often disagree, but that disagreement cannot be the basis for rejecting objective standards generally. Were it enough, society could never have objective rules. Of course reasonable minds may disagree. Plaintiffs notably don't respond to the point that people often seek a second opinion about medical conditions and procedures. *See* ECF No. 70, at 14. And the 2023 Act's maternal health exception allows for that. *Cf. Karlin*, 188 F.3d at 464 (physicians might reasonably disagree on whether a medical emergency warrants an abortion). It just doesn't allow for anyone to *un*reasonably conclude that the exception applies.

**4.** Plaintiffs' protestations about hypotheticals also fall flat. *See* ECF No. 81, at 19–20. Plaintiffs don't refute Defendants' basic legal proposition: Facial challenges cannot be based on hypotheticals. *See* ECF No. 70, at 14. Instead, Plaintiffs say they have a long list of "specific

examples" of conditions in their Amended Complaint. ECF No. 81, at 19 (citing ECF No. 10, ¶¶ 114, 118–19). But that's not quite right. One of those conditions might come up one day, but Plaintiffs never alleged that those conditions have come up and made a Plaintiff believe an abortion was necessary but prohibited. Those paragraphs are, without more, hypotheticals. The only examples Plaintiffs included in their Amended Complaint were about a miscarriage (ECF No. 10, ¶ 130) and chronic kidney disease (ECF No. 10, ¶ 127), and Defendants have already explained how neither of those examples supports Plaintiffs' facial challenge. *See* ECF No. 70, at 17–18.

### B.  Fatal fetal anomaly exception

**1.** The text is clear. As Defendants explained, if a physician concludes that an unborn child will not be able to live after birth because of the chromosomal or congenital anomaly, then the exception applies. *See id.* at 19. Have no doubt, even if the 2023 Act specified some number of days, weeks, or months after birth by which the child would have to die for the exception to apply, as Plaintiffs suggest, Plaintiffs would still be here claiming that, for some conditions or some unborn children, they would not know whether the child would live that long. They are demanding a certainty that courts have never required in statutes. *See Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

Just as the text is clear, so too is Plaintiffs' dislike of it. They want permission to abort unborn children when a condition "may be very likely to cause death, but it is unclear" when death might happen. ECF No. 81, at 26. Take their comments about hypoplastic left heart syndrome. *See id.* at 27 & n.15. Just because every child with that condition may not survive after treatment, many will. *See* ECF No. 70, at 20. Plaintiffs' position is like saying there's no reason to treat cancer because that disease will still claim some lives, even though treatment would save others—in essence, if you can't save everyone, no reason to be required to save anyone.

Speaking of their dislike of the scope of this exception, Plaintiffs cannot rewrite their allegations to minimize their invocation of ACOG's "life-limiting conditions" standard. *See* ECF No. 81, at 28. That standard is far more permissive of abortion than the 2023 Act's bar of "incompatible with sustaining life after birth." S.C. Code Ann. § 44-41-610(5). Plaintiffs (and ACOG) would allow abortions for children who will live, but who might have an "extremely poor quality of life." ACOG Comm. Op. No. 786, *Perinatal Palliative Care*, at e85 (Aug. 22, 2019), https://tinyurl.com/4b5zd56a. But the State gets to set its policy. Not Plaintiffs or interest groups.

Plus, it's not clear how the ACOG standard would provide more clarity than the 2023 Act. For instance, how long is "long-term ex utero survival"? *Id.* How awful must a condition be to be a "severely morbid" one? *Id.* Or how miserable must a child be to have an "extremely poor quality of life"? *Id.* The same types of questions Plaintiffs ask of the fatal fetal anomaly exception can be asked just as—if not more—easily of their proposed standard. *See* ECF No. 81, at 25.

**2.** As for a facial challenge based on hypotheticals, Plaintiffs again come up short in response. They don't dispute that the only example in their Amended Complaint is Seal's patient whose unborn child had Trisomy 13. ECF No. 81, at 27. Instead, they complain that Defendants' suggestion that this patient bring an as-applied challenge was "cruel." *Id.* That's not exactly what Defendants said. They said that "Seal *or* her patient" could have sued if they lacked clarity. ECF No. 70, at 21 (emphasis added). To be sure, Plaintiffs are quick to assert that Seal may have had standing to bring that claim. *See* ECF No. 81, at 27–28. Whoever the plaintiff might have been, that case would have provided concrete facts to resolve a particular dispute, thereby avoiding the facial challenge that Plaintiffs admit is "disfavored." *Id.* at 25. This example may not be a hypothetical, but it is—in Plaintiffs' words—a "situation" (singular), *id.* at 27, that doesn't warrant "[h]astily resorting to vagueness doctrine" to resolve a facial challenge, *Dubin v. United States*,

599 U.S. 110, 132 n.10 (2023).

That's why Defendants' illustrations of anencephaly and Down Syndrome are important. *See* ECF No. 70, at 19–20. Those examples confirm the exception's plainly legitimate sweep. What Plaintiffs ask the Court to do is decide "hypothetical cases" about conditions without any specific facts about a particular unborn child or pregnancy. *Grayned*, 408 U.S. at 112. That's exactly what a court *cannot* do on a facial challenge. *See Schleifer by Schleifer v. City of Charlottesville*, 159 F.3d 843, 853 (4th Cir. 1998). Courts decide those hard cases "as those challenges arise." *Id.*

**III.    The 2023 Act does not violate Plaintiffs' Free Exercise right.**

**A.    Plaintiffs have not alleged a sufficient burden on religious exercise.**

No Plaintiff has gotten out of the starting blocks on a Free Exercise claim. Two haven't alleged a religious exercise, and three haven't alleged a sufficient burden on that exercise.

Begin with religious exercise. Tarleton and Wyant insist that the Free Exercise Clause protects their conscientious beliefs. ECF No. 81, at 31. They are wrong. That clause provides that "Congress shall make no law respecting an establishment of *religion*, or prohibiting the free exercise *thereof*." U.S. Const. amend. I (emphasis added). On its face, then, it's about *religion*.

That's why even the single case on which Plaintiffs rely does not help them. The paragraph after the one they quote makes that clear, when the Fourth Circuit noted "the distinction between a religion and a way of life." In *Moore-King v. County of Chesterfield, Va.*, 708 F.3d 560, 571 (4th Cir. 2013). Thus, seclusion based on religion (like the Amish) is constitutionally protected while seclusion based on "philosophical or personal" views (like Henry David Thoreau) is not. *Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972). More like Thoreau than the Amish, Tarleton and Wyant have not alleged "some organizing principle or authority other than [themselves] that prescribes [their] religious convictions." *Moore-King*, 708 F.3d at 571. They cite only their

9

"conscience." ECF No. 10, ¶¶ 30 Tarleton); 33 (Wyant). They therefore cannot prevail on a Free Exercise claim.

Though the other three Plaintiffs point to religion,[2] they have not alleged a sufficient burden on their religious exercise to state a claim. They contend that the 2023 Act "routinely forces them to deny an abortion to very sick, grieving, or traumatized patients," ECF No. 81, at 32, but their Amended Complaint confirms that performing the abortion itself is not the religious exercise. The religious exercise is "empower[ing]" others' choices about their bodies and lives, ECF No. 10, ¶ 18 (Bingham), "serv[ing] others in a nonjudgmental, honest, and compassionate manner," *id.* ¶ 22 (Doe), and "extend[ing] unconditional acceptance, support, and love to every person," *id.* ¶ 26 (Seal). Performing abortion, in other words, is not the actual religious exercise. Once again, Plaintiffs can do no better in response than pointing to a general paragraph from the beginning of their Amended Complaint, *see* ECF No. 81, at 32 n.17 (citing ECF No. 10, ¶ 4), but they continue to ignore the details in the Amended Complaint that explain their religious exercise in greater detail. Bingham, Doe, and Seal can still express all these things for patients, *cf.* ECF No. 10, ¶¶ 165, 176—and thereby exercise their religious beliefs—without performing abortions.

Confirming as much is Plaintiffs' response about the original meaning of the Free Exercise Clause. *See* ECF No. 81, at 28–31. While trying to sketch out how their abortion-related claims might fit within Free Exercise jurisprudence, what Plaintiffs don't say is telling: They never cite a case in which "performing abortions" is religious exercise. Understandably so. Taking another's life (or even, to use Plaintiffs' term, "potential life") would be a curious exercise that would lead to questions of whether that belief was "truly held." *United States v. Seeger*, 380 U.S. 163, 185

---

[2] Defendants didn't move to dismiss based on a lack of sincerity, but Defendants did not generally concede that point. Plaintiffs wrongly claim otherwise. *See* ECF No. 81, at 31.

(1965). So although the original understanding of the Free Exercise Clause may well exclude abortion-based claims, at the very least, that history undermines any assertion that "performing abortions" is, itself, a religious exercise.[3]

But even if Plaintiffs were bold enough to claim that "performing abortions" is their religious exercise, they overlook a critical fact: Pregnant women—not abortion providers—make the decision to end a pregnancy. No Plaintiff may ever perform an abortion without the pregnant woman's "voluntary and informed written consent." S.C. Code Ann. § 44-41-620. But under the 2023 Act, a pregnant woman may give that consent because she cannot lawfully choose to abort her unborn child after a fetal heartbeat exists, unless an exception applies. There is thus no "religious exercise" by Plaintiffs that could be burdened without that first—and impossible—step of a woman's consent.

B.     **The 2023 Act is neutral and generally applicable.**

When it comes *Smith*, Plaintiffs concede that the 2023 Act involves no discretionary decisions by government officials. *See* ECF No. 70, at 25–26; ECF No. 81, at 32 n.18. They argue instead that the Act permits abortion for secular reasons but not for religious ones, so the Act isn't generally applicable. *See* ECF No. 81, at 32–35. Their contention fails for several reasons.

---

[3] For two reasons, it's also hard to reconcile "performing abortions" as Plaintiffs' religious exercise with their attempt to avoid the physician-assisted-suicide hypothetical. First, they claim that a physician's role is a "healer." ECF No. 81, at 37. Fair enough. But it's impossible to be a "healer" for the unborn child because the abortion does not "heal" the child.
    Second, "physician as healer" is inapplicable when a patient has a terminal condition. By definition, the doctor cannot heal the patient because the patient's condition will result in death. In that situation and with their religious belief that they must not "reject[] . . . their patients' inherent worth" and help patients when "the gravity of their patients' suffering is intolerable," *id.,* how can assisting with that patient's desire to end his own life go against Plaintiffs' religious belief? That's how their Free Exercise claim here opens the door to countless other scenarios.
    And to clarify Plaintiffs' apparent confusion, Defendants never claimed that Plaintiffs would challenge polygamy. Defendants said that "someone else[]" might. ECF No. 70, at 31.

11

For starters, Plaintiffs strain to construe the 2023 Act as making "value judgment[s]" about the "secular motivation" for an abortion. *Id.* at 34. The 2023 Act, however, has nothing to do with "motivation." The circumstances in which a woman may obtain an abortion are based in fact: An unborn child does not yet have a fetal heartbeat. An unborn child suffers from a fatal fetal anomaly. A woman's life or health is seriously threatened by her pregnancy. Or a woman's pregnancy follows rape or incest. Whatever the situation, a woman's motivation for seeking an abortion might be religious or secular. But in all cases, the facts of her pregnancy will satisfy the Act's requirements for obtaining an abortion—or they will not. Her motivation is irrelevant.

And while Plaintiffs are quick to say that laws do not have "to target religion to lack general applicability," *id.*, they miss critical parts about cases like *Lukumi* and *Tandon*. Restaurants and hunters, for instance, did not have the same restrictions on disposing animal carcasses that the Santeria devotees did. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah.*, 508 U.S. 520, 543–45 (1993). And people could gather to watch a movie or listen to a concert with different rules than they could gather for Mass or in a synagogue. *See Tandon v. Newsom*, 593 U.S. 61, 63–64 (2021). Unlike those cases, nothing in the 2023 Act puts religious exercise at a disadvantage compared to secular activity. It's not as if a secular motivation (such as the concern about the cost of raising a child or a sudden divorce from the father) would allow for an abortion that a religious motivation would not. *Why* a woman seeks an abortion (or *why* a provider would perform an abortion) is irrelevant. That makes cases like *Lukumi* and *Tandon* inapposite, when *why* people killed an animal or assembled was the critical fact. *Cf. Liberty Univ., Inc. v. Lew*, 733 F.3d 72, 99 (4th Cir. 2013) (a law is neutral and generally applicable if it "has no object that infringes upon or restricts practices *because of* their religious motivation" (emphasis in original) (cleaned up)).

Plaintiffs' *Tandon* argument suffers from another flaw. *Tandon* instructs that activities

12

must be "comparable," which means looking at "the risks various activities pose" in relation to the government's interest. 593 U.S. at 62. Plaintiffs treat the narrow exceptions in the Act that permit some abortions as sufficient to justify the broad exception they seek because, they say, every abortion ends a life. ECF No. 81, at 33. In essence, they claim that if the State will allow an abortion for some reasons, it must allow any abortions for their religious one. But their desired exception would reach far broader than the 2023 Act, ending far more lives and doing so without the countervailing considerations of rape, incest, maternal health, or a child who cannot survive outside the womb.

Coming at this point from another angle, Plaintiffs never explain how the 2023 Act subjects them to "unequal treatment," which is what the Free Exercise Clause "protects religious observers" from. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 475 (2020). Plaintiffs can perform abortions under the same circumstances as nonreligious abortion providers. They are, in other words, no worse off than anyone else under the 2023 Act. What they demand, instead, is a special carveout to perform whatever abortions they want simply because the State has established a few narrow exceptions to its protection for unborn life after "vigorous debate and compromise." *Planned Parenthood S. Atl. v. State*, 440 S.C. 465, 485, 892 S.E.2d 121, 132 (2023).

On this front, Plaintiffs have nothing to say about the all-or-nothing implications of their Free Exercise claim. Their silence speaks volumes. If their "motivation" theory is correct, it means that any exception in a pro-life law would require a limitless religious exception. Plaintiffs point to no case that has ever held anything like that, nor do they explain how that tracks with "return[ing] the issue of abortion to the people's elected representatives." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 232 (2022).

Plaintiffs fare no better by pointing to IVF. *See* ECF No. 81, at 34 & n.26. IVF "is a

13

complex series of procedures that *can lead* to a pregnancy." *In Vitro Fertilization*, Mayo Clinic (last visited Apr. 28, 2025), https://tinyurl.com/r3t3e2me (emphasis added). It involves fertilizing an egg with a sperm by a professional in a lab, and then the embryo is implanted in a woman. *See id.* Only if that procedure is successful is the woman pregnant. South Carolina "has a compelling interest *from the outset of a woman's pregnancy* in protecting the health of the woman and the life of the unborn child." 2023 Act, § 1(3) (emphasis added). Unimplanted embryos mean that there is no pregnant woman, and these embryos cannot be born, as a child in a woman's womb can (and usually will once a heartbeat has been detected) be. IVF therefore provides an inapt analogy.

One last, brief point here: Plaintiffs don't even contend that the 2023 Act is unconstitutional if it is generally applicable. *Cf.* ECF No. 70, at 29 (explaining how the Act passes rational basis).

**C.     The 2023 Act survives strict scrutiny.**

Even if the Court were to apply strict scrutiny, Plaintiffs' Free Exercise claim still fails. To begin, Plaintiffs incorrectly frame the inquiry, trying to collapse compelling interest and narrowly tailored into a single step. *See* ECF No. 81, at 36. But courts have consistently taken a two-step approach. First, they consider whether the State has a compelling interest that it's trying to accomplish. And second, they analyze whether the challenged law is sufficiently targeted to that interest. *See, e.g.*, *ACLU v. Holder*, 673 F.3d 245, 253 (4th Cir. 2011) (concluding that the government has a "compelling interest in ongoing fraud investigations" and then "turn[ing] to whether [the challenged law was] narrowly tailored to serve that compelling government interest").

As for the first step, Plaintiffs never challenge the State's explanation that it has a compelling interest in both maternal health and the life of the unborn child. *See* ECF No. 70, at 29–30. But before leaving the compelling-interest question, one other point deserves mention. Plaintiffs' conflation of "potential life" and "life of the unborn child" as "mean[ing] the same

14

things" is wrong. ECF No. 81, at 36, n.22. According to South Carolina law, an unborn child is alive. She's just not born yet. It's not "potential life." It's "life." Plaintiffs may have a different worldview, but they cannot substitute their view for South Carolina law.

Turning to the second step, Plaintiffs briefly insist that other things—from comprehensive sex education to increased public benefits to reducing racial bias in healthcare—would keep "some people" from having abortions. *Id.* at 36–37. In other words, their misplaced policy argument implicitly concedes that these other steps would not be as effective at protecting unborn life as prohibiting certain abortions altogether. Nor do they justify their assumption about what people might do. California does those things but still has a high abortion rate. *See* ECF No. 70, at 31.

Plaintiffs also mention under- and overinclusiveness, but neither argument moves the needle. As for underinclusiveness, Plaintiffs' theory would force States to take an all-or-nothing approach to abortion. Courts have never demanded as much, and imposing such a requirement would deprive legislatures of the ability to deal with complicated and competing concerns. Plaintiffs rightly recognize that "[l]egislatures can and do balance important interests all of the time," but they are wrong that the South Carolina General Assembly has done so in a way that "disfavors [Plaintiffs'] religious conduct." ECF No. 81, at 35.

As for overinclusiveness, Plaintiffs say that the 2023 Act "prevents abortions even when the fetus is not viable." *Id.* at 37. That makes no sense. Viable means "capable of living." Merriam-Webster's (2025), https://tinyurl.com/ypwzsp2r. If an unborn child has a condition that "would be incompatible with sustaining life after birth" (in other words, that is not capable of living), S.C. Code Ann. § 44-41-610(5), then a mother may obtain an abortion, *id.* § 44-41-660(A).

## **CONCLUSION**

The Court should grant the Motion to Dismiss.

Respectfully submitted,

s/Thomas T. Hydrick  
Robert D. Cook (Fed. Bar. No. 285)  
*Solicitor General*  
J. Emory Smith, Jr. (Fed. Bar. No. 3908)  
*Deputy Solicitor General*  
Thomas T. Hydrick (Fed. Bar. No. 13322)  
*Asst. Dep. Solicitor General*  
Joseph D. Spate (Fed. Bar. No. 13100)  
*Asst. Dep. Solicitor General*  
Benjamin M. McGrey (Fed Bar No. 14374)  
*Asst. Dep. Solicitor General*  
OFFICE OF THE  
SOUTH CAROLINA ATTORNEY GENERAL  
1000 Assembly St.  
Columbia, South Carolina 29201  
(803) 734-4127  
rcook@scag.gov  
esmith@scag.gov  
thomashydrick@scag.gov  
josephspate@scag.gov  
benmcgrey@scag.gov  

*Counsel for Attorney General Wilson and Solicitors Pascoe, Weeks, Burch, Newman, Barnette, Stumbo, Black, Hubbard, Clements, Wilkins, Richardson, and Brackett*

s/Wm. Grayson Lambert  
Thomas A. Limehouse, Jr. (Fed. Bar No. 12148)  
*Chief Legal Counsel*  
Wm. Grayson Lambert (Fed. Bar No. 11761)  
*Chief Deputy Legal Counsel &*  
*Senior Litigation Counsel*  
Erica W. Shedd (Fed. Bar No. 13206)  
*Deputy Legal Counsel*  
Tyra S. McBride (Fed. Bar No. 13324)  
*Deputy Legal Counsel*  
OFFICE OF THE GOVERNOR  
South Carolina State House  
1100 Gervais Street  
Columbia, South Carolina 29201  
(803) 734-2100  
tlimehouse@governor.sc.gov  
glambert@governor.sc.gov  
eshedd@governor.sc.gov  
tmcbride@governor.sc.gov  

*Counsel for Governor McMaster*

May 5, 2025  
Columbia, South Carolina